**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

THE STATES OF MISSOURI, ARIZONA,
ARKANSAS, INDIANA, KANSAS,
MONTANA, NEBRASKA, OHIO,
OKLAHOMA, SOUTH CAROLINA,
TENNESSEE, and UTAH,

*Plaintiffs*,

v.

JOSEPH R. BIDEN, JR.,
in his official capacity as the President of
the United States of America;
ROBERT FAIRWEATHER, in his official
capacity as Acting Director of the Office of
Management and Budget;
CECILIA ROUSE, in her official capacity
as Chair of the Council of Economic
Advisers;
KEI KOIZUMI, in his official capacity as
Acting Director of the Office of Science
and Technology Policy;
U.S. ENVIRONMENTAL PROTECTION
AGENCY;
JANE NISHIDA, in her official capacity as
Acting Administrator of the Environmental
Protection Agency
U.S. DEPARTMENT OF ENERGY;
JENNIFER GRANHOLM, in her official
capacity as Secretary of Energy;
FEDERAL ENERGY REGULATORY
COMMISSION;
RICHARD GLICK, in his official capacity
as the Chairman of the Federal Energy
Regulatory Commission;
U.S. DEPARTMENT OF
TRANSPORTATION;
PETER BUTTIGIEG, in his official
capacity as Secretary of Transportation;
U.S. DEPARTMENT OF
AGRICULTURE;

No. _____

1

TOM VILSACK, in his official capacity as
Secretary of Agriculture;
U.S. DEPARTMENT OF THE INTERIOR;
SCOTT DE LA VEGA, in his official
capacity as Acting Secretary of the Interior;
U.S. BUREAU OF LAND
MANAGEMENT;
NADA CULVER, in her official capacity as
acting director of the U.S. Bureau of Land
Management; and
INTERAGENCY WORKING GROUP ON
SOCIAL COST OF GREENHOUSE
GASES, UNITED STATES
GOVERNMENT,

*Defendants*.

## NATURE OF THE ACTION

1.  Plaintiffs, the States of Missouri, Arizona, Arkansas, Indiana, Kansas, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, and Utah, bring this action to vindicate the structural separation of powers in the federal government, the most fundamental bulwark of our liberty. "Frequently," a threat to the separation of powers "will come before the Court clad, so to speak, in sheep's clothing…. But this wolf comes as a wolf."  *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

2.  Through Section 5 of Executive Order 13990, President Joseph R. Biden, Jr., has arrogated to the Executive Branch the unilateral power to dictate specific values for the "social costs" of greenhouse gases in virtually every regulatory program administered by the federal government. He has done so without any statutory or constitutional authority.

3.  Setting the "social cost" of greenhouse gases is an inherently speculative, policy-laden, and indeterminate task, which involves attempting to predict such unknowable contingencies as future human migrations, international conflicts, and global catastrophes for hundreds of years into the

2

future.  Assigning such values is a quintessentially legislative action that falls within Congress's exclusive authority under Article I, Section 1 of the Constitution.

4.  This quintessentially legislative policy has enormous consequences for America's economy and people.  In theory, the Biden Administration's calculation of "social costs" would justify imposing trillions of dollars in regulatory costs on the American economy every year to offset these supposed costs.

5.  In practice, President Biden's order directs federal agencies to use this enormous figure to justify an equally enormous expansion of federal regulatory power that will intrude into every aspect of Americans' lives—from their cars, to their refrigerators and homes, to their grocery and electric bills.  If the Executive Order stands, it will inflict hundreds of billions or trillions of dollars of damage to the U.S. economy for decades to come.  It will destroy jobs, stifle energy production, strangle America's energy independence, suppress agriculture, deter innovation, and impoverish working families.  It undermines the sovereignty of the States and tears at the fabric of liberty.

6.  The Biden Administration's calculation of such "social costs" of gases such as carbon dioxide and methane is also arbitrary and capricious.  Affordable and reliable methods of agricultural and energy production—which these actions would stifle—have global benefits that the Biden Administration studiously ignores.  Affordable food and energy production lift millions of people out of poverty, eliminate hunger, promote economic development and opportunity, create millions of jobs, enable innovation and entrepreneurship, encourage industry and manufacturing, promote America's energy independence, and create the conditions for liberty to flourish.  These benefits enrich the entire world, and yet the Biden Administration gave them little or no weight in its calculation of the "social cost" of carbon dioxide, methane, and nitrous oxide.

3

7.   The Biden Administration's actions violate the separation of powers by encroaching on the legislative power that is exclusively vested in Congress through Article I, Section 1 of the U.S. Constitution.  The power to regulate is the power to destroy, and our Constitution does not vest in the President the unilateral authority to regulate virtually every aspect of the American economy.

**PARTIES**

8.   Plaintiff State of Missouri is a sovereign State of the United States of America.  Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

9.   Eric S. Schmitt is the 43rd Attorney General of the State of Missouri.  Attorney General Schmitt is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests, or claims any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 270.060.

10. Plaintiff State of Arizona is a sovereign State of the United States of America.  Arizona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

11. Mark Brnovich is the Attorney General of Arizona.  Attorney General Brnovich has authority to "[r]epresent the state [of Arizona] in any action in a federal court." A.R.S. §41-193(A)(3).

12. Plaintiff State of Arkansas is a sovereign State of the United States of America.  Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

13. Leslie Rutledge is the Attorney General of Arkansas.  Attorney General Rutledge is authorized to bring legal actions on behalf of the State of Arkansas and its citizens.

14. Plaintiff State of Indiana is a sovereign State of the United States of America.  Indiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

4

15. Theodore E. Rokita is the Attorney General of Indiana.  Attorney General Rokita is authorized to bring legal actions on behalf of the State of Indiana and its citizens.

16. Plaintiff State of Kansas is a sovereign State of the United States of America.  Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

17. Derek Schmidt is the duly elected and sworn 44th Attorney General of the State of Kansas. Attorney General Schmidt is authorized to "prosecute and defend any and all actions and proceedings, civil or criminal, … in all federal courts, in which the state shall be interested or a party, and shall, when so appearing, control the state's prosecution or defense."  K.S.A. 75-702.

18. Plaintiff State of Montana is a sovereign State of the United States of America.  Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

19. Austin Knudsen is the Attorney General of Montana.  Attorney General Knudsen is authorized to bring legal actions on behalf of the State of Montana and its citizens.

20. Plaintiff State of Nebraska is a sovereign State of the United States of America.  Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

21. Douglas J. Peterson is the Attorney General of Nebraska.  Attorney General Peterson is authorized to bring legal actions on behalf of the State of Nebraska and its citizens.

22. Plaintiff State of Ohio is a sovereign State of the United States of America.  Ohio sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

23. Dave Yost is the Attorney General of Ohio.  Attorney General Yost is authorized to bring legal actions on behalf of the State of Ohio and its citizens.

24. Plaintiff State of Oklahoma is a sovereign State of the United States of America.  Oklahoma sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

25. Mike Hunter is the Attorney General of Oklahoma.  Attorney General Hunter is authorized to bring legal actions on behalf of the State of Oklahoma and its citizens.

26. Plaintiff State of South Carolina is a sovereign State of the United States of America.  South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

27. Alan Wilson is the Attorney General of South Carolina.  Attorney General Wilson is authorized to bring legal actions on behalf of the State of South Carolina and its citizens.

28. Plaintiff State of Tennessee is a sovereign State of the United States of America.  Tennessee sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

29. Herbert H. Slattery III is the Attorney General & Reporter of Tennessee.  Attorney General Slattery is authorized to bring legal actions on behalf of the State of Tennessee and its citizens.

30. Plaintiff State of Utah is a sovereign State of the United States of America.  Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

31. Sean D. Reyes is the Attorney General of Utah.  Attorney General Reyes is authorized to bring legal actions on behalf of the State of Utah and its citizens.

32. Collectively, the States of Missouri, Arizona, Arkansas, Indiana, Kansas, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, and Utah, are referred to herein as the "Plaintiff States."

33. Defendant Joseph R. Biden, Jr., is the President of the United States of America.  He issued Executive Order 13990 ("EO 13990," or "the Executive Order") on January 20, 2021, on which Defendants rely for authority to publish interim values for the "social costs" of carbon dioxide, nitrous oxide, and methane that all federal agencies are required to use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published.  He is sued in his official capacity.

34. Defendant Robert Fairweather is the Acting Director of the Office of Management and Budget, an office within the Executive Office of the President.  31 U.S.C. § 501.  Section 5 of EO 13990 makes him (and his successor) a co-chair of the interagency working group responsible for implementing and publishing the interim social cost of greenhouse gas rules.  He is sued in his official capacity.

35. Defendant Cecilia Rouse is the Chair of the Council of Economic Advisers, an entity within the Executive Office of the President.  15 U.S.C. § 1023.  EO 13990 makes her a co-chair of the interagency working group responsible for implementing and publishing the interim social cost of greenhouse gases.  She is sued in her official capacity.

36. Defendant Kei Koizumi is the acting Director of the Office of Science and Technology Policy, an office within the Executive Office of the President.  42 U.S.C. § 6611.  EO 13990 makes him (and his successor) a co-chair of the interagency working group responsible for implementing and publishing the interim social cost of greenhouse gases.  He is sued in his official capacity.  Eric Lander is the nominee for director and will assume office if confirmed by the U.S. Senate.

37. Defendant U.S. Environmental Protection Agency ("EPA") is a federal cabinet agency responsible for implementing and enforcing certain environmental statutes.  EPA is an executive agency and an agency within the meaning of 5 U.S.C. § 551(1).

38. Defendant Jane Nishida is the Acting Administrator of EPA.  Michael Regan has been nominated as Administrator of EPA and will assume office if confirmed by the Senate.  Nishida is sued in her official capacity.

39. Defendant U.S. Department of Energy ("DOE") is a federal cabinet agency responsible for implementing and enforcing certain energy-related statutes.  DOE is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 551(1).

7

40. Defendant Jennifer Granholm is the Secretary of Energy and the head of DOE.  She is sued in her official capacity.

41. Defendant Federal Energy Regulatory Commission ("FERC") is a federal agency within DOE.  FERC is responsible for implementing and enforcing certain energy-related statutes.  FERC is an agency within the meaning of 5 U.S.C. § 551(1).

42. Defendant Richard Glick is the Chairman of FERC.  He is sued in his official capacity.

43. Defendant U.S. Department of Transportation ("DOT") is a federal cabinet agency responsible for implementing and enforcing certain transportation-related statutes.  DOT is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 551(1).

44. Defendant Peter Buttigieg is the Secretary of Transportation and the head of DOT.  He is sued in his official capacity.

45. Defendant U.S. Department of Agriculture ("USDA") is a federal cabinet agency responsible for implementing and enforcing certain transportation-related statutes.  USDA is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 551(1).

46. Defendant Tom Vilsack is the Secretary of Agriculture and the head of USDA.  He is sued in his official capacity.

47. Defendant U.S. Department of the Interior ("DOI") is a federal cabinet agency responsible for implementing and enforcing certain statutes relating to the interior.  DOI is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 551(1).

48. Defendant Scott de la Vega is the Acting Secretary of the Interior and the head of DOI. Debra Haaland has been nominated as Secretary of the Interior and will assume office if confirmed by the Senate.  De la Vega is sued in his official capacity.

49. Defendant U.S. Bureau of Land Management ("BLM") is a federal agency within the U.S. Department of the Interior.  BLM is responsible for administering and enforcing certain statutes relating to federal lands.  BLM is an agency within the meaning of 5 U.S.C. § 551(1).

50. Defendant Nada Culver is the acting Director of BLM.  She is sued in her official capacity.

51. Collectively, Defendants EPA, Nishida, DOE, Granholm, FERC, Glick, DOT, Buttigieg, USDA, Vilsack, DOI, de la Vega, BLM, and Culver are referred to herein as the "Agency Defendants."

52. Defendant Interagency Working Group on Social Cost of Greenhouse Gases, United States Government ("Working Group") is a federal agency within the meaning of 5 U.S.C. § 551(1).

53. Collectively, Defendants Fairweather, Rouse, Koizumi, Nishida, Granholm, Buttigieg, Vilsack, de la Vega, and the Working Group are referred to herein as the "Working Group Defendants."

54. Each of the Agency Defendants is required, by the plain terms of Section 5 of Executive Order 13990, to adopt as binding and to employ in agency actions the interim values for the "social costs" of carbon dioxide, methane, and nitrous oxide promulgated by the Interagency Working Group created by that same Order, in their administration of federal regulatory programs, conduct of rulemaking proceedings, and other agency actions.

## JURISDICTION AND VENUE

55. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201(a).  The action arises under the U.S. Constitution (art. I, § 1, art. II, § 1), 5 U.S.C. §§ 702-703, and other federal

statutes.  This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

56. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies or officers sued in their official capacities.  The State of Missouri is a resident of this judicial district and a substantial part of the events or omissions giving rise to the Complaint occur within the Eastern District of Missouri.

57. The Plaintiff States bring this action to redress harms to their sovereign interests, their quasi-sovereign interests, their proprietary interests, and their interests as *parentes patriae*; and to vindicate their interests under 5 U.S.C. § 702.

58. This Court may grant declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 2201 and 2202, and its inherent equitable powers.

59. Divisional venue is proper in the Eastern Division under Local Rule 2.07(B)(3) as venue is based on the residency of Plaintiff the State of Missouri that resides throughout the State.

## GENERAL ALLEGATIONS

### I.        The Separation of Powers Is the Fundamental Bulwark of Liberty.

### A.  The Constitution Mandates Separation of Legislative and Executive Powers.

60. Article I, Section 1 of the Constitution vests the legislative power exclusively in the Congress of the United States: "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. CONST. art. I, § 1.

61. Article II, Section 1 of the Constitution vests executive power in the President: "The executive power shall be vested in a President of the United States of America."  U.S. CONST. art. II, § 1.  Article II does not vest legislative power in the President or the Executive Branch.

10

62. Article II, Section 3 of the Constitution provides that the President "shall take care that the laws be faithfully executed." U.S. CONST. art. II, § 3. This "Take Care" clause grants the President the power and duty to enforce the laws that Congress makes, not to make laws of his own.

63. The vesting clauses of Article I and Article II reflect the Founders' insights that "the legislative, executive, and judiciary departments ought to be separate and distinct," and that this separation is an "essential precaution in favor of liberty." THE FEDERALIST NO. 47 (Madison) (C. Rossiter ed. 1961), p. 301.

64. As Madison stated, "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty." *Id.*

65. "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny." *Id.*

66. "Were the federal Constitution … really chargeable with the accumulation of power, or with a mixture of powers, having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system." *Id.*

67. "It is the proud boast of our democracy that we have 'a government of laws and not of men.'" *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) (emphasis added) (quoting Part the First, Article XXX, of the Massachusetts Constitution of 1780).

68. This phrase "comes from Part the First, Article XXX, of the Massachusetts Constitution of 1780," which provides that "the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men." *Id.*

11

69. "The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government." *Id.*

70. "The purpose of the separation and equilibration of powers in general . . . was not merely to assure effective government but to preserve individual freedom." *Id.* at 727.

71. "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Id.* at 710.

72. "The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive, and judicial, to assure, as nearly as possible, that each Branch of government would consign itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983).

73. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *Id.*

**B.  The Separation of Powers Preserves the States' Role in Our System of Federalism.**

74. One critical purpose of the horizontal separation of powers among the three Branches of the federal government was to preserve the unique role of the States in our system of federalism.

75. The Constitution's "Great Compromise" on the horizontal separation of powers "allayed the fears of both the large and small states." *Chadha*, 462 U.S. at 950.

76. Regarding the separation of powers, "[t]he choices . . . made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked." *Chadha*, 462 U.S. at 959.

77. Indeed, "our government was designed to have such restrictions. The price was deemed not too high in view of the safeguards which these restrictions afford." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 613 (1952) (Frankfurter, J. concurring)).

78. The separation of powers prescribes that federal action result from "a step-by-step, deliberate and deliberative process." *Chadha*, 462 U.S. at 959.

79. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

80. For these reasons, "the composition of the Federal Government was designed in large part to protect the States from overreaching by Congress." *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 550-51 (1985).  This principle applies to overreaching by the federal Executive Branch as well.

81. "The records of the Convention and debates in the States preceding ratification underscore the common desire to define and limit the exercise of the newly created federal powers affecting the states and the people." *Chadha*, 462 U.S. at 959.

82. Thus, any encroachment by one Branch of the federal government on the authority of a separate, co-equal Branch threatens the independence and authority of the States in our system of federalism.  The concentration of power in a single Branch of the federal government undermines the States' separate power and authority within our federal system of vertical and horizontal checks and balances.

C.  **The Executive May Not Exercise Legislative Power Without a Valid Delegation.**

83. Any action of the Executive Branch must come from one of two sources of authority: (1) a valid delegation of authority by statute enacted by Congress, or (2) a direct exercise of one of the President's enumerated powers in Article II. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

84. Where "[t]here is no statute that expressly authorizes the President to take" an action, "[n]or is there any act of Congress … from which such a power can fairly be implied," the action is not authorized by an act of Congress. *Id.*

85. In the absence of such an express or implied authorization by act of Congress, "if the President had authority to issue the order he did, it must be found in some provisions of the Constitution." *Id.* at 587.

86. Article II confers no authority on the President to exercise any legislative function without a delegation of authority by statute enacted by Congress.

**II.** **The President's Executive Order on the Social Cost of Greenhouse Gases Violates the Separation of Powers.**

**A. Section 5 of EO 13990 dictates the adoption of binding values for the "social cost" of three greenhouse gases that must be used by all federal agencies.**

87. On January 20, 2021, President Biden issued Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis." 86 Fed. Reg. 7037 (attached as Exhibit 1).

88. Section 5 of EO 13990, entitled "Accounting for the Benefits of Reducing Climate Pollution," instructs all federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." 86 Fed. Reg. 7040.

14

89. Section 5(a) of EO 13990 provides that "[t]he 'social cost of carbon' (SCC), 'social cost of nitrous oxide' (SCN), and 'social cost of methane' (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions." *Id.*

90. Section 5(b) of EO 13990 provides that "[t]here is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the 'Working Group'). The Chair of the Council of Economic Advisors, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group." *Id.*

91. Section 5(b)(i) of EO 13990 provides that "[t]he Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council." *Id.*

92. Section 5(b)(ii)(A) of EO 13990 provides that "the Working Group shall … publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies ***shall*** use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." *Id.* (emphasis added). This provision mandates that all federal agencies "shall" use these interim values in regulatory actions as soon as they are promulgated. *Id.*

93. Thirty days from the date of EO 13990 fell on Friday, February 19, 2020.

94. Section 5(b)(ii)(B) of EO 13990 provides that "the Working Group shall … publish a final SCC, SCN, and SCM by no later than January 2022." *Id.*

95. EO 13990 cited no statutory authorization for its creation of the Working Group or its directive to the Working Group to set binding values for SCC, SCN, and SCM that "shall" be used by regulatory agencies administering statutes pursuant to statutory delegations of authority enacted by Congress.

96. Carbon dioxide, methane, and nitrous oxide are produced as by-products in many critical economic activities, including energy production, agricultural production, industrial production, transportation, construction, waste disposal, and many other processes. They are among the most common and prevalent by-products of human economic activity.

97. According to EPA, "[c]arbon dioxide enters the atmosphere through burning fossil fuels (coal, natural gas, and oil), solid waste, trees and other biological materials, and also as a result of certain chemical reactions (e.g., manufacture of cement). Carbon dioxide is removed from the atmosphere (or 'sequestered') when it is absorbed by plants as part of the biological carbon cycle." EPA, *Overview of Greenhouse Gases*, *at* https://www.epa.gov/ghgemissions/overview-greenhouse-gases. Carbon dioxide is also emitted when human beings and other respiratory organisms breathe.

98. According to EPA, "[m]ethane is emitted during the production and transport of coal, natural gas, and oil. Methane emissions also result from livestock and other agricultural practices and by the decay of organic waste in municipal solid waste landfills." *Id.* According to EPA, about 27 percent of methane emissions come from "enteric fermentation," *i.e.*, livestock manure and flatulence. About 30 percent of methane emissions come from "natural gas and petroleum systems." Methane is the principal component of natural gas.

99. According to EPA, "[n]itrous oxide is emitted during agricultural and industrial activities, combustion of fossil fuels and solid waste, as well as during treatment of wastewater." *Id.*

According to EPA, about 75 percent of nitrous oxide emissions come from "agricultural soil management activities, such as application of synthetic and organic fertilizers and other cropping practices, the management of manure, or burning of agricultural residues"—in other words, fertilizing crops. *Id.*

100.    The emission of these three gases is thus ubiquitous in human activity, especially agriculture and energy production.

101.    On February 26, 2021, the Working Group released its interim values for the social costs of carbon, methane, and nitrous oxide. *See* Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates Under Executive Order 13990* (Feb. 26, 2021) ("Interim Values") (attached as Exhibit 2).

102.    Although Section 5 of EO 13990 instructed the Working Group to elicit and receive input from the public and stakeholders in conducting its business, the Working Group did not elicit or receive comments or input from the public or stakeholders before publishing the Interim Values.

103.    The Interim Values define the "social cost of greenhouse gases (SC-GHG)" as "the monetary value of the net harm to society associated with adding a small amount of that GHG to the atmosphere in a given year." *Id.* at 2.

104.    According to the Working Group, "[t]he SC-GHGs are the theoretically appropriate values [for agencies] to use in conducting benefit-cost analyses of policies that affect GHG emissions." *Id.*

105.    In the Interim Values, the Working Group admits that the task of calculating the social costs of greenhouse gases is inherently speculative, and policy-laden, and indeterminate.

106.    For example, the Working Group admits that the task of making predictions about the future economic impact of climate change involves attempting to predict global "changes in net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services." *Id.* at 2.  According to the Interim Values, "[e]xamples of affected interests include … spillover pathways such as economic and political destabilization and global migration." *Id.* at 3.  In other words, this task involves attempting to predict such unknowable contingencies as the likelihood, frequency, scope, and severity of future international conflicts and human migrations for decades and centuries into the future—an inherently speculative task. *Id.*

107.    The Interim Values also admit that its calculations involve attempting to predict future developments in human technology and innovation, future mitigation strategies performed by the world's 195 nations, and global reductions in greenhouse gas emissions—another inherently speculative task. *See, e.g., id.* at 16 (considering the potential impact of "mitigation activities by other countries"); *id.* at 30 (noting that estimates reflect "incomplete treatment of adaptation and technological change").

108.    The Interim Values noted that "[b]enefit-cost analysis of U.S. Federal regulations have traditionally focused on the benefits and costs that accrue to individuals that reside within the country's national boundaries." *Id.* at 14.  But the Interim Values reflect a policy decision and value judgment to consider in their calculation the anticipated global effects of greenhouse gases, not just their anticipated effects within the United States. *See id.* at 14-16.

109.    Under the Working Group's approach, one critical factor in calculating the dollar value for the "social cost" of a greenhouse gas is the "discount rate." *See id.* at 16-22.

18

110.    The Working Group describes the "discount rate" as a percentage factor designed to calculate the net present value of the future anticipated damages from a marginal increase in emissions of a particular gas: "In calculating the SC-GHG, the stream of future damages to agriculture, human health, and other market and non-market sectors from an additional unit of emissions are estimated in terms of reduced consumption (or consumption equivalents).  Then that stream of future damages is discounted to its present value in the year when the additional unit of emissions was released." *Id.* at 17.

111.    The lower the percentage factor selected as the discount rate, the higher the current value calculated as the "social cost" of that gas.

112.    The Working Group notes that the selection of the discount rate has a critical impact on the dollar value actually selected as the current "social cost" of each gas: "Given the long time horizon over which the damages are expected to occur, the discount rate has a large influence on the present value of future damages." *Id.*

113.    The Working Group admits that the task of selecting a discount rate is highly indeterminate; indeed, in its own analysis, the Working Group calculates social costs at four different values using three different discount rates, and notes multiple other possibilities as well.

114.    The selection of a discount rate has an enormous impact on the dollar value actually calculated.  For example, the Working Group calculated the social cost of carbon at four different values using three different discount rates, which ranged from $14 per metric ton to $152 per metric ton, depending largely on the discount rate selected.  *Id.* at 5.

115.    The Working Group admitted that the choice of a discount rate involves policy and value judgments, not merely empirical predictions, howsoever speculative: "*the choice of a*

*discount rate … raises highly contested and exceedingly difficult questions of science, economics, ethics, and law*." *Id.* at 17 (emphasis added).

116.    The Working Group also noted that "the range of discount rates reflects both uncertainty and, at least in part, *different policy or value judgments*." *Id.* at 27 (emphasis added).

117.    According to the Working Group, the choice of a discount rate rests, in part, on value-laden factors such as "intergenerational ethical considerations," which must "be accounted for in selecting future discount rates." *Id.* at 3.

118.    The indeterminacy and value-laden nature of choosing a discount rate results in a wide range of potential values for the "social costs" of gases.  For example, estimates of the "social cost" of carbon dioxide in recent years have ranged from approximately $1-7 per metric ton to over $1000 per metric ton.  Using different discount factors, the Working Group provides 2020 values for the social cost of carbon dioxide at $14, $51, $76, and $152 per metric ton,[1] *id.* at 5, and it also notes other values used by other governmental authorities such as New York ($125 per metric ton) and Canada (135 and 440 Canadian dollars, or about $107 USD and $348 USD per metric ton).  *Id.* at 35.  Public reports indicate that the German government uses values as high as $820 per metric ton of carbon dioxide.  *See, e.g., Eight Priorities for Calculating the Social Cost of Carbon*, Nature (Feb. 19, 2021), *at* https://www.nature.com/articles/d41586-021-00441-0.

119.    Another group of commenters recently observed that "[r]ecent estimates of SCC range from approximately $10/tonne of CO2 to as much as $1000/tCO2."  Ricke et al., *Country-Level Social Cost of Carbon* (2018), *at* http://www.cobham-erc.eu/wp-content/uploads/2019/04/preprint_Ricke2018_country_level_scc.pdf.

---

[1] The figure of $152 is a representation of a certain portion of the probability distribution of the estimated values using a 3 percent discount rate.  *See id.*

120.     This wide range of estimated values for the "social cost" of carbon dioxide—from $1 to $1000 per metric ton—reflects the inherently speculative, indeterminate, and policy-laden nature of the task of assigning such values.

121.     The Interim Values calculate that the current "social costs" of carbon, methane, and nitrous oxide, at current rates of emission, are enormous.

122.     Among the range of values provided, the Interim Values provide the 3 percent discount rate as the baseline for agency calculations, but they also invite federal agencies to use smaller discount rates that will increase the calculation of the social cost of gases.

123.     According to the Working Group, under the 3 percent discount rate, the current "social cost" of carbon dioxide in 2020 is $51 per metric ton, the social cost of methane is $1,500 per metric ton, and the social cost of nitrous oxide is $18,000 per metric ton.  *Id.* at 5-6.  The Working Group emphasizes that it believes that these values "likely underestimate" the total social costs of those three gases.  *Id.* at 4.

124.     According to EPA, in 2019, the most recent year for which data is available, the United States emitted 5.274 billion metric tons of carbon dioxide, 660.1 million metric tons of methane, and 457.8 million metric tons of nitrous oxide.  EPA, *Draft Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2019* 2-3 tbl.2-1 (Feb. 12, 2021).[2]

125.     Assuming similar rates of emission between 2019 and 2020, using the Working Group's values for the "social costs" of these three gases, the total social cost of carbon in 2020 was approximately $269 billion, the social cost of methane in 2020 was approximately $990 billion, and the social cost of nitrous oxide in 2020 was approximately $8.24 trillion.  Collectively,

---

[2] For methane and nitrous oxide, the number is based on their "carbon dioxide equivalent," "which weight[s] each gas by its global warming potential . . . ."  EPA, *Draft Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2019* 3-1 n.1 (Feb. 12, 2021).

using to the Working Group's values at the principal discount rate of 3 percent, the collective social cost of all three gases in 2020 would be approximately $9.5 trillion.  This number gives some idea of the magnitude of the regulatory costs on the American economy that the Interim Values would justify.

126.     Moreover, the Working Group's report repeatedly indicates that it believes that these numbers "likely understate" the true costs of these gases, and suggests that the Working Group will arrive at higher numbers in future calculations.  Interim Values, at 31.  It also invites agencies to employ discount rates lower than 3 percent immediately, *id.* at 22, which would also increase the dollar values per ton assigned to such "social costs."

127.     The potential regulatory impact of such numbers is enormous.  These numbers are high enough to justify massive increases in regulatory restrictions on agricultural practices, energy production, energy use, or any other economic activity that results in the emission of such gases.  When agencies follow President Biden's directive that the agencies "shall" use these Interim Values in their rulemakings and other regulatory activities, the use of these numbers will inevitably result in more restrictive regulatory policies in innumerable areas.

128.     The use of such numbers necessarily entails a great expansion of the scope and reach of the federal government's regulatory power, reaching into every aspect of everyday life.  One commentator described this "social cost" as "the most important number you've never heard of," and noted that the number "helps determine the stringency of federal regulations governing cars, trucks, power plants, refrigerators, microwave ovens, washing machines, vending machines and much more."  Cass Sunstein, *Biden Climate Regulation Is About to Get Tougher*, BLOOMBERG OPINION (Jan. 26, 2001), *at* https://www.bloomberg.com/opinion/articles/2021-01-26/biden-climate-regulation-to-get-boost-from-carbon-cost.   "Because federal agencies often base their

22

decisions on cost-benefit analysis, a high social cost of carbon means aggressive regulation of greenhouse gas emissions." *Id.*

129.　　On information and belief, the potential cost to the U.S. economy, including lost GDP, from increased regulations justified by the "social costs" in the Interim Values will be in the hundreds of billions or trillions of dollars in upcoming years and decades.  These costs will impact every household in the America, including every household in the Plaintiff States.

**B.  Section 5 of EO 13990 exercises quintessentially legislative powers.**

130.　　Regardless of what one thinks of the underlying calculations, dictating binding values for the "social cost of carbon," "social cost of nitrous oxide," and "social cost of methane" for use in federal regulatory programs is a quintessentially legislative action that the Constitution vests exclusively in Congress through the vesting clause of Article I, § 1 of the Constitution.

131.　　In issuing Section 5 of Executive Order 13990, the President did not purport to exercise any authority expressly or impliedly granted by an Act of Congress.

132.　　EO 13990 did not cite any statute purporting to authorize the President's directive creating the Working Group and instructing it to adopt binding values for the "social cost of carbon," "social cost of nitrous oxide," and "social cost of methane."  No such statute exists.

133.　　Moreover, any action by the Executive Branch setting binding values for SCC, SCN, and SCM that was taken pursuant to a delegation of authority from Congress would be subject to the requirements of the Administrative Procedure Act.

134.　　EO 13990 did not purport to comply with those procedures, so the Executive Branch does not purport to be exercising authority pursuant to a statutory authorization by Congress in Section 5 of EO 13990.

135.    Likewise, in issuing the Interim Values, the Working Group did not purport to comply with the Administrative Procedure Act.  Among other things, the Working Group did not provide any opportunity for notice and public comment before promulgating the Interim Values.

136.    Section 5 of EO 13990, and the Working Group's promulgation of the Interim Values, are also not valid exercises of any power vested in the President by Article II of the Constitution.

137.    "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.  And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.  The first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States.'"  *Youngstown*, 343 U.S. at 587-88 (quoting U.S. CONST. art. I, § 1).

138.    Thus, setting values for the "social cost" of greenhouse gases to be used in the administration of various federal statutes "is a job for the Nation's lawmakers," if anyone.  *Id.* at 587.

139.    "The Constitution did not subject this law-making power of Congress to presidential … control."  *Id.*

140.    Section 5 of EO 13990 "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."  *Id.*  This violates the separation of powers by encroaching on the exclusive authority of the Legislative Branch.  *See id.*

24

141.     "The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times."  *Id.* at 589.

**C. The adoption of the Interim Values violates other federal statutes and the Administrative Procedure Act.**

142.     In promulgating the Interim Values, the Working Group failed to comply with the procedural and substantive requirements of the Administrative Procedure Act ("APA").

143.     Despite being instructed to do so by the Executive Order, the Working Group did not seek input from stakeholders or the public, and did not provide any public notice or opportunity to comment, before promulgating the Interim Values.  In doing so, it violated both the Executive Order and the APA.

144.     In promulgating the Interim Values, the Working Group adopted and relied heavily on analysis performed by a prior version of the Working Group during the Obama Administration, and the Working Group ultimately adopted the numbers promulgated by its predecessor in August 2016, adjusted for inflation.

145.     In doing so, the Working Group replicated the errors of that prior analysis conducted during the Obama Administration, which was arbitrary, capricious, unreasonable, and contrary to law.

146.     Among other things, the Working Group's analysis failed to consider important aspects of the problem because it declined to give any weight, or proper weight, to the positive externalities associated with affordable and reliable domestic energy and agricultural production. Such cheap and reliable production results from processes that emit carbon dioxide, methane, and nitrous oxide as byproducts.  Such production lifts millions of people out of poverty and hunger, promotes economic development, creates millions of jobs, enables innovation and entrepreneurship, prevents international conflict, encourages industry and manufacturing,

25

promotes America's energy independence, and creates the economic conditions for liberty to flourish.

147.     On information and belief, the Working Group gave little or no weight to these positive externalities, and thus it "failed to consider important aspects of the problem" before it. *Dep't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1910 (2020) (alterations and citation omitted).  For example, while the Working Group directed agencies to evaluate costs on a global scale, it provided no guidance about whether benefits—such as the one discussed above—should be similarly evaluated or otherwise included those benefits in its calculation of costs.  That failure means the Working Group's analysis scales up the costs of emissions without a similar scaling up of their benefits.

148.     Nor did the Working Group consider whether "there was 'legitimate reliance' on the" prior administration's method of focusing on domestic effects and using higher discount rates. *Dep't of Homeland Security v. Regents of the University of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  That was arbitrary and capricious; where, as here, "an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting another source)).

149.     The Working Group's adoption of the analysis performed by its predecessor was arbitrary and capricious on other grounds as well, in that it mischaracterized the scientific models on which it was based, failed to adequately justify its selection of a discount rate, failed to adequately justify its consideration of global effects, and suffered from other similar deficiencies in explanation and methodological problems.

III.    **The Executive's Violation of the Separation of Powers and Other Laws Inflicts Grave Injuries on the Plaintiff States and Their Sovereign, Quasi-Sovereign, and Proprietary Interests.**

150.    The Working Group's adoption of binding values for the "social cost" of carbon, nitrous oxide, and methane, for use in all federal regulatory programs for which they are relevant, gravely injures the Plaintiff States in their sovereign, quasi-sovereign, and proprietary capacities, as well as depriving them of opportunities to provide input and comment prior to adoption of the Interim Values.

151.    Preserving the unique authority and role of the States in our federal system was a critical purpose for the Constitution's adoption of the horizontal separation of powers.  Actions by the federal Executive Branch that encroach on the authority of Congress undermine the separate authority and role of the States in our system of federalism, thus injuring them in their sovereign capacities.

152.    Federal regulations promulgated employing the Interim Values will preempt conflicting state regulations under the Supremacy Clause, and thus the promulgation of the Interim Values directly encroaches on the States' authority by limiting their scope of authority in areas subject to traditional state regulation.

153.    For example, the Plaintiff States have traditionally regulated agriculture within their borders, in the interests of their citizens and farmers.

154.    The Interim Values authorize federal agencies to engage in a great expansion of federal regulatory authority over agricultural practices, directly encroaching on the Plaintiff States' sovereign authority to regulate agriculture within their borders.  For example, as noted above, using the Interim Values, the "social cost" of America's methane emissions in 2020 (assuming 2019 emission rates and a 3 percent discount rate) was $990 billion.  According to EPA,

27

approximately 27 percent of methane emissions come from agriculture's "enteric fermentation"—*i.e.*, manure and flatulence from livestock such as cattle, pigs, sheep, goats, and chickens.  Thus, using the Interim Values, the "social cost" in 2020 of raising livestock to produce basic food staples such as meat, milk, eggs, chicken, butter, and cheese was approximately $268 billion.  This number effectively authorizes a massive expansion of federal regulatory restrictions on the raising of livestock, directly encroaching on an area of traditional state regulation.

155.      Likewise, using the Interim Values, the "social cost" of nitrous oxide in 2020 (assuming 2019 emission rates and the 3 percent discount rate) was $8.24 trillion.  According to EPA, approximately 75 percent of nitrous oxide emissions in the U.S. come from "agricultural soil management, such as application of synthetic and organic fertilizers and other cropping practices, the management of manure, or burning of agricultural residues"—*i.e.*, fertilizing crops.  Thus, using the Interim Values, the "social cost" inflicted upon the world by America's farmers fertilizing their crops in 2020, according to the Biden Administration, was about $6.2 trillion.  Again, this number authorizes a massive expansion of federal regulatory restrictions on fertilizing and growing crops, directly encroaching on an area of traditional state authority.

156.      The Interim Values create an expansion of federal regulatory authority in other areas of state authority as well.  For example, the Plaintiff States have traditionally regulated energy production, transportation, and use within their borders.  According to EPA, approximately 30 percent of America's methane emissions come from "natural gas and petroleum systems."  This is unsurprising because "[m]ethane is the primary component of natural gas.  Methane is emitted to the atmosphere during the production, processing, storage, transmission, and distribution of natural gas and the production, refinement, transportation, and storage of crude oil."  EPA, *Overview of Greenhouse Gases*, *supra*.  Thus, using the Interim Values, the "social cost" of

methane emissions in 2020 from "natural gas and petroleum systems" was approximately $294.9 billion.   This number authorizes a major expansion of federal authority over production, transportation, and use of basic energy sources, again at the expense of the States' traditional authority.

157.    The Working Group's Interim Values encroach on state sovereignty in numerous other areas of traditional state regulation as well.

158.    An academic review in 2017 identified "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] have used the SCC or SCM in their analyses," including by Defendants EPA, DOE, DOT, DOI, and USDA, through mid-2016. Howard & Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219-20 & appx. A (2017); *see also* Ex. 3 (Appendix A to Howard & Schwartz, which is herein incorporated by reference).  These regulatory actions include many regulatory actions that directly affect the Plaintiff States in their sovereign capacities and traditional areas of state regulation.

159.    Appendix A to Howard & Schwartz indicates that, through mid-2016, the "social cost" of greenhouse gases had been used in adopting federal regulations, policies, and regulatory actions related to vending machines, light trucks, dishwashers, dehumidifiers, microwave ovens, kitchen stoves, clothes washers, small electric motors, residential water heaters, ozone standards, residential refrigerators and freezers, sewage guidelines, medium and heavy-duty vehicles, mercury emissions, industrial boilers, solid waste incineration units, fluorescent lamps, residential clothes dryers, room air conditioners, residential furnaces, residential central air conditioners, battery chargers, dishwashers, petroleum refineries, halide lamps, walk-in coolers and freezers, commercial refrigeration units, commercial clothes washers, commercial ice makers, and heat

pumps, among many other areas.  In each case, the expansion of federal regulatory authority encroaches on the Plaintiff States' freedom of action in an area that falls within the States' traditional police powers.

160.     Moreover, in their sovereign capacities, the Plaintiff States cooperatively administer many federal programs directly affected by the Working Group's actions, and the Executive Order and the Working Group's Interim Values will directly impact the actions they must take in their participation in these cooperative-federalism programs.  The President's Executive Order and the Working Group's actions effectively mandate that the Plaintiff States, in their cooperative administration of federal programs, must take actions that they deem unconstitutional, unlawful, and arbitrary and capricious, for the reasons stated herein.

161.     Congress often requires federal agencies to consider the costs and benefits of taking action or inaction when delegating legislative power.  For example, in promulgating emission standards for hydrocarbons, carbon monoxide, and oxides of nitrogen for new motor vehicles, the standards must "reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator [of the Environmental Protection Agency] determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology."  42 U.S.C. § 7521(3)(A)(i).

162.     As another example, the Energy Policy and Conservation Act requires that the Secretary of Transportation "consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy."  49 U.S.C. § 32902(f).

30

163.    Congress's mandatory considerations of costs and benefits are not isolated to federal agencies, as federal and state agencies often collaborate on federally funded projects and programs subject to statutory requirements.

164.    For example, the National Environmental Policy Act (NEPA) requires all federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" that includes, among other things, the environmental impact of an agency action, any adverse environmental effects which cannot be avoided, and alternatives to the proposed action. 42 U.S.C. § 4332(C).

165.    Under NEPA, agencies often consider the costs and benefits in evaluating environmental impacts and alternatives to the proposed action.  When they do, agencies must include this analysis and discuss the relationship between quantified and unquantified environmental impacts, values, and amenities.  40 C.F.R. § 1502.22.

166.    Agencies are further required to use "reliable existing data and resources" and must "identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement."  40 C.F.R. § 1502.23.

167.    Congress directed that state agencies prepare these statements and underlying determinations with approval by federal agencies.  42 U.S.C. § 4332(D).

168.    Federal regulations require agencies to "involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments."  40 C.F.R. § 1501.5(e).  State agencies may also act as "joint lead agencies to prepare an environmental impact statement or environmental assessment."  40 C.F.R. §1501.7(b).

169.     Under the Executive Order, the agencies of the Plaintiff States must now employ the Working Group's Interim Values in their NEPA environmental impact statements or face disapproval and rejection by the federal agencies.  Thus, the Executive Order requires States to take actions in their sovereign capacities that their chief legal officers have determined to be unconstitutional and unlawful, thus injuring the States in their sovereign capacities.

170.     Similarly, for a major federal action by the Federal Highway Administration, a state department of transportation generally must serve as a joint lead agency.

171.     Because state agencies serve as "joint lead" agencies and prepare environmental analyses that include cost-benefit analyses, EO 13990 and the Interim Values require agencies of the Plaintiff States to use the illegally and unconstitutionally imposed social costs of greenhouse gases in their cooperative administration of Federal Highway Administration projects.  This imposes a direct and immediate injury on the Plaintiff States' sovereign interests.

172.     For example, the Plaintiff States regularly engage in federally funded highway projects that require the States to conduct NEPA assessments, which will now have to include the Interim Values or face rejection by the Department of Transportation.

173.     Similarly, the Clean Air Act provides for the administration of national ambient air quality standards through a program of cooperative federalism under which the States submit for approval, and then implement and enforce, State Implementation Plans to the EPA.  42 U.S.C. § 7410(a)(1).  The statute calls for the periodic revision of such plans "from time to time as may be necessary to take account of … the availability of improved or more expeditious methods of attaining such standard."  42 U.S.C. § 7410(a)(2)(H)(i).

174.     Under EO 13990, agencies of the Plaintiff States will be required to adopt and employ the Working Group's Interim Values in the State Implementation Plans submitted under

the Clean Air Act in order to obtain approval by EPA.  This imposes a direct and immediate injury on the Plaintiffs States' sovereign interests.

175.      Further, Plaintiff State of Missouri is a "no stricter than" State for most emissions standards promulgated by EPA.  A Missouri statute provides: "Other provisions of law notwithstanding, the Missouri air conservation commission shall have the authority to promulgate rules and regulations … to establish standards and guidelines to ensure that the state of Missouri is in compliance with the provisions of the federal Clean Air Act, as amended (42 U.S.C. Section 7401, et seq.).  *The standards and guidelines so established shall not be any stricter than those required under the provisions of the federal Clean Air Act*, as amended.…"  Mo. Rev. Stat. § 643.055.

176.      Missouri's "no stricter than" statute effectively requires Missouri, as a matter of law for most clean-air programs, to enforce through its State Implementation Plans the clean-air standards adopted by EPA, including those standards that incorporate and rely upon the Interim Values.  Thus, Section 5 of EO 13990 and the Interim Values purport to legally obligate Missouri, in its cooperative administration of cooperative-federalism programs under the Clean Air Act, to enforce illegally and unconstitutionally adopted standards.

177.      The Executive Order and the Working Group's actions also injure the Plaintiff States' proprietary interests.  In addition to being cooperative regulators with federal agencies, the States are also directly regulated parties under many federal regulatory programs impacted by the adoption of mandatory interim values for SCC, SCM, and SCN.  They are also regular purchasers of regulated products which will now become more expensive due to increased regulations.

178.      As noted above, an academic review in 2017 identified "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] have

used the SCC or SCM in their analyses," including by Defendants EPA, DOE, DOT, DOI, and

USDA, through 2016.  Howard & Schwartz, *supra*; Ex. 3.  These regulatory actions include many

regulatory actions that directly affect the Plaintiff States in their proprietary capacities.

179.    Appendix A to Howard & Schwartz indicates that, through 2016, the "social cost"

of greenhouse gases had been used in adopting federal regulations, policies, and regulatory actions

related to vending machines, light trucks, dishwashers, dehumidifiers, microwave ovens, kitchen

stoves, clothes washers, small electric motors, residential water heaters, ozone standards,

residential refrigerators and freezers, sewage guidelines, medium and heavy-duty vehicles,

mercury emissions, industrial boilers, solid waste incineration units, fluorescent lamps, residential

clothes dryers, room air conditioners, residential furnaces, residential central air conditioners,

battery chargers, dishwashers, petroleum refineries, halide lamps, walk-in coolers and freezers,

commercial refrigeration units, commercial clothes washers, commercial ice makers, and heat

pumps, among many others.  Thus, the use of the Interim Values will affect Americans pervasively,

in virtually every aspect of everyday life.

180.    This impact will also directly affect the Plaintiff States in their proprietary

capacities, as the Plaintiff States and their agencies purchase and use many of the items listed in

Appendix A.  Among other things, Plaintiff States as purchasers will be forced to expend additional

public funds to purchase more expensive technologies that are justified by the Interim Values.

181.    The Executive Order and the Working Group's actions injure the Plaintiff States'

quasi-sovereign interests in the health and well-being, both physical and economic, of their

citizens.

182.    The Executive Order and the Interim Values will inflict enormous regulatory costs

on the economies and citizens of those States, ultimately resulting in lost jobs, reduced economic

productivity, loss of revenue to support state programs, decline in competitiveness of American industry, loss of American energy independence, and many other such injuries to the States and their citizens that the Biden Administration ignored in its calculation of the "social cost" of carbon, methane, and nitrous oxide.

183.    Using the Working Group's values for SCC, SCM, and SCN and 3 percent discount rate, the annual "social cost" of the United States' emissions of those three gases at current rates of emission is approximately $9.5 trillion.

184.    The President's directive in Section 5 of EO 13990 dictates that these figures "shall" be used by all relevant federal agencies to justify imposing new regulatory costs on many aspects of the U.S. economy.

185.    By instructing that all federal agencies "shall" use these interim figures in regulatory cost-benefit analyses involving emissions of any of the three gases, the Executive Order necessitates the imposition of major regulatory costs on the U.S. economy.

186.    No one will escape the burden of these regulatory costs, because they will be imposed on federal regulations that reach many aspects of everyday life.  As noted above, one commentator aptly observed that "the social cost of carbon" is "a figure that helps determine the stringency of federal regulations governing cars, trucks, power plants, refrigerators, microwave ovens, washing machines, vending machines and much more."  Cass Sunstein, *Biden Climate Regulation Is About to Get Tougher*, *supra*.  Every citizen and state agency of the Plaintiff States will necessarily feel the economic pinch from these regulations.

187.    A policy decision of the magnitude reflected in Section 5 of EO 13990 the Working Group's Interim Values is entrusted, if at all, to Congress and the process of bicameralism and presentment, not to the Executive Branch alone.

188.     The Plaintiff States' quasi-sovereign interests in protecting the physical and economic health of their citizens and their economies authorize them to challenge the unconstitutional imposition of massive regulatory costs on every human being in America, including in each Plaintiff State.

189.     In addition to injuring the Plaintiff States in their quasi-sovereign capacities, the increased regulation required by Section 5 of EO 13990 and the Interim Values will necessarily and immediately deprive the Plaintiff States of much-needed tax revenues by imposing enormous costs on the economies of Missouri and the other Plaintiff States, thus injuring them in their proprietary capacities.

190.     The Working Group's actions have also injured the Plaintiff States in their sovereign, quasi-sovereign, and proprietary capacities by depriving them of the opportunity to participate in notice-and-comment rulemaking—or to provide input of any kind—regarding the adoption of the Interim Values.

191.     Section 5(b)(iii) of EO 13990 directed that "in carrying out its activities, the Working Group shall … solicit public comment [and] engage with the public and stakeholders." 86 Fed. Reg. 7041.  On information and belief, the Working Group did not do so.

192.     The Administrative Procedure Act also required the Working Group to seek input from the public and stakeholders, and to provide notice and a reasonable opportunity for public comment, or else issue a good-cause statement justifying the failure to do so, before issuing the Interim Values.  On information and belief, the Working Group did not do so.

193.     The Working Group's actions thus deprived the Plaintiff States of their interests in providing input, participating in a public-comment process, and having their voices heard by the Working Group and the public prior to the adoption of the Interim Values.

## COUNT ONE – VIOLATION OF THE SEPARATION OF POWERS

194.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

195.     Our Constitution creates a federal government of limited and enumerated powers, and this limitation applies to the Executive Branch.

196.     As the Supreme Court held in *Youngstown*, any action by the Executive Branch must be authorized either by a statutory delegation of authority from Congress, enacted through bicameralism and presentment, or by one of the President's enumerated powers in Article II.

197.     Section 5 of EO 13990 and the Working Group's publication of the Interim Values are not authorized by any statutory delegation of authority.

198.     Section 5 of EO 13990 and the Working Group's publication of the Interim Values are not authorized by any power granted to the President in Article II.

199.     By purporting to calculate and adopt binding values for the "social costs" of carbon dioxide, methane, and nitrous oxide that "shall" be used by federal agencies conducting cost-benefit analyses, Section 5 of the EO 13990 and the Working Group's publication of the Interim Values unconstitutionally and unlawfully seeks to exercise a quintessentially legislative power that the Constitution vests exclusively in Congress under Article I, Section 1.

200.     Congress did not delegate the authority to dictate binding values for the social costs of carbon dioxide, methane, and nitrous oxide to the Working Group.  Indeed, consistent with the non-delegation doctrine, Congress likely could not have validly delegated such sweeping and indeterminate authority, with enormous potential impact on the U.S. economy, to a single federal agency—and certainly could not have done so without an extremely clear statement of congressional intent.  No such statement—and no such statute—exists here.

201.     Accordingly, Section 5 of EO 13990 and the Working Group's Interim Values violate the Constitution's separation of powers, the most fundamental bulwark of our liberty.

## COUNT TWO – VIOLATION OF AGENCY STATUTES

202.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

203.     Section 5 of EO 13990 and the Working Group's Interim Values violate the statutes that confer authority on various federal agencies to conduct cost-benefit analyses in regulatory actions that involve emissions of carbon dioxide, methane, and/or nitrous oxide.

204.     No federal statute purports to confer on the Working Group the authority to promulgate binding values for the "social costs" of gases for use in federal regulatory programs administered by other federal agencies and officials.

205.     The Executive Order purports to confer on the Working Group authority that federal statutes confer—to the extent that they confer, or validly confer, such authority at all—on other federal agencies.

206.     For example, the Clean Air Act confers authority on the Administrator of EPA to administer various federal programs relating to air pollution, which includes the authority to conduct cost-benefit analyses in adopted federal regulations in certain instances.  By purporting to dictate that the Administrator "shall" employ certain values for the "social costs" of gases in his or her cost-benefit analyses, the Executive Order purports to assign authority to the Working Group that a federal statute assigns to the Administrator of EPA.

207.     The same is true of other federal agencies and statutes affected by the Working Group's Interim Values.

208.     Section 5 of EO 13990, and the Working Group's Interim Values are illegal because they purport to exercise authority that federal statutes specifically confer on identified federal

38

agencies and officials, not on the Working Group, and thus the Interim Values violate those statutes.

## COUNT THREE – PROCEDURAL VIOLATION OF THE APA

209.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

210.    The Interim Values are agency rules within the meaning of the APA.

211.    Notwithstanding the Executive Order's instruction that the Working Group must seek input from the public and stakeholders in all its activities, the Working Group did not seek or obtain input from the public or (on information and belief) from stakeholders before publishing the Interim Values.

212.    The Interim Values purport to be immediately binding on federal agencies in their conduct of cost-benefit analyses.

213.    The Working Group is a federal agency subject to the requirements of the Administrative Procedure Act ("APA").

214.    The adoption and promulgation of the Interim Values is a major agency action that could not lawfully be conducted without compliance with APA procedures such as notice-and-comment rulemaking.

215.    Under the APA, a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."  5 U.S.C. § 551(4).

216.    The social costs of greenhouses gases purport to "capture the full costs of greenhouse gas emissions" to facilitate sound-decision making.  The President considers them to be "essential" "to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions."

217.    The adoption and promulgation of the Interim Values did not comply with APA procedural requirements such as notice-and-comment rulemaking, and thus the agency action is invalid and void under the APA.

## COUNT FOUR – SUBSTANTIVE VIOLATION OF THE APA

218.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

219.    The Interim Values are agency rules within the meaning of the APA.

220.    The Working Group is a federal agency subject to the requirements of the Administrative Procedure Act ("APA").

221.    The adoption and promulgation of the Interim Values was a major agency action that could not lawfully be conducted without compliance with the APA.

222.    In adopting the Interim Values, by its own admissions, the Working Group did not conduct its own independent analysis, but instead relied heavily upon and adopted the analysis of the previous Working Group that published similar values for the "social costs" of carbon dioxide, methane, and nitrous oxide in August 2016.

223.    The analysis of the previous Working Group, which the current Working Group uncritically adopted, suffered from fatal defects that render it arbitrary and capricious under the APA.  The Working Group failed to consider important aspects of the problem, such as the benefits from activities that emit greenhouse gases and any reliance regulated parties had based on prior methods of calculations, and it failed to adequately explain and justify its actions.

224.     The Working Group's analysis also exceeded and was contrary to its statutory authority, which was non-existent.

225.     Under the APA, a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."  5 U.S.C. § 551(4).

226.     The social costs of greenhouses gases purport to "capture the full costs of greenhouse gas emissions" to facilitate sound-decision making.  The President considers them to be "essential" "to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

227.     The Working Group's publication of the Interim Values violated the APA's substantive requirements for agency rulemaking.

### PRAYER FOR RELIEF

Wherefore, the Plaintiff States ask this Court to issue an order and judgment:

a.     Declaring that Section 5 of EO 13990 and the Working Group's Interim Values unconstitutionally purport to exercise legislative powers and violate the Constitution's separation of powers;

b.     Declaring that federal agencies, including the Agency Defendants, may not utilize the Working Group's Interim Values where a federal statute requires the consideration of costs, burdens, benefits, or impacts;

c.       Declaring that the Working Group's Interim Values are invalid substantive rules with putative legal effect for agency actions where a federal statute requires an agency to consider costs, burdens, benefits, or impacts because the interim social costs were not promulgated under the Administrative Procedure Act's rulemaking processes;

d.       Declaring that the Interim Values are arbitrary, capricious, unreasonable, and contrary to law;

e.       Declaring that the Working Group violated both the APA's procedural requirements and the EO 13990's requirements to solicit public comment, engage with the public and stakeholders, and seek the advice of ethics experts when promulgating the interim social costs of greenhouse gases;

f.       Declaring that the Working Group's Interim Values violate federal statutes conferring regulatory authority on specific federal agencies that the Executive Order unlawfully arrogated to the Working Group;

g.       Granting preliminary and permanent injunctive relief against all Defendants consistent with and implementing the declaratory relief requested herein;

h.       Granting preliminary and permanent injunctive relief against the Working Group Defendants to prevent them from continuing to implement illegal and unconstitutional actions;

i.       Granting preliminary and permanent injunctive relief against the Agency Defendants to prevent them from adopting, employing, treating as binding, or relying upon the work product of the Working Group, including but not limited to its Interim Values, in exercise of their statutory authority; and

j.       Granting such other relief that the court deems just and proper.

Dated: March 8, 2021                    Respectfully submitted,

                                        **ERIC S. SCHMITT**
                                        **ATTORNEY GENERAL OF MISSOURI**

                                        */s/ Justin D. Smith*
                                        Justin D. Smith, #63253MO
                                          Deputy Attorney General for Special Litigation
                                        Jeff P. Johnson, #1029291DC
                                        Michael E. Talent, #322220CA
                                        Missouri Attorney General's Office
                                        Post Office Box 899
                                        Jefferson City, MO 65102
                                        Tel: (573) 751-0304
                                        Fax: (573) 751-0774
                                        Justin.Smith@ago.mo.gov
                                        *Counsel for Plaintiff States*

OTHER COUNSEL:

MARK BRNOVICH
Attorney General of Arizona
 Robert J. Makar*
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5205
Robert.Makar@azag.gov
*Counsel for the State of Arizona*

LESLIE RUTLEDGE
  Attorney General of Arkansas
Nicholas J. Bronni*
  Solicitor General
Dylan L. Jacobs
  Assistant Solicitor General
Office of Arkansas Attorney General Leslie Rutledge
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

THEODORE E. ROKITA
Attorney General of Indiana
Tom Fisher*
Solicitor General
Kian Hudson*
Deputy Solicitor General
Office of Attorney General Todd Rokita
302 West Washington Street
IGCS-5th Floor
Indianapolis, IN 46204
p: 317.232.0709 │f: 317.232.7979
kian.hudson@atg.in.gov
*Counsel for the State of Indiana*

DEREK SCHMIDT
Attorney General of Kansas
Jerry Edwards, Assistant Solicitor General
Office of Kansas Attorney General Derek Schmidt
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
(785) 368-8435 Phone
(785) 291-3767 Fax
Jerry.Edwards@ag.ks.gov
*Counsel for the State of Kansas*

AUSTIN KNUDSEN
Montana Attorney General
David M.S. Dewhirst*
  Solicitor General
Montana Attorney General's Office
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
  Attorney General of Nebraska
James A. Campbell*
  Solicitor General
Justin D. Lavene*
  Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

DAVE YOST
Ohio Attorney General
Benjamin M. Flowers
Ohio Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614-466-8980
bflowers@ohioattorneygeneral.gov
*Counsel for the State of Ohio*

MIKE HUNTER
Attorney General of Oklahoma
Mithun Mansinghani
  Solicitor General
Bryan Cleveland
  Assistant Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Phone:  (405) 522-4392
mithun.mansinghani@oag.ok.gov
*Counsel for the State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina
J. Emory Smith, Jr.
Deputy Solicitor General
Office of the Attorney General
PO Box 11549
Columbia South Carolina 29211
Phone:  803-734-3680
*Counsel for the State of South Carolina*

HERBERT SLATTERY III
Attorney General of Tennessee
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Phone: (615) 532-2580
*Counsel for the State of Tennessee*

SEAN D. REYES
Utah Attorney General
Melissa A. Holyoak*
  Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

*Admission application forthcoming