# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

THE STATE OF MISSOURI, *et al.*,

                Plaintiffs,

    v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

                Defendants.[1]

Case No. 4:21-cv-00287-AGF

## DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Acting Assistant Attorney General

SAYLER A. FLEMING
United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI, #84311 (VA)
CODY T. KNAPP, #5715438 (NY)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

*Attorneys for Defendants*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Shalanda Young (Acting Director of the Office of Management and Budget) and Dr. Eric S. Lander (Director of the Office of Science and Technology Policy) are automatically substituted as Defendants in their official capacities for their predecessors, Robert Fairweather and Kei Koizumi (respectively).

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

BACKGROUND................................................................................................. 3

I.     Factual Background ................................................................................. 3

     A.    Requiring cost-benefit analysis is a longstanding presidential practice. ...........................3

     B.    Federal agencies assess the costs and benefits of changes in greenhouse gas emissions when conducting cost-benefit analyses. ...................................5

          1.    Past Federal Estimates of the Social Cost of Greenhouse Gases ......................5

          2.    Executive Order 13990 and the Working Group's 2021 Interim Estimates..11

II.    Procedural Background ....................................................................... 13

ARGUMENT.....................................................................................................13

I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION...............................14

     A.    Plaintiffs lack Article III standing. ...............................................15

          1.    The possibility that Plaintiffs will suffer a future injury—let alone an injury actually caused by the Executive Order—is speculative.....................................15

          2.    Any injury would be traceable to future, hypothetical agency actions, not to the Executive Order or the Interim Estimates. ...................................21

          3.    Plaintiffs' alleged injuries are not redressable by a victory in this lawsuit. ......24

          4.    Plaintiffs' remaining, miscellaneous bases for standing are meritless. .............26

     B.    Plaintiffs' claims are not ripe. ....................................................30

II.    PLAINTIFFS LACK A CAUSE OF ACTION...............................................37

     A.    Plaintiffs do not challenge any final agency action. ...............................37

     B.    The APA provides no cause of action to sue the President or the Working Group..39

     C.    Plaintiffs cannot rely on an implied equitable cause of action for their separation-of-powers claim. ..................................................42

III.   PLAINTIFFS' CLAIMS ARE MERITLESS.................................................43

     A.    Plaintiffs' statutory claims are meritless. ...........................................43

B.      Plaintiffs' constitutional claims are meritless. ...........................................................44

C.      Plaintiffs' notice-and-comment claims are meritless. ..............................................48

D.      Any remaining claims against the Defendants other than the President or the
        Working Group should be dismissed for failure to state a claim. ....................................50

IV.   **PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.....51**

A.      Plaintiffs cannot show imminent, irreparable harm. .............................................51

B.      The public interest would be disserved by a preliminary injunction. .............................53

C.      Any relief should be limited to declaring the Interim Estimates non-binding. ............54

**CONCLUSION** .....................................................................................................................**55**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ...................................................................................................30

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ...................................................................................................37

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ...................................................................................................27

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ..................................................................................42

*Almaklani v. Trump,*
    444 F. Supp. 3d 425 (E.D.N.Y. 2020) ......................................................................39

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
    452 U.S. 490 (1981) ...................................................................................................36

*Armstrong v. Exec. Off. of the President,*
    90 F.3d 553 (D.C. Cir. 1996) ....................................................................................41

*ASARCO Inc. v. Kadish,*
    490 U.S. 605 (1989) ...................................................................................................16

*Batsche v. Price,*
    875 F.3d 1176 (8th Cir. 2017) ..................................................................................37

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................35, 37, 38

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ..............................................................................33, 46

*California v. Bernhardt,*
    472 F. Supp. 3d 573 (N.D. Cal. 2020) ..............................................................18, 24, 32

*California v. Trump,*
    No. 19-cv-960 (RDM), 2020 WL 1643858 (D.D.C. Apr. 2, 2020)..................................19, 44

*Care Comm. v. Arneson,*
    638 F.3d 621 (8th Cir. 2011) ....................................................................................30

*Center for Biological Diversity v. National Highway Traffic Safety Administration,*
    538 F.3d 1172 (9th Cir. 2008)..............................................................................*passim*

*Citizens Telecommunications Co. of Minnesota, LLC v. FCC,*
    901 F.3d 991 (8th Cir. 2018) ................................................................................50

*City of Kennett, Missouri v. EPA,*
    887 F.3d 424 (8th Cir. 2018) ..........................................................................15, 16

*City of Tacoma v. Taxpayers,*
    357 U.S. 320 (1958) ............................................................................................36

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................15, 16, 29

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ............................................................................37

*Correctional Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ..............................................................................................43

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
    640 F.2d 109 (8th Cir. 1981) ..........................................................................51, 52

*Duffner v. City of St. Peters, Missouri,*
    930 F.3d 973 (8th Cir. 2019) ..........................................................................30, 32

*EarthReports, Inc. v. FERC,*
    828 F.3d 949 (D.C. Cir. 2016) ............................................................................32

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009) ............................................................................................36

*Fed. Forest Res. Coal. v. Vilsack,*
    100 F. Supp. 3d 21 (D.D.C. 2015) ......................................................................17

*Frank v. City of St. Louis,*
    458 F. Supp. 3d 1090 (E.D. Mo. 2020) ..............................................................51

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................................25, 26, 39

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ........................................................................................45, 47

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008) ............................................................................53

*Gonnella v. SEC*,
 954 F.3d 536 (2d Cir. 2020) ........................................................................48

*Gov't of Manitoba v. Bernhardt*,
 923 F.3d 173 (D.C. Cir. 2019).................................................................26, 27

*Helicopter Ass'n Int'l, Inc. v. FAA*,
 722 F.3d 430 (D.C. Cir. 2013)....................................................................19

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
 52 F. Supp. 3d 1174 (D. Colo. 2014) ..........................................................32

*Iowa ex rel. Miller v. Block*,
 771 F.2d 347 (8th Cir. 1985) ......................................................................27

*Iowa League of Cities v. EPA*,
 711 F.3d 844 (8th Cir. 2013) ......................................................................37

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
 613 F.3d 1112 (D.C. Cir. 2010)...................................................................49

*Johnson v. State of Mo.*,
 142 F.3d 1087 (8th Cir. 1998) ......................................................16, 30, 31

*Jones v. Gale*,
 470 F.3d 1261 (8th Cir. 2006) ....................................................................26

*Lance v. Coffman*,
 549 U.S. 437 (2007) ....................................................................................27

*Lincoln v. Vigil*,
 508 U.S. 182 (1993) ....................................................................................48

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ......................................................................15, 24, 28

*M.S. v. Brown*,
 902 F.3d 1076 (9th Cir. 2018).....................................................................25

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*,
 811 F.3d 542 (2d Cir. 2016) ..................................................................40, 41

*Massachusetts v. Mellon*,
 262 U.S. 447 (1923) ................................................................................27, 29

*Mazurek v. Armstrong*,
 520 U.S. 968 (1997) ....................................................................................51

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) ................................................................40, 44

*Michigan Corr. Org. v. Michigan Dep't of Corr.,*
    774 F.3d 895 (6th Cir. 2014) ...............................................................................42

*Michigan v. EPA,*
    576 U.S. 743 (2015) ............................................................................................36

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ...............................................................................25

*Missouri v. Yellen,*
    No. 4:21-cv-376 (HEA), --- F. Supp. 3d ----, 2021 WL 1889867 (E.D. Mo. May 11, 2021)   ..34, 51

*Mo. Roundtable for Life v. Carnahan,*
    676 F.3d 665 (8th Cir. 2012) ...............................................................................30

*N.J. Conservation Found. v. FERC,*
    353 F. Supp. 3d 289 (D.N.J. 2018) .....................................................................36

*Nat'l Ass'n of Home Builders v. EPA,*
    667 F.3d 6 (D.C. Cir. 2011) .................................................................................17

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) ................................................................5, 19, 20

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................................................45

*Nat'l Mining Ass'n v. Sec'y of Labor,*
    589 F.3d 1368 (11th Cir. 2009) ...........................................................................48

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ......................................................................................*passim*

*Nat'l Sec. Comm'n on A.I.,*
    466 F. Supp. 3d 100 (D.D.C. 2020) .....................................................................40

*Nat'l Truck Equip. Ass'n v. NHTSA,*
    711 F.3d 662 (6th Cir. 2013) .................................................................................5

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ...........................................................................26

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................51

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ....................................................................................39

*Novus Franchising, Inc. v. Dawson,*
  725 F.3d 885 (8th Cir. 2013) ....................................................................55

*Nw. Nat'l Bank v. U.S. Dep't of the Treasury,*
  917 F.2d 1111 (8th Cir. 1990) ..................................................................48

*CREW v. Off. of Admin.,*
  566 F.3d 219 (D.C. Cir. 2009) ............................................................39, 40

*Ohio Forestry Association v. Sierra Club,*
  523 U.S. 726 (1998) ............................................................................31, 34

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n,*
  506 F.2d 33 (D.C. Cir. 1974) ....................................................................48

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ..................................................................................29

*Reno v. Cath. Soc. Servs., Inc.,*
  509 U.S. 43 (1993) ............................................................................30, 31

*Sackett v. EPA,*
  566 U.S. 120 (2012) ............................................................................37, 38

*Schlesinger v. Reservists Comm. to Stop the War,*
  418 U.S. 208 (1974) ............................................................................27, 28

*Seila Law LLC v. CFPB,*
  140 S. Ct. 2183 (2020) ..............................................................................47

*Seminole Tribe v. Florida,*
  517 U.S. 44 (1996) ....................................................................................43

*Sierra Club v. Costle,*
  657 F.2d 298 (D.C. Cir. 1981) ..................................................................46

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  446 F.3d 808 (8th Cir. 2006) ....................................................................37

*Simon v. E. Kentucky Welfare Rts. Org.,*
  426 U.S. 26 (1976) ............................................................................19, 21

*Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Engr's,*
  888 F.3d 906 (8th Cir. 2018) ................................................................37, 38

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971)..............................................................................41

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018)....................................................................38, 39, 42

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016).................................................................................*passim*

*St. Louis Effort for AIDS v. Huff,*
    782 F.3d 1016 (8th Cir. 2015)...............................................................................54

*St. Louis Univ. v. Duncan,*
    97 F. Supp. 3d 1106 (E.D. Mo. 2015)..................................................................50

*State of Mo. ex rel. Mo. Highway & Transp. Comm'n v. Cuffley,*
    112 F.3d 1332 (8th Cir. 1997)...............................................................................31

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)................................................................................................17

*Stenger v. Bi-State Dev. Agency of Missouri/Illinois Metro. Dist.,*
    No. 14-cv-1655-AGF, 2015 WL 164044 (E.D. Mo. Jan. 13, 2015), *aff'd*, 808 F.3d 734 (8th Cir. 2015)............................................................................................................42

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009).........................................................................................*passim*

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996)..............................................................................26

*Texas v. United States,*
    523 U.S. 296 (1998)..............................................................................................34

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
    137 S. Ct. 1645 (2017).........................................................................................28

*Trump v. New York,*
    141 S. Ct. 530 (2020) ......................................................................................2, 30

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011)................................................................................50

*Warth v. Seldin,*
    422 U.S. 490 (1975) .............................................................................................30

*Watkins Inc. v. Lewis,*
    346 F.3d 841 (8th Cir. 2003)................................................................................52

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...........................................................................................36, 45

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ...................................................................................................15

*WildEarth Guardians v. Bernhardt,*
    2021 WL 363955 (D. Mont. Feb. 3, 2021) .............................................................32

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...............................................................................................51, 53

*Wyoming v. Dep't of the Interior,*
    493 F. Supp. 3d 1046 (D. Wyo. 2020) ....................................................................32

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ...................................................................................................27

*Yakus v. United States,*
    321 U.S. 414 (1944) .......................................................................................21, 47, 48

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ...........................................................................................43, 46

*Zero Zone, Inc. v. United States Dep't of Energy,*
    832 F.3d 654 (7th Cir. 2016) ..........................................................................9, 18, 32, 49

## Executive Orders

Executive Order 11246 (Sept. 24, 1965) ......................................................................47

Executive Order 12044 (Mar. 23, 1978)........................................................................3

Executive Order 12291 (Feb. 17, 1981) ..............................................................3, 4, 40

Executive Order 12866 (Sept. 30, 1993) ...............................................................*passim*

Executive Order 13202 (Feb. 17, 2001) ......................................................................46

Executive Order 13783 (Mar. 28, 2017).........................................................11, 12, 42

Executive Order 13990 (Jan. 20, 2021) .................................................................*passim*

Executive Order 14008 (Jan. 27, 2021) .......................................................................54

## Constitutional Provisions

U.S. Const. Art. II .............................................................................................45, 46

**Statutes**

5 U.S.C. § 553 ...................................................................................................48

5 U.S.C. § 701(b)(1) .......................................................................................39, 42

5 U.S.C. § 702 ...........................................................................................26, 29, 39

5 U.S.C. § 704 ..............................................................................................37, 39

5 U.S.C. § 706 ..............................................................................................42, 49

15 U.S.C. § 717r(b) ..........................................................................................36

28 U.S.C. §§ 2201-2202 ......................................................................................42

42 U.S.C. § 4321 .............................................................................................28

49 U.S.C. § 32902(a) ..........................................................................................6

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ...............................................................37

Federal Rule of Civil Procedure 12(b)(6) ...........................................................37, 43

**Regulatory Documents**

40 C.F.R. § 1502.22 (2020) .................................................................................28

*Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*,
  71 Fed. Reg. 17566 (Apr. 6, 2006) .....................................................................6

*Certification of New Interstate Natural Gas Facilities*,
  86 Fed. Reg. 11,268-72 (Feb. 24, 2021) ..........................................................34, 35

EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal*,
  (2017) ....................................................................................................11

*Energy Conservation Program: Energy Conservation Standards for Certain Consumer  Products*,
  73 Fed. Reg. 62034 (Oct. 17, 2008) .....................................................................7

*Endangerment & Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*,
  74 Fed. Reg. 66496 (Dec. 15, 2009) .....................................................................6

*Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles*,
  81 Fed. Reg. 73478 (Dec. 27, 2016) ...................................................................50

*Notice of Availability*,
  78 Fed. Reg. 70586 (Nov. 26, 2013) .....................................................................9

*Notice of Availability and Request for Comment on "Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under E.O. 13990"*,
86 Fed. Reg. 24669 (May 7, 2021) ...................................................................................13

*Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews*,
76 Fed. Reg. 52738 (Aug. 23, 2011) .................................................................................9

*Proposed Rulemaking To Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*,
74 Fed. Reg. 49454 (Sept. 28, 2009) ...........................................................................8, 49

*Regulating Greenhouse Gas Emissions Under the Clean Air Act*,
73 Fed. Reg. 44354 (July 30, 2008) ..................................................................................7

*Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements*,
83 Fed. Reg. 49184 (Sept. 28, 2018) ..............................................................................11

**Other Authorities**

Alex Marten, *Incremental CH4 and N2O Mitigation Benefits Consistent with the U.S. Government's SC-CO2 Estimates, 15(2) Climate Policy*,
(2015) ...............................................................................................................................10

*Climate Change*,
https://www.epa.gov/climate-change ..............................................................................24

*Climate Solutions*,
https://www.usda.gov/topics/climate-solutions ..............................................................24

Curtis W. Copeland, Cong. Research Serv., RL32397, *Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs*,
(Jan. 26, 2010) ...................................................................................................................3

Dep't of the Interior, Sec'y of the Interior Order No. 3399 (April 16, 2021),
*available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf..........33

EPA, *Whitepaper on Valuing Methane Emissions Changes in Regulatory Benefit-Cost Analysis, Peer Review Charge Questions, and Responses:  EPA Summary and Response*,
(Oct. 1, 2015) ...................................................................................................................10

Elena Kagan, *Presidential Administration*,
114 HARV. L. REV. 2245 (2001) .......................................................................................53

Katharine Hayhoe et al., *Our Changing Climate in Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment*,
*Volume II*, (2018) ..............................................................................................................5

National Academies of Sciences, Engineering, and Medicine, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide*,
(2017) ...................................................................................................................................8, 10

OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs) (OIRA Guidance)*,
(June 3, 2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2021/06/Social-Cost-of-Greenhouse-Gas-Emissions.pdf..............................................................................*passim*

OMB, *Circular A-4 (2003)*,
*available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf
.................................................................................................................................................5

*Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates*,
(July 2014)......................................................................................................................................7

The White House, *Fact Sheet: President Biden's Leaders Summit on Climate (Apr. 23, 2021)*,
*available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/23/fact-sheet-president-bidens-leaders-summit-on-climate ...............................................................54

Working Group, *Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under E.O. 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide (2016 CH4 and N2O Estimates)*,
(Aug. 2016) ...............................................................................................................................10

Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (Response to Comments)*,
(July 2015)................................................................................................................7, 9, 49, 50

Working Group, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under E.O. 13990 (February 2021 TSD)*,
(Feb. 2021).........................................................................................................................12, 13

Working Group, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (February 2010 TSD)*,
(Feb. 2010).......................................................................................................................... 7, 8

Working Group, *Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866*,
(Aug. 2016)...............................................................................................................................10

Working Group, *Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (November 2013 TSD)*,
(Nov. 2013)................................................................................................................................8

## INTRODUCTION

The President of the United States has long exercised his constitutional authority, when not in conflict with any legislative command to the contrary, to manage the rulemaking functions of the Executive Branch—including, for decades, by requiring and supervising agency use of cost-benefit analysis in rulemaking.  In particular, following court decisions recognizing that the costs and benefits of changes in greenhouse gas emissions can be an important consideration to account for in many agency rules, President Obama, President Trump, and now President Biden have each taken action to standardize the estimated monetization of those costs and benefits across the Executive Branch.

Despite this history, Plaintiffs now challenge Section 5 of Executive Order 13990, by which President Biden reconstituted the Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"), as beyond the power of the Executive Branch.  Ex. 1, Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20, 2021) ("the Executive Order" or "E.O. 13990").  The Working Group's primary mission is to prepare updated monetary estimates, for use in agency cost-benefit analyses, which "capture the full costs of greenhouse gas emissions as accurately as possible." *Id.* § 5(a). Plaintiffs also specifically challenge the "Interim Estimates" of those costs, which will be in effect until the Working Group publishes final updated estimates.  *See id.* § 5(b)(ii)(A).

Although Plaintiffs clearly disagree with the policy goals behind Executive Order 13990, Article III requires more than political disagreement—it requires an actual or imminent injury in fact, traceable to the challenged provision of the Executive Order, and redressable by the relief they seek. There, Plaintiffs fall short, because even though their adventurous legal theories are tied to the Executive Order and the Interim Estimates, their alleged injuries are not.  Instead, Plaintiffs' allegations of injury all stem from fears that hypothetical future regulations, which may be issued in reliance on the Interim Estimates, will one day cause them (or their citizens, or in-state businesses) a variety of possible harms.  In Plaintiffs' words, they fear the "potential regulatory impact" of "more restrictive regulatory policies" that may or may not be issued in the "upcoming years and decades." Am. Compl., ECF No. 6, ¶¶ 129, 131.

1

As is self-evident from those sweeping allegations, at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam).  President Biden, to be sure, has made clear his desire that agencies use the Interim Estimates in monetizing the costs of greenhouse gases.  But the Interim Estimates will typically be used only for internal Executive Branch purposes, and even when they are relied upon to justify a substantive rule, they will rarely be outcome-determinative.  Accordingly, any prediction as to the consequences of the Interim Estimates is "no more than conjecture" at this time.  *Id.*  In any case, Plaintiffs can challenge future agency regulations when they are actually issued, as long as those regulations cause them some concrete, particularized, and actual or imminent harm.  And in those lawsuits, Plaintiffs can argue that the Executive Order or the Interim Estimates led the agency into legal error.  But before rushing into court, Plaintiffs must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the [Executive Order] to the claimant's situation in a fashion that harms or threatens to harm him."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Accordingly, all claims should be dismissed for lack of Article III standing, lack of ripeness, or the lack of any cause of action under the Administrative Procedure Act (APA) or the Constitution.

Even if Plaintiffs could overcome these fundamental threshold defects of jurisdiction and justiciability, all of Plaintiffs' claims are meritless; they suffer from a fundamental misunderstanding of the Executive Order and its place within the broader federal regulatory process.  In particular, contrary to Plaintiffs' assertion that E.O. 13990 "assign[s] authority to the Working Group" that is reserved exclusively for federal agencies, Am. Compl. ¶ 207, in fact, the Executive Order expressly provides (more than once) that it does not "impair or otherwise affect the authority granted by law to an executive department or agency," E.O. 13990 § 8(a)(i).  In any case, since the Reagan era, every President has supervised a centralized process for the review of proposed regulations and, by executive order, required agencies to submit cost-benefit analyses that align with the President's policymaking principles.  And beginning under President George W. Bush, agencies have used estimates of the social

cost of greenhouse gas emissions when preparing those analyses.  Plaintiffs offer nothing that would justify a sudden, court-ordered halt to these long-settled and salutary good-government procedures.

Plaintiffs also seek a preliminary injunction that would prevent agencies from treating the Interim Estimates "as binding values in any agency action."  Pls.' Mem. in Support of Mot. for Prelim. Injunction ("Pls.' Br."), ECF No. 18, at 50.  The Court need not separately address that motion, given Plaintiffs' failure to establish jurisdiction or to state a claim.  But if the Court does consider the preliminary-injunction factors, the motion is meritless: Plaintiffs cannot show any imminent harm, let alone *irreparable* harm.  Nor would a preliminary injunction serve the public interest, given the global climate crisis and the Executive Branch's legitimate interest in pursuing the President's policy priorities consistent with authority delegated by Congress.

Plaintiffs may disagree as a general matter with federal climate change policy.  But the remedy for that policy disagreement must come from the political branches, not the judiciary.  All of Plaintiffs' claims should be dismissed, and Plaintiffs' motion for a preliminary injunction should be denied.

## BACKGROUND

### I.   Factual Background

#### A.   Requiring cost-benefit analysis is a longstanding presidential practice.

Precisely because rulemaking requires federal agencies to exercise their discretion in making policy judgments, every President since President Nixon has imposed some requirement for federal agencies to assess the predictable consequences of proposed rules.  *See* Curtis W. Copeland, Cong. Research Serv., RL32397, *Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs*, at 5-6 (Jan. 26, 2010).  In 1978, President Carter issued E.O. 12044, which established a requirement to provide a regulatory analysis for a subset of impactful rules.  *See* Exec. Order No. 12044, *Improving Government Regulations*, 43 Fed. Reg. 12661 (Mar. 23, 1978).  Then, in 1981, President Reagan took a decisive step to combine comprehensive regulatory analysis principles with centralized regulatory review when he issued Executive Order 12291.  *See* Exec. Order No. 12291, *Federal Regulation*, 46 Fed. Reg. 13193 (Feb. 17, 1981).  Among other things, E.O. 12291 set general policies for agencies to follow in issuing new regulations, including an instruction that "to the extent permitted by law, . . .

regulatory action shall not be undertaken unless the potential benefits to society . . . outweigh the potential costs." *Id.* § 2(b). And, for the first time, it established a centralized review process, requiring agencies to prepare an analysis of major proposed regulations—including the costs and benefits of the proposed rule, and reasonable alternatives—and to submit that analysis to the White House's Office of Management and Budget (OMB). *See id.* § 3. Every President since has embraced the core premise of E.O. 12291: that an empirical, monetized assessment of the expected social and economic consequences of federal regulation—in other words, a cost-benefit analysis—should inform policymakers and the public about the predicted effects of significant agency decisions.

Executive Order 12866, issued by President Clinton, established the modern framework for overseeing and coordinating the development of significant rules throughout the Executive Branch.[2] *See* Ex. 2, Exec. Order No. 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993). Like its Reagan-era predecessor, E.O. 12866 directs agencies to follow certain principles "unless a statute requires another regulatory approach." *Id.* § 1(a). And it establishes a detailed regulatory-review process to be coordinated by OMB and its Office of Information and Regulatory Affairs (OIRA) in which all agencies, save "independent regulatory agencies," must participate. *Id.* § 3(b). For significant regulatory actions,[3] E.O. 12866 requires an assessment of the anticipated costs and benefits of the agency's proposal. *See id.* §§ 6(a)(3)(B)-(C). The agency must also provide OIRA with a written explanation of why it opted for the proposed action and how it best meets the need for the action. *See id.* §§ 6(a)(3)(B)(i)-(ii), (C)(iii). OIRA then reviews the agency's action. *See id.* § 6(b)(2). If an agency publishes a proposed rule, one product of this process, often called a Regulatory Impact Analysis (RIA), is published alongside the Notice of Proposed Rulemaking. *See id.* § 6(a)(3)(E).

---

[2] Each President since President Clinton has made modifications to this process. *See, e.g.* Exec. Order No. 13563 § 4, 76 Fed. Reg. 3821, 3822 (Jan. 18, 2011) (President Obama instructing agencies to "consider regulatory approaches that reduce burdens and maintain flexibility"); Exec. Order No. 13771 § 3(b), 82 Fed. Reg. 9339, 9340 (Jan. 30, 2017) (President Trump requiring regulations to be included in the Unified Regulatory Agenda or approved by the OMB Director prior to issuance).

[3] For purposes of E.O. 12866, significant regulatory actions include those that would create inconsistencies or otherwise interfere with other agency action, alter certain budgetary impacts, raise novel issues, or are "likely to result in a rule that may have an annual effect on the economy of $100 million or more" or adversely affect the economy or its components. *Id.* § 3(f) (cleaned up).

OMB guidance, in particular OMB Circular A-4, sets out detailed recommendations to assist agencies in developing RIAs that comply with E.O. 12866. *See* OMB, *Circular A-4 (2003)*, *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf. Among other things, Circular A-4 emphasizes that agencies "should monetize quantitative estimates whenever possible." *Id.* at 27. Furthermore, as Circular A-4 explains, a good cost-benefit analysis will monetize more than just direct effects: Agencies should include "any important ancillary benefits and countervailing risks." *Id.* at 26. And because the costs and benefits of regulation often accrue well into the future, the guidance describes how agencies should consider those future effects—namely, by choosing appropriate discount rates[4] and selecting an end point "far enough in the future to encompass all the significant benefits and costs likely to result from the rule." *Id.* at 31-32.

Importantly, RIAs do not bind an agency's exercise of its statutory discretion. *See* E.O. 12866, prmbl. And because RIAs, standing alone, place no judicially enforceable limits on an agency's ability to choose among regulatory alternatives, they are generally not subject to judicial review. *See Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not . . . provide a basis for rejecting final agency action."). Only in specific circumstances—such as when Congress specifies that agencies must consider costs and benefits, or when an agency chooses to adopt or justify a rule based on the cost-benefit analysis in its RIA—will an agency's cost-benefit analysis be subject to arbitrary-and-capricious review under the APA. *See, e.g., Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012).

**B.    Federal agencies assess the costs and benefits of changes in greenhouse gas emissions when conducting cost-benefit analyses.**

**1.    Past Federal Estimates of the Social Cost of Greenhouse Gases**

There is a broad scientific consensus that human-source emissions of greenhouse gases (GHGs) are primary contributors to climate change. *See* Katharine Hayhoe et al., *Our Changing Climate in Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, at 73

---

[4] A discount rate is an interest rate used to convert future monetary sums into present-value equivalents. *See* OMB, *Circular A-4*, at 31-32. The higher the discount rate, the less value a future sum will have in present-day terms.

(2018); *see also* EPA, *Endangerment & Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66496 (Dec. 15, 2009) (finding that motor-vehicle emissions of greenhouse gases "endanger both the public health and the public welfare of current and future generations"). To quantify how future emissions of GHGs are expected to impact our society, experts have developed methods for estimating the net impacts—the good and the bad—of additional emissions of GHGs, such as Carbon Dioxide ($CO_2$), Methane ($CH_4$), and Nitrous Oxide ($N_2O$). The resulting estimates—monetary values of the net damages anticipated to result from one additional ton of emissions of a particular gas in a given year—are described in scientific literature as the "social costs" of a GHG. Since 2007, following the Ninth Circuit's decision in *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (9th Cir. 2008), federal agencies have employed estimates of the social cost of greenhouse gases (SC-GHG) to value projected reductions or increases in GHG emissions when preparing cost-benefit analyses.

*Center for Biological Diversity* involved a fuel economy rule issued by the National Highway Traffic Safety Administration (NHTSA). *See id.* at 1180-81. The rule was issued pursuant to the Energy Policy and Conservation Act of 1975 (EPCA), which directs the Secretary of Transportation to set fuel economy standards at "the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year." 49 U.S.C. § 32902(a). The EPCA further specifies that the Secretary's decision must be based upon certain statutory considerations, including "economic practicability." *Id.* § 32902(f). To fulfill this requirement, when NHTSA chose among possible standards, the agency relied on the cost-benefit analysis in its RIA. *See* NHTSA, *Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17566, 17592 (Apr. 6, 2006).

NHTSA's cost-benefit analysis did not include any monetized estimates of the damages associated with GHG emissions. In the agency's view, at that time, the "extremely wide variation in published estimates of damage costs from greenhouse gas emissions" meant that "the value of reducing emissions of $CO_2$ and other greenhouse gases" was "too uncertain to support their explicit valuation and inclusion among the savings in environmental externalities." *Id.* at 17638. Various plaintiffs sued to challenge NHTSA's analysis, arguing that it was arbitrary and capricious for the

agency to rely on a cost-benefit analysis that, effectively, assigned a monetary value of zero to the benefit of reducing global $CO_2$ emissions.  *See Ctr. for Biological Diversity*, 538 F.3d at 1181.

The Ninth Circuit agreed.  While acknowledging that "the record show[ed] that there [was] a range of values" that could be used, the court rejected NHTSA's concern about the uncertainty of the value of GHG emissions reductions.  *Id.* at 1200.  As the court saw it, no matter how difficult it was to choose an exact number, "the value of carbon emissions reduction [was] certainly not zero."  *Id.* Given the availability of reasonable, non-zero estimates of the value of $CO_2$ reductions, the court found "no evidence to support NHTSA's conclusion that the appropriate course was not to monetize or quantify the value of carbon emissions reduction at all."  *Id.* at 1201.

After *Center for Biological Diversity*, at the end of the George W. Bush Administration, agencies began using varying estimates of the social cost of carbon (SC-$CO_2$) to monetize projected changes in $CO_2$ emissions as part of their cost-benefit analyses.[5]  In 2009, seeking to harmonize these estimates across the Executive Branch, OMB convened an interagency process "to develop a transparent and defensible method, specifically designed for the rulemaking process, to quantify avoided climate change damages from reduced $CO_2$ emissions."  Working Group, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (February 2010 TSD)*, at 5 (Feb. 2010).  The resulting working group was constituted by leaders of various agencies, and co-chaired by OMB and the Council of Economic Advisors.  *See February 2010 TSD*, at i.

The Working Group began by analyzing the existing peer-reviewed scientific literature, from which it derived interim global SC-$CO_2$ estimates to recommend for use in agency RIAs.  *See* Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (Response to Comments)*, at 3-4 (July 2015).  When agencies used those 2009 interim estimates in their RIAs, they requested comment on "all of the scientific, economic, and ethical issues" implicated by the interim

---

[5] *See, e.g.*, *Energy Conservation Program: Energy Conservation Standards for Certain Consumer Products*, 73 Fed. Reg. 62034, 62110 (Oct. 17, 2008) (Dep't of Energy); *Regulating Greenhouse Gas Emissions Under the Clean Air Act*, 73 Fed. Reg. 44354, 44446 (July 30, 2008) (EPA); *see also* GAO, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates*, at 22-23 (July 2014) (listing "[i]ndividually developed agency estimates").

SC-CO$_2$ estimates in anticipation of "establishing improved estimates for use in future rulemakings." *See, e.g.*, EPA & NHTSA, *Proposed Rulemaking To Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 74 Fed. Reg. 49454, 49612 (Sept. 28, 2009).

In 2010, the Working Group published revised SC-CO$_2$ estimates. *See February 2010 TSD*, at 28. In doing so, it relied on three climate impact models—the Dynamic Integrated Climate Economy model (DICE), the PAGE model (Policy Analysis of the Greenhouse Effect), and the FUND model (Climate Framework for Uncertainty, Negotiation, and Distribution). *See id.* at 5. Collectively, these represented the three most widely cited peer-reviewed models capable of translating future GHG emissions into climate impacts, and climate impacts into monetized damages. *Id.*

While acknowledging differences among these models,[6] the Working Group applied certain standard inputs. It adjusted the models' end year, setting each to run through 2300 in order to adequately capture a significant proportion of future damages. *See id.* at 12-17. The Working Group also chose five socioeconomic and emissions "scenarios"[7] and three discount rates—2.5%, 3%, and 5%—to apply in running the three models.[8] *See id.* at 15-23. It then conducted simulations using these combinations, running each combination 10,000 times to sample across the range of climate impact projections, for a total of 450,000 observations per year. *See id.* at 28. For each discount rate, the Working Group averaged the resulting global SC-CO$_2$ estimates across all models and scenarios. *See id.* The resulting estimates for 2010 (reported in 2007 dollars) were $4.70 at the 5% discount rate,

---

[6] Each model takes a unique approach to estimating SC-GHG, reflecting the assumptions and science-based judgments of their developers. For example, the three models each account for human adaptation in different ways. *See February 2010 TSD* at 6-8; Working Group, *Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866* (*November 2013 TSD*), at 11 (Nov. 2013); National Academies of Sciences, Engineering, and Medicine, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide*, at 184-86 (2017). (Thus, the foundational premise of the *amicus curiae* brief filed by the Texas Public Policy Foundation—that "the social cost of carbon is developed and used in a way that ignores adaptation," ECF No. 26, at 13—is simply incorrect.)

[7] These "scenarios" set certain GDP, population, and emission trajectories, allowing the models to be sensitive to varying assumptions about the future. *February 2010 TSD*, at 15.

[8] While it noted Circular A-4's recommendation to include a 7% discount rate in most regulatory analysis, the Working Group explained that it would be inappropriate to use such a high discount rate in this context, when accounting for the extended intergenerational effects of SC-CO$_2$ emissions. *See February 2010 TSD*, at 17-23.

$21.40 at the 3% discount rate, and $35.10 at the 2.5% discount rate. *See id.* Additionally, to represent the damages associated with "low-probability, high-impact" climate damages, the Working Group reported a fourth value, $64.90, which was the 95th percentile SC-$CO_2$ estimate across all of the three models using the 3% discount rate. *Id.*

The Working Group continued to update its estimates and methodology. Following the release of the 2010 SC-$CO_2$ estimates, many agencies that employed the estimates in rulemaking received comments urging consideration of recent, peer-reviewed updates to the DICE, PAGE, and FUND models. *See, e.g.*, EPA, *Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews*, 76 Fed. Reg. 52738 (Aug. 23, 2011). The Working Group responded in 2013 by producing revised SC-$CO_2$ estimates. *See November 2013 TSD.*

The Working Group, acting through OMB, subsequently sought public comment on the methodology underlying its 2013 SC-$CO_2$ estimates. *See* OMB, *Notice of Availability*, 78 Fed. Reg. 70586 (Nov. 26, 2013). Among other things, the Working Group sought comments on its selection of the three models, its method for synthesizing the resulting estimates, the model inputs it used to produce the estimates (such as the discount rates and climate sensitivity parameters), and the general strengths and limitations of its overall methodology. *See id.* After receiving tens of thousands of comments, the Working Group issued a lengthy July 2015 response. *See Response to Comments*, at 4. While its responses broadly defended its earlier methodological choices, the Working Group also committed to seeking further input from the National Academies of Sciences, Engineering, and Medicine regarding the technical merits of its approach and proposals to add additional rigor to the analysis. *See id.* at 5. The Working Group's response was accompanied by a technical revision to its SC-$CO_2$ estimates, which corrected minor errors in its prior revision. *See id.* at 41. The Seventh Circuit later upheld an agency's reliance on the Working Group's estimates, notwithstanding litigants' methodological objections. *See Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 678 (7th Cir. 2016).

Eventually, the Working Group broadened its focus beyond $CO_2$ emissions, and also issued estimates of the social cost of methane (SC-$CH_4$) and nitrous oxide (SC-$N_2O$). Experts had developed estimates of SC-$CH_4$ and SC-$N_2O$, using the same methodology that the Working Group had used

for the SC-CO$_2$. *See* Alex Marten, *Incremental CH$_4$ and N$_2$O Mitigation Benefits Consistent with the U.S. Government's SC-CO$_2$ Estimates*, 15(2) Climate Policy 272 (2015); *see also* Working Group, *Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under E.O. 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide* (*2016 CH$_4$ and N$_2$O Estimates*), at 2-3 (Aug. 2016) (describing methodological approach consistent with that used to derive SC-CO$_2$ estimates). After EPA commissioned an external peer review of the application of these estimates to regulatory analysis, agencies began to employ these estimates in RIAs and seek public comment. *See 2016 CH$_4$ and N$_2$O Estimates*, at 3; *see also* EPA, *Whitepaper on Valuing Methane Emissions Changes in Regulatory Benefit-Cost Analysis, Peer Review Charge Questions, and Responses: EPA Summary and Response*, at 28-29 (Oct. 1, 2015). After further consideration of the peer-reviewed literature and the public comments received in agency rulemakings, the Working Group published the first federal SC-CH$_4$ and SC-N$_2$O estimates in August 2016. *See 2016 CH$_4$ and N$_2$O Estimates*, at 2-3. Following the National Academies' advice, the Working Group simultaneously enhanced the presentation and discussion of uncertainty around its 2013 SC-CO$_2$ estimates, and deferred further updates until the National Academies could release their final report and recommendations. *See* Working Group, *Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866*, at 2 (Aug. 2016). In January 2017, the National Academies report was issued, and it broadly endorsed the use of SC-GHG estimates, while also outlining recommendations to ensure that these estimates kept up with the latest science. *See* National Academies of Sciences, Engineering, and Medicine, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide* (2017).

Shortly after his inauguration in 2017, President Trump issued Executive Order 13783, which disbanded the Working Group and withdrew its prior analyses as "no longer representative of the administration's policy." Exec. Order No. 13783 § 5(b), *Promoting Energy Independence and Economic Growth*, 82 Fed. Reg. 16093 (Mar. 28, 2017). President Trump further ordered that "when monetizing the value of changes in greenhouse gas emissions resulting from regulations, including with respect to the consideration of domestic versus international impacts and the consideration of appropriate

discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in OMB Circular A-4." *Id.* § 5(c).

Although the Trump Administration's policy approach to climate issues differed in many ways from that of the preceding administration, it continued to use standardized estimates of the social costs of greenhouse gases. Pursuant to E.O. 13783, EPA developed interim SC-$CO_2$ estimates by making two (and only two) changes to the Working Group's 2016 estimates: First, it began reporting estimates that attempted to capture only the domestic impacts of climate change, and second, it applied 3% and 7% discount rates. *See* EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal*, at 44 (2017). These interim domestic estimates were intended to be used by EPA and other agencies until a more rigorous estimate of the impacts of climate change to the United States could be developed. *See id.* at 43. Accordingly, although the Working Group had been disbanded, and although the estimates of the social costs of greenhouse gas estimates were now lower (because of higher discount rates and an exclusive focus on U.S.-domestic damages), agencies continued to estimate the social costs of greenhouse gases in their cost-benefit analyses, as ordered by the President, just as they had done in prior administrations. *See, e.g.*, BLM, *Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements*, 83 Fed. Reg. 49184, 49190 (Sept. 28, 2018) (using "interim values" for the SC-$CH_4$, "adjusted" to comply with E.O. 13783).

### 2.  Executive Order 13990 and the Working Group's 2021 Interim Estimates

On January 20, 2021, President Biden issued the latest in this history of Executive pronouncements on employing the social cost of greenhouse gases: Executive Order 13990. Just as President Trump had done in E.O. 13783, President Biden laid out his expectations for agencies estimating the social costs of greenhouse gases:

> It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), "social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are

11

> intended to include changes in net agricultural productivity, human
> health, property damage from increased flood risk, and the value of
> ecosystem services. An accurate social cost is essential for agencies to
> accurately determine the social benefits of reducing greenhouse gas
> emissions when conducting cost-benefit analyses of regulatory and
> other actions.

E.O. 13990 § 5(a). President Biden also reestablished the Working Group, and directed that it "shall,

as appropriate and consistent with applicable law[,] publish an interim SCC, SCN, and SCM within 30

days." *Id.* § 5(b)(ii)(A). E.O. 13990 further stated that "agencies shall use" those interim estimates

"when monetizing the value of changes in greenhouse gas emissions resulting from regulations and

other relevant agency actions until final values are published." *Id.* The Executive Order also set a

September 1, 2021 deadline to "provide recommendations to the President" regarding the use of

SC-GHG estimates in contexts other than rulemaking, and a January 2022 deadline to publish a more

comprehensive update to the cost estimates. *See id.* § 5(b)(ii)(B)(C).

  As directed by the President, on February 26, 2021, the Working Group issued its interim

SC-CO$_2$, SC-CH$_4$, and SC-N$_2$O estimates ("the Interim Estimates"), which are identical to the

Working Group's 2016 estimates, other than adjustments for inflation. *See* Ex. 3, Working Group,

*Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under E.O.*

*13990 (February 2021 TSD)*, at 1 (Feb. 2021). As the Working Group explained, it reviewed the interim

SC-GHG estimates that EPA had developed in 2017 for use under E.O. 13783 and found them

wanting in several respects. *See id.* at 3. For one, they failed to acknowledge that "a global perspective

is essential for SC-GHG estimates because climate impacts occurring outside U.S. borders can directly

and indirectly affect the welfare of U.S. citizens." *Id.* Another failing was their use of high discount

rates that "inappropriately underestimate[d] the impacts of climate change" and failed to account for

"intergenerational ethical considerations." *Id.* But the Working Group also acknowledged significant

advances in the relevant scientific literature, and explained that recent studies suggest that the new

Interim Estimates "likely underestimate the damages from GHG emissions." *Id.* at 31.

  On May 7, 2021, pursuant to E.O. 13990's directive for the Working Group "to solicit public

comment, engage with the public and stakeholders, and seek the advice of ethics experts" in

conducting its work, E.O. 13990 § 5(b)(iii) (cleaned up), OMB published a notice in the Federal Register, inviting public comments "on the [February 2021 TSD] as well as on how best to incorporate the latest peer-reviewed science and economics literature in order to develop an updated set of SC-GHG estimates."  OMB, *Notice of Availability and Request for Comment* on *"Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under E.O. 13990"*, 86 Fed. Reg. 24669, 24669 (May 7, 2021).  Comments are due by June 21, 2021.  *Id.*

On June 3, 2021, OIRA issued a "Frequently Asked Questions" document to assist agencies in meeting their obligations under E.O. 13990.  Ex. 4, OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs)* (*OIRA Guidance*), (June 3, 2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2021/06/Social-Cost-of-Greenhouse-Gas-Emissions.pdf.  As that guidance makes clear, the Interim Estimates will be used when agencies prepare cost-benefit analyses "for purposes of compliance with E.O. 12866."  *Id.* at 1.  The OIRA Guidance also confirms that where "an applicable statute expressly specifies and requires or excludes an analytic approach," *e.g.*, cost-benefit analysis, that statute "must control" the agency's approach "in taking an agency action," even in the context of the Executive Order.  *Id.* at 2.  In other words, where Congress has addressed the issue, "those statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas emissions in the context of the agency action."  *Id.*

## II.    Procedural Background

Twelve states (now thirteen, after amendment) filed this action on March 8, 2021, claiming that Section 5 of E.O. 13990 and the Interim Estimates violate the Constitution, the APA, and an unstated number of other (largely unidentified) statutes.  They named as Defendants nineteen federal entities and officials, including the President.  On March 26, Plaintiffs filed an amended complaint. ECF No. 6.  On May 3, Plaintiffs filed a motion for a preliminary injunction, ECF Nos. 17-20.

## ARGUMENT

Although all of Plaintiffs' claims are meritless, this Court need not reach them, because the Court lacks subject-matter jurisdiction under both the doctrines of Article III standing and ripeness. Although Plaintiffs purport to challenge E.O. 13990 and the Interim Estimates, all of their alleged

injuries are (1) speculative; (2) caused by future hypothetical agency regulations (rather than the Executive Order or the Interim Estimates); and (3) not likely to be redressed by a victory here.  And if, one day, Plaintiffs *do* face an actual or imminent injury from agency action taken in reliance on the Executive Order, Plaintiffs can challenge that action (including the agency's reliance on the Executive Order) at that time.  On top of all that, Plaintiffs have failed to identify any applicable cause of action.

Plaintiffs' claims would ultimately fare no better on the merits.  Their understanding of the Executive Order as presidential lawmaking, through which agencies are required to violate federal law, is squarely refuted by the text of the Executive Order and the recent OIRA Guidance interpreting it: the Executive Order is inoperative by its own terms whenever an agency faces conflicting statutory requirements.  And although there were no notice-and-comment obligations here, what matters is that agencies *will* seek comment before issuing binding rules, and that the Working Group has already (and repeatedly) considered and rejected Plaintiffs' methodological concerns.

Finally, Plaintiffs' motion for a preliminary injunction should be denied not only for the reasons above, but also because of the lack of any irreparable harm.  Plaintiffs try to repurpose various alleged injuries that aren't even enough to give rise to a cognizable Article III injury—let alone to justify the extraordinary remedy of a preliminary injunction.   All of Plaintiffs' claims should be dismissed, and their motion for a preliminary injunction should be denied.

## I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION.

There are many reasons why this case should be dismissed in its entirety, but the two most straightforward are grounded in this Court's subject-matter jurisdiction:  standing and ripeness. Despite some variation between the doctrines, the same basic error requires dismissal of Plaintiffs' claims under either.  In short, instead of waiting until the Executive Order or the Interim Estimates are actually used in a particular agency action, in a manner that causes Plaintiffs some concrete harm, Plaintiffs have instead filed this premature challenge to the Executive Order itself.  In doing so, Plaintiffs (in their words) seek to avoid the "*potential* regulatory impact" of "more restrictive" future policies that may be issued by a variety of agencies in "innumerable areas" in the "upcoming years and decades."  Am. Compl., ECF No. 6, ¶¶ 129, 131 (emphasis added).  Although Plaintiffs might prefer

that the Executive Order and the Interim Estimates be invalidated in their entirety and all at once—rather than to litigate these issues in the context of specific agency actions that actually cause them concrete harm—that type of speculative, prophylactic relief is not available from Article III courts.

## A.       Plaintiffs lack Article III standing.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff who seeks to establish standing "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Here, Plaintiffs cannot establish any of them.

### 1.       The possibility that Plaintiffs will suffer a future injury—let alone an injury actually caused by the Executive Order—is speculative.

To support Article III standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (quoting *Lujan*, 504 U.S. at 565 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that 'allegations of possible future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *City of Kennett, Missouri v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) ("In future injury cases, the plaintiff must demonstrate that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'"). Where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan*, 504 U.S. at 562).

**a.** Plaintiffs do not allege that they have *already* suffered any "concrete, particularized," or "actual" injury, *Clapper*, 568 U.S. at 409—instead, this is a "future injury case[]." *City of Kennett*, 887

F.3d at 431. But Plaintiffs allege at most a "possible future injury," rather than one that is "certainly impending." *Clapper*, 568 U.S. at 409. In particular, Plaintiffs allege that "[t]he *potential* regulatory impact" of the Interim Estimates is significant—that is, Plaintiffs hypothesize that agencies will use them "to justify massive increases in regulatory restrictions on agricultural practices, energy production, energy use, or any other economic activity that results in the emission of such gases," Am. Compl. ¶ 129 (emphasis added), and that those future, hypothetical agency actions will harm them.

Plaintiffs' theory of injury is entirely speculative. For starters, "a number of things must occur before appellants will suffer an actual or even an imminent injury," *Johnson v. State of Mo.*, 142 F.3d 1087, 1089-90 (8th Cir. 1998), and most of them are quite hard to predict. In particular, Plaintiffs ignore that, while operating within the wide boundaries set by the Executive Order (and by dozens of potentially relevant statutory delegations of authority), agencies taking future action will still be making independent "policy judgment[s] committed to the[ir] broad and legitimate discretion"—discretion which, so long as the agencies comply with the APA and their statutory authority, "courts cannot presume either to control or to predict." *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (citation omitted). In other words, when it comes to implementing the Executive Order on an agency-by-agency, rulemaking-by-rulemaking basis, "[t]hese policy decisions might be made in different ways by the governing officials, depending on their perceptions of wise . . . policy and myriad other circumstances." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614-15 (1989). Perhaps agencies will issue new, costly regulations. Perhaps not. Plaintiffs offer nothing but conjecture to support their assumption that a cavalcade of new, burdensome regulation is surely forthcoming, and that those hypothetical regulations will surely injure them. The Supreme Court has appropriately been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this Court do exactly that. *Cf. id.* at 412 ("[B]ecause § 1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural.").

The Supreme Court's application of these principles in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), is a prime example of why Plaintiffs' speculative fears of a regulatory slippery slope are

not enough.  "In *Summers*, the Court considered a challenge brought by environmental groups with respect to a Forest Service regulation exempting certain timber salvage sales (those involving less than 250 acres of forest) from the notice and comment period otherwise required for such sales."  *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 43 (D.D.C. 2015) ("*FFRC*") (citing *Summers*, 555 U.S. at 490).  "In ruling that the plaintiffs lacked standing, the *Summers* Court noted that 'the regulations under challenge here neither require nor forbid any action on the part of' the plaintiffs, but rather 'govern only the conduct of Forest Service officials engaged in project planning.'"  *Id.* (quoting *Summers*, 555 U.S. at 493).  "Ultimately, the Supreme Court found that the plaintiffs lacked standing because they had failed 'to allege that any *particular* timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete' interest of the plaintiffs in the national forests."  *Id.* (quoting *Summers*, 555 U.S. at 495) (emphasis added).  Thus, the plaintiffs could not challenge the generic regulation, until it was actually applied by the Forest Service, in a specific timber sale, in a way that caused a concrete injury.  *See Summers*, 555 U.S. at 493 ("[R]espondents can demonstrate standing only if *application* of the regulations by the Government will affect them.") (second emphasis omitted).

E.O. 13990, "much like the rule at issue in *Summers*, governs only agency conduct."  *FFRC*, 100 F. Supp. 3d at 44.  Therefore, "under *Summers'* reasoning," Plaintiffs lack standing "unless and until they have been—or certainly will be—harmed by a specific" agency action that was "developed pursuant to" the Executive Order.  *Id.*; *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011) (no standing to challenge determination that portions of a river qualified as "traditional navigable waters" and thus were "subject to Clean Water Act jurisdiction," because plaintiffs still "face[d] only the *possibility* of regulation"); *FFRC*, 100 F. Supp. 3d at 42 ("Plaintiffs have not identified a specific land management plan promulgated pursuant to the [2012] Planning Rule that threatens to harm [them] . . . . Indeed, it appears that Plaintiffs here cannot even begin to clear the particularization hurdle because no individual forest plans have been created pursuant to the 2012 Planning Rule.").  Plaintiffs might think it more efficient to challenge a broad regulatory framework (like the one at issue in *Summers*) at the outset, rather than waiting for a concrete application.  But Article III has no convenience exception.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

**b.** The speculation inherent in Plaintiffs' injury-in-fact theory, indeed, goes deeper than just their assumption that they will be harmed by future, hypothetical agency actions. For there to be any cognizable harm caused by Section 5 of the Executive Order, Plaintiffs would at least have to show that, in the absence of the Executive Order and the Interim Estimates, the agency would have come to a different regulatory result. *See, e.g.*, *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 157 (D.D.C. 2019) ("[B]ecause the evidence demonstrates that factors unrelated to [the] Executive Order and OMB Guidance have delayed finalization of the V2V and Commercial Water Heating Equipment rules . . . , the Court will now dismiss the action for lack of standing."). But that is unknowable in advance. Even if it were certain that agencies eventually will regulate in a way that injures Plaintiffs, there is no way to be confident that those future actions (and thus, future injuries) will be causally connected to the Executive Order or the Interim Estimates.

Imagine that Section 5 of the Executive Order and the Interim Estimates were never issued. In that hypothetical world that Plaintiffs desire, agencies would *not* be precluded from considering the social costs of greenhouse gases. After all, as several courts have held, it is consistent with reasoned decision-making for agencies to take the costs of greenhouse gas emissions into account, *see, e.g.*, *Zero Zone*, 832 F.3d at 678—and, at least in some cases, it may be arbitrary and capricious not to, *see, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1203; *California v. Bernhardt*, 472 F. Supp. 3d 573, 611 (N.D. Cal. 2020). And Section 1 of E.O. 13990—not challenged here—directs all agencies to "immediately commence work to confront the climate crisis," and to do so "guided by the best science."

In these hypothetical rulemakings, the social cost of greenhouse gas emissions is but one of many factors that an agency might (or might not) consider when regulating in the "innumerable areas," Am. Compl. ¶ 129, that Plaintiffs are concerned about—depending on the policy question at issue, and the statutory delegations of authority that will necessarily guide the agency's approach. In fact, in light of Plaintiffs' acknowledgment that these costs have been estimated in ranges that may *exceed* those set by the Interim Estimates, Plaintiffs could face *higher* social-cost estimates in the absence of the uniform approach contemplated by E.O. 13990. *See* Pls.' Br. 9-10; Am. Compl. ¶ 128; Feb. 2021 TSD at 4 (noting that the Interim Estimates "likely underestimate societal damages from GHG emissions").

18

Thus, not only is it speculative that Plaintiffs will be injured at all, that speculation is further compounded when trying to demonstrate that any injury will stem from the Executive Order or the Interim Estimates—a showing that is required for Plaintiffs to rely on this theory of injury. *See, e.g.,* *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 45 (1976) (plaintiffs lacked standing because "[s]peculative inferences are necessary to connect their injury to the challenged actions" of the government); *California v. Trump*, No. 19-cv-960 (RDM), 2020 WL 1643858, at *8 (D.D.C. Apr. 2, 2020) ("[W]ith respect to each of the four regulatory inactions or actions at issue, Plaintiffs cannot show that any material delay in action or any agency action was caused by the Executive Order. . . .").[9]

**c.** Executive Order 13990's place in the broader scheme of regulatory review also shows why it is speculative to assume that it will necessarily dictate policy outcomes that concretely harm Plaintiffs. To be clear, Plaintiffs' concern is not agency cost-benefit analyses in a vacuum, but that the Interim Estimates will be used "*to justify* imposing new regulatory costs," Am. Compl. ¶ 185 (emphasis added). But Plaintiffs overestimate the role that cost-benefit analysis generally (and this Executive Order specifically) plays in *justifying* (as opposed to analyzing or explaining) agency action—as confirmed by recent OIRA Guidance on the subject of E.O. 13990.

Often, agencies prepare a cost-benefit analysis solely as part of the Regulatory Impact Analysis required by E.O. 12866—*not* because it is required by statute, and *not* because that cost-benefit analysis will be relied upon as justification for the agency rule. By definition, in that scenario, the Interim Estimates will have made no substantive difference to the outcome. That is why it is well-settled that a cost-benefit analysis that is undertaken only for purposes of compliance with E.O. 12866 (rather than to justify a rule) is *not* subject to judicial review. *Compare, e.g., Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013) ("Executive Order 12,866," which "require[s] that the agency perform cost benefit analyses for each proposed regulation" does not "create[] private rights," so alleged violations of it are not "subject to judicial review"), *with Nat'l Ass'n of Home Builders*, 682 F.3d at 1040 ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious

---

[9] For similar reasons, Plaintiffs cannot demonstrate that their alleged injuries are traceable to the Executive Order, or redressable by its invalidation. *See infra* at Sections I.A.2., I.A.3.

flaw undermining that analysis can render the rule unreasonable."). E.O. 13990 does not change the fact that in these situations, the agency's cost-benefit analysis will *not* have been the basis for the agency's (hypothetical) action—with that analysis instead having been carried out solely to comply with other, longstanding executive orders that are not challenged here.

Other times, an agency prepares a cost-benefit analysis because it is required (or permitted) to do so by some federal statute, and in which the cost-benefit analysis is part of the *justification* for the agency action. But the OIRA Guidance confirms that "when applicable statutes require another approach, those statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas emissions in the context of the agency action." OIRA Guidance, at 2; *see also* E.O. 13990 §§ 5(b)(ii), 8. In other words, the agency is not only authorized, but *required* to deviate from the Interim Estimates, if doing so is necessary to comply with a statute. Of course, in that situation, the cost-benefit analysis *would* typically be subject to judicial review, at a time when any effect of the agency action will be more concrete. *See, e.g.*, *Nat'l Ass'n of Home Builders*, 682 F.3d at 1039-40. And to facilitate that review, agencies will "respond to any significant comments on [the Interim Estimates] and ensure [their] analysis (including any use of the 2021 interim estimates) is justified as not arbitrary or capricious." OIRA Guidance, at 2.

In short, it is unknowable in advance whether any harm caused by future (hypothetical) regulations would have any causal connection to the Executive Order or the Interim Estimates.

**d.** To make matters even more speculative, even if an agency's cost-benefit analysis is relied upon to justify a rule—and for the reasons above, it often will not be—it is unknowable in advance whether the social costs of greenhouse gases would be outcome determinative even *to the cost-benefit analysis*. The usual purpose of an agency cost-benefit analysis is to answer a single, yes-or-no question: do the quantifiable benefits of the proposed rule outweigh the quantifiable costs? It is entirely speculative to assume that, for any (let alone all) future regulations, the costs of a proposed rule would outweigh its benefits *but for* the benefits associated with reducing greenhouse gas emissions. And any other impact (including an increase in the *magnitude* of the net benefits) will often be immaterial to the agency's ultimate decision. Likewise, it is even more difficult to speculate as to whether Plaintiffs'

*particular* concerns—*e.g.*, the discount rate—would alter the bottom-line question of whether the benefits of a proposed rule, overall, outweigh its costs.  Thus, it is entirely uncertain whether the Executive Order would *ever* be determinative in the decision to issue a rule.  And it is even more speculative to assume that, even if some regulation that meets all of those criteria is issued one day, that that particular regulation will *also* happen to be one that concretely harms Plaintiffs.

    **e.**  In short, Plaintiffs' entire theory of standing is based on a portrait of agency regulation that is painted with broad, and often mistaken, strokes.  Plaintiffs seem to imagine a government of regulation by mathematical formula, in which one can simply adjust a single numerical variable on the front end, and every regulation that emerges at the back end will necessarily be altered in some material and predictable way.  But in fact, agencies have broad discretion to exercise independent policy judgment within the boundaries set by Congress in its (often quite general) delegations of authority. *Cf. Yakus v. United States*, 321 U.S. 414, 425 (1944) ("It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework.").  And Plaintiffs' narrative fundamentally misunderstands the relationship between this Executive Order, prior executive orders (like E.O. 12866), and the way that cost-benefit analysis is used—or, more often, not used—to justify agency rules.

    Accordingly, even if Plaintiffs could somehow show that the future hypothetical regulations they fear were "certainly impending," it remains impossible (absent impermissible speculation) to assume that any such injuries will be attributable to the challenged provisions of the Executive Order. *See, e.g.*, *Simon*, 426 U.S. at 42-43.  That is fatal to their standing.

    **2.**    **Any injury would be traceable to future, hypothetical agency actions, not to the Executive Order or the Interim Estimates.**

    Even if Plaintiffs could show a "certainly impending" injury, they still cannot satisfy the causation requirement of Article III standing, because none of Plaintiffs' alleged future injuries would be "fairly traceable to the challenged conduct of the defendant," *Spokeo*, 136 S. Ct. at 1547—that is, to Section 5 of the Executive Order, or to the Interim Estimates.  Instead, all of Plaintiffs' alleged

injuries will be caused, if at all, by future (and currently hypothetical) agency actions.  One day, Plaintiffs may have standing to challenge some of those agency actions under the APA—assuming those hypothetical regulations are actually issued, and that they concretely harm Plaintiffs.  And Plaintiffs can argue in a future case that an agency erred in its consideration of the costs of greenhouse gases—including by arguing that the estimates relied upon were arbitrary and capricious.  But Plaintiffs cannot rely on alleged future injuries from those non-existent regulations to manufacture standing to challenge an Executive Order that *itself* is not the cause of any concrete, particularized injury.

Plaintiffs' own allegations confirm their traceability problem.  Although Section 5 of E.O. 13990 is the "challenged conduct" that Plaintiffs say is unlawful, *Spokeo*, 136 S. Ct. at 1547, it is hypothetical agency actions that Plaintiffs identify as the source of their (future) injuries.  According to Plaintiffs, they are concerned about the "potential regulatory impact" of "more restrictive regulatory policies" that may one day be issued by various agencies in "innumerable areas" in the "upcoming years and decades."  Am. Compl. ¶¶ 129, 131.  For example, they allege that E.O. 13990 "authorize[s] federal agencies to engage in a great expansion of federal regulatory authority over agricultural practices," and that this (hypothesized) regulatory expansion, if and when it happens, will "encroach[] on the Plaintiff States' sovereign authority to regulate agriculture within their borders."  *Id.* ¶ 157.

Again, even setting aside the speculative nature of these sorts of allegations, *see supra* at Section I.A.1; *infra* at Section I.B., if they ever come to pass, any such injuries will have been caused by some hypothetical future regulatory "expansion" by the Department of Agriculture, or some other agency (or combination of agencies)—*not* by the challenged Executive Order, which, by itself, has no effect on "federal regulatory authority over agricultural practices."  Am. Compl. ¶ 157.  Whatever prognostications one could make about the future of agricultural policy, not a single state law or federal regulation has been promulgated, preempted, or altered, in any way, by the Executive Order.

More generally, Plaintiffs assert that the Interim Estimates "are high enough to justify massive increases in regulatory restrictions on agricultural practices, energy production, energy use, or any other economic activity that results in the emission of such gases."  *Id.* ¶ 129.  But any such hypothetical injury would still stem only from future agency action.  So even if it were plausible that

22

"[e]very citizen and state agency of the Plaintiff States will necessarily feel the economic pinch *from these regulations*," *id.* ¶ 187 (emphasis added), that would (at most) be a basis for a future challenge to "th[o]se regulations"—not to the Executive Order or the Interim Estimates.

To be sure, the Executive Order requires agencies to use the Interim Estimates in some circumstances. *See* E.O. 13990 §§ 5(b)(ii)(A) (using the word "shall"); OIRA Guidance, at 1. But that directive is inoperative whenever the agency faces any conflicting statutory obligation, *see* OIRA Guidance, at 2-3; *see also* E.O. 13990 §§ 5(b)(ii), 8. In other words, agencies will only ever rely on the Interim Estimates when they have *discretion* to do so—which is why Plaintiffs' alleged future injuries (if any) will necessarily be traceable to future agency decisions, rather than to the Executive Order or the Interim Estimates.

Although Plaintiffs try to elide the distinction between the Executive Order and the future (and still hypothetical) regulations that they fear, their own amended complaint repeatedly undermines that effort. For example, Plaintiffs allege that they are "purchasers of regulated products which will now become more expensive *due to increased regulations*." *Id.* ¶ 179 (emphasis added). But they do not identify any such regulation (for none yet exists), nor do they allege that prices have increased already—that is, that there has been any effect that is actually "due to" the Executive Order that is the target of this lawsuit. *See also, e.g., id.* ¶ 155 ("*Federal regulations* promulgated employing the Interim Values will preempt conflicting state regulations under the Supremacy Clause . . . .") (emphasis added); *id.* ¶ 131 ("[T]he *potential* cost to the U.S. economy, including lost GDP, *from increased regulations* justified by the "social costs" in the Interim Values will be in the hundreds of billions or trillions of dollars in upcoming years and decades.") (emphasis added). These sorts of allegations acknowledge what is unavoidable from the nature of Plaintiffs' hypothesized injuries: they all stem from potential, future regulations. And absent those regulations, Plaintiffs will suffer no harm. Accordingly, as a matter of causation, Plaintiffs lack standing to bring this lawsuit, which challenges only the Executive Order and the Interim Estimates—not any past, present, or future agency regulation.

**3.      Plaintiffs' alleged injuries are not redressable by a victory in this lawsuit.**

**a.**  Even if Plaintiffs could satisfy the injury-in-fact and traceability requirements, they would still lack standing, because it is not "likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation omitted).  Plaintiffs seek an order that would "enjoin all defendants ... from using the [Interim Estimates] as *binding* values in any agency action."  Pls.' Br. 50 (emphasis added).[10]  But with or without any binding directive, agencies often may (and sometimes must) consider the social costs of greenhouse gases.  *See, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1203.  And in doing so, whether or not the Interim Estimates are mandatory, agencies are not likely to ignore them, as they reflect years of cutting-edge work from leading experts and academics inside and outside government.  To the contrary, there are many reasons to expect that, given the policy priorities of the President and his Cabinet,[11] agencies will consider these costs when regulating, including by relying on the Interim Estimates—even without any binding directive from the President.  In fact, in the absence of the Interim Estimates, it is possible that some agencies would conduct their own analyses and rely upon even *higher* estimates, with greater potential downstream regulatory effects.  *See supra* at 18 (citing Pls.' Br. 9-10; Am. Compl. ¶ 128; Feb. 2021 TSD, at 4).

In other words, vacating Section 5 of the Executive Order would have "no legal impact on the consensus that [the Working Group's] estimates constitute the best available science about monetizing the impacts of greenhouse gas emissions." *California v. Bernhardt*, 472 F. Supp. 3d at 611 (holding that the Department of the Interior's failure to consider the global social cost of methane was arbitrary and capricious); *see also* E.O. 13990 § 1 (in a provision not challenged here, directing agencies to "immediately commence work to confront the climate crisis," and to do so "guided by the

_____

[10]  As discussed further below, *see infra* at 54 n.31, although Plaintiffs' prior filings are inconsistent regarding the scope of relief they request, Plaintiffs' preliminary-injunction brief makes clear that Plaintiffs now seek an order that would prohibit the Executive Branch from treating the Interim Estimates as legally binding on agencies.

[11]  *See, e.g.*, EPA, *Climate Change*, https://www.epa.gov/climate-change ("Understanding and addressing climate change is critical to EPA's mission of protecting human health and the environment.  EPA tracks and reports greenhouse gas emissions, leverages sound science, and works to reduce emissions to combat climate change.");  USDA, *Climate Solutions*, https://www.usda.gov/topics/climate-solutions ("The changing climate presents real threats to U.S. agricultural production, forest resources, and rural economies.").

best science"). As a result, even if Plaintiffs obtain the order they seek—that is, enjoining Defendants from treating the Interim Estimates "as binding values in any agency action," Pls.' Br. 50—it is not "likely, as opposed to merely speculative," that such relief would meaningfully alter any particular regulation (let alone do so in a way that would prevent what otherwise would have been a concrete, particularized injury to these Plaintiffs). That is independently fatal to Plaintiffs' Article III standing. *See, e.g.*, *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) (no redressability if "the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces").

**b.** Setting aside the general redressability problem with all of Plaintiffs' claims, at a minimum, Plaintiffs cannot obtain relief against the President—as they seem to recognize. *See* Pls.' Br. 50 (seeking relief against all Defendants "except for the President"). That creates an independent redressability problem for Plaintiffs' claims against the President, and provides an additional reason to dismiss him as a Defendant. *See, e.g.*, *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[E]ven where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief.").

Plaintiffs' core complaint is with Section 5 of the Executive Order—specifically, Section 5(b)(ii)(A)'s provision in which the President states that, when consistent with applicable law, "agencies shall use" the Interim Estimates when monetizing the costs of GHG emissions. *That* is what the Plaintiffs hope to forestall through this lawsuit. There can be no question, then, that to grant the relief Plaintiffs seek in the amended complaint, the Court would need to exert control over the manner in which the President exercises his discretionary duties as head of the Executive Branch.

This the Court cannot do. Issuing an injunction directly against the President would violate the longstanding principle—rooted in the very separation of powers that Plaintiffs invoke—that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality op.) (stating that a "grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows"). "[F]or the President to 'be ordered

to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan v. Clinton,* 100 F.3d 973, 978 (D.C. Cir. 1996).

The same is true as to Plaintiffs' claims for declaratory relief against the President. In practice, to subject the President to suits for declaratory relief poses essentially the same concerns as injunctions. *See Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment) ("It is incompatible with [the President's] constitutional position that he be compelled personally to defend his executive actions before a court."). Thus, even when "[t]he only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against . . . the President himself . . . [s]uch relief is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1014 (D.C. Cir. 2010). Accordingly, given that the Court will be unable to award relief against the President, Plaintiffs' claims against the President are not redressable, and the Court should dismiss him as a Defendant.

**4.      Plaintiffs' remaining, miscellaneous bases for standing are meritless.**

Plaintiffs make passing reference to a variety of miscellaneous standing-related theories, asserting (often without further explanation) that they "bring this action to redress harms to their sovereign interests, quasi-sovereign interests, their proprietary interests, and their interests as *parentes patriae*, and to vindicate their interests under 5 U.S.C. § 702." Am. Compl. ¶ 59. None of these theories can surmount the fundamental standing defects explained above, because they all rely on: (1) speculation about possible future injuries; (2) harms that, even if they come to pass, would be traceable to future hypothetical regulations, rather than to the Executive Order or the Interim Estimates; and (3) harms that are not likely to be redressed by a favorable decision. But even if the Court was unpersuaded by all of the above arguments from *Defendants*, it remains *Plaintiffs'* burden to demonstrate subject-matter jurisdiction. *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006). And for the reasons below, Plaintiffs' specific standing theories are all meritless, even on their own terms.

**a.**      Plaintiffs rely on "their interests as *parentes patriae*." Am. Compl. ¶ 59. "The problem for Missouri is that, as a general matter, a 'State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 176 (D.C. Cir. 2019)

26

(quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)).  That is because it is the United States, and not the State, that represents the people as *parens patriae* in their relations to the federal government.  *See Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 354-55 (8th Cir. 1985).  Because standing on a *parens patriae* theory is off the table, all of Plaintiffs' standing allegations can be ignored, except for the few that allege a *direct* injury to the states—rather than injury to their citizens or in-state businesses.  *See Manitoba*, 923 F.3d at 178 (discussing "[t]wo types of lawsuits" that states can bring) (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992) (distinguishing between "claims of *parens patriae* standing" and "allegations of direct injury to the State")).  That means that, for example, Plaintiffs' allegations that "[t]he Executive Order and the Interim Values will inflict enormous regulatory costs on the economies and citizens of those States" are irrelevant (even if they were plausible).  Am. Compl. ¶ 184.

**b.**  In the amended complaint, allegations related to the possibility of a *direct* injury to the states are few and far between.  But even where they occasionally appear—for example, Plaintiffs' assertion that they are "regular purchasers of regulated products," like "light trucks, dishwashers, dehumidifiers, microwave ovens, . . . battery chargers" and so on, which allegedly "will now become more expensive due to increased regulations," Am. Compl. ¶¶ 179-82—those kinds of interests are shared by virtually every state, every business, every organization, and every person in the United States (even setting aside the obvious speculativeness and traceability problems).  *See, e.g., id.* ¶ 5 (alleging an "enormous expansion of federal regulatory power" is forthcoming, which "will intrude into every aspect of Americans' lives—from their cars, to their refrigerators and homes, to their grocery and electric bills").

As a result, even taking Plaintiffs' allegations at face value, unless and until the Executive Order is applied in a future agency action that directly affects these Plaintiffs in some *particularized* way, Plaintiffs' interest in the Executive Order's legality is the same as anyone else's: an "undifferentiated, generalized grievance about the conduct of government."  *Lance v. Coffman*, 549 U.S. 437, 442 (2007).  But "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974).  And "[v]indicating the public

interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," not of federal-court plaintiffs. *Lujan*, 504 U.S. at 576.

 **c.** In an attempt to identify a specific injury that applies to the states, Plaintiffs assert that "[u]nder the Executive Order, the agencies of the Plaintiff States must now employ the Working Group's Interim Values in their NEPA environmental impact statements or face disapproval and rejection by the federal agencies." Am. Compl. ¶ 171. That is incorrect. The Executive Order applies to "all executive departments and agencies" of the *federal* government, E.O. 13990 § 1—it does not bind *state* agencies. And no decisions have yet been made as to whether (and to what extent) the Executive Order applies *at all* outside the context of agency regulations. *See* E.O. 13990 § 5(b)(ii) (the President requesting "recommendations" by September on the applicability of the Interim Estimates outside the context of regulations). So, at present, any NEPA consequences are entirely speculative.

 In any event, NEPA does not require *any* agency to conduct a cost-benefit analysis when preparing an analysis of environmental impacts, and federal agencies frequently do not do so. *See* 40 C.F.R. § 1502.22 (2020); *see also* 42 U.S.C. § 4321 *et seq.* And, at present, Section 5 of the Executive Order only governs when an agency monetizes the cost of greenhouse-gas emissions in a cost-benefit analysis. *See* E.O. 13990 § 5(a), (b)(ii)(A); Feb. 2021 TSD at 9 (the Interim Estimates are "the theoretically appropriate values to use when conducting benefit-cost analyses of policies that affect GHG emissions"). In any case, while this allegation might (at most) be relevant to a future lawsuit challenging the use of the Interim Estimates in a specific agency action that triggers NEPA-related requirements, it cannot provide standing to challenge the Executive Order itself. After all, "standing is not dispensed in gross." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017).

 Plaintiff Missouri similarly points to its own "'no stricter than' statute," which Plaintiffs believe "effectively requires Missouri, as a matter of law for most clean-air programs, to enforce . . . the clean-air standards adopted by EPA, including those standards that incorporate and rely upon the Interim Values." Am. Compl. ¶ 178. As a threshold matter, no such standards currently exist, and if EPA one day *does* adopt new clean-air standards that rely on the Interim Estimates, *and* they cause concrete harm to Plaintiffs, Plaintiffs can challenge them then. But even ignoring that timing problem,

Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves." *Clapper*, 568 U.S. at 416; *see also Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage inflicted by its own hand."). If the State of Missouri is injured by Missouri law, it can change its law. That sort of self-inflicted harm cannot support standing.

     **d.**  Plaintiffs allege broadly that "[a]ctions by the federal Executive Branch that encroach on the authority of Congress undermine the separate authority and role of the States in our system of federalism, thus injuring them in their sovereign capacities." Am. Compl. ¶ 154. But those sorts of generic appeals to federalism and sovereignty as a basis for standing cannot be reconciled with *Massachusetts v. Mellon*, in which the Supreme Court made clear that Article III jurisdiction is not satisfied by a state plaintiff raising "abstract questions of political power, of sovereignty, of government." 262 U.S. 447, 485 (1923). The Supreme Court held that the State's "naked contention that Congress has usurped the reserved powers of the several States by the mere enactment of the statute" was insufficient to establish an Article III case or controversy. *Id.* at 483. Instead, Massachusetts was required to allege that a particular sovereign interest was "actually invaded or threatened" by "the actual or threatened operation of the statute," *id.* at 485—precisely the sort of concrete and particularized injury that Plaintiffs lack here, in the absence of any actual or imminent *application* of the Executive Order in a specific regulatory action affecting Plaintiffs concretely.

     **e.**  Finally, Plaintiffs claim that the Interim Estimates harmed them "by depriving them of the opportunity to participate in notice-and-comment rulemaking." Am. Compl. ¶ 191; *see also id.* ¶ 59 (citing Plaintiffs' "interests under 5 U.S.C. § 702"). As explained below, Plaintiffs' notice-and-comment claims fail. *See infra* at Section III.C. But even if they had merit, the Supreme Court has squarely rejected this argument: "a bare procedural violation, divorced from any concrete harm," is not enough for standing. *Spokeo*, 136 S. Ct. at 1549; *see also Summers*, 555 U.S. at 496 (being "denied the ability to file comments" is "insufficient to create Article III standing"). Plaintiffs cannot bootstrap their way into federal court merely by alleging that Defendants violated the law—that is the basic premise of standing doctrine.

**B.**     <u>Plaintiffs' claims are not ripe</u>.

For reasons that are conceptually distinct but similar in kind to the problems with Plaintiffs' theory of standing,[12] this case is not ripe.  If an agency one day relies on the Interim Estimates to justify some action that actually causes Plaintiffs a concrete injury, they can challenge that specific agency action (including its use of the Interim Estimates) at that time.  For both constitutional and prudential reasons, that is the only appropriate way to bring this sort of challenge: in a concrete context, about a specific agency action, which is causing concrete harms, to a specific plaintiff.

**1.**     "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  To determine whether a claim is ripe, courts "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Duffner v. City of St. Peters, Missouri*, 930 F.3d 973, 977 (8th Cir. 2019) (citation omitted).

**2.**     On the question of hardship, Plaintiffs' claimed harm rests on speculation that one or more agencies will one day take some action that will cause them injury.  *See supra* at Section I.A.1.  In other words, this lawsuit "involves 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Mo. Roundtable for Life v. Carnahan*, 676 F.3d 665, 674 (8th Cir. 2012) (quoting *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011)).  At least "[a]t this time, the timing and type of injury to the [Plaintiffs] cannot be determined" with any confidence or specificity.  *Johnson*, 142

---

[12] "[S]tanding and ripeness are technically different doctrines," but they are "closely related in that each focuses on 'whether the harm asserted has matured sufficiently to warrant judicial intervention.'"  *Johnson*, 142 F.3d at 1090 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)); *see Trump v. New York*, 141 S. Ct. 530, 535 (2020) (standing and ripeness are "[t]wo related doctrines of justiciability," "each originating in the case-or-controversy requirement of Article III").

F.3d at 1089. That creates a ripeness problem: "[a] federal court is neither required nor empowered to wade through a quagmire of what-ifs like the one the State placed before the District Court in this case." *State of Mo. ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1338 (8th Cir. 1997).

In the context of challenges to federal regulation, the Supreme Court has been especially vigilant about these principles, which is why "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.[13]

For example, in *Ohio Forestry Association v. Sierra Club*, the Supreme Court held that a challenge to a forest plan for a particular National Forest was not ripe. 523 U.S. 726, 732-37 (1998). The Court noted that the forest plan standing alone caused no hardship: by itself, it "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* at 733. And the plaintiff would "have ample opportunity later to bring its legal challenge" to the plan in the context of a *specific* logging project, "at a time when harm is more imminent and more certain." *Id.* at 734. Likewise, in *National Parks Hospitality Association*, the Supreme Court held that a challenge to a National Park Service regulation about concession contracts was not ripe, because "judicial resolution" of the issue "should await a concrete dispute about a particular concession contract." 538 U.S. at 812; *see also Reno*, 509 U.S. at 43 (challenge to immigration regulation not ripe until applied to plaintiffs).

So too here. Plaintiffs can challenge any future regulation that actually causes them concrete harm, if and when such a regulation is actually issued. That is not just a hypothetical: there have been several cases over the years challenging specific agency actions on the theory that an agency inappropriately accounted for the social costs of greenhouse gases. Several of those cases hold that (at least in some circumstances) an agency *must* consider those costs as part of the agency's cost-benefit

---

[13] The Supreme Court identified two possible exceptions to this principle, but neither applies here: (1) "a statutory provision providing for immediate judicial review," or (2) "a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

analysis.[14]  By contrast, one court has held that an agency may *not* consider the global, social costs of greenhouse gases in justifying a specific regulation.[15]  And many others hold that an agency has a range of available options.[16]  But those varied outcomes, in cases against various agency defendants, with varying statutory constraints on their delegated authority, confirm why it is both impractical and unnecessary to litigate all of these issues now, in this abstract context, with thirteen plaintiffs suing nineteen defendants at once, complaining of a variety of potential future statutory violations across "innumerable areas." Am. Compl. ¶ 129.  Instead, these claims must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the [Executive Order] to [Plaintiffs'] situation in a fashion that harms or threatens to harm" them. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

    **3.**  As for "the fitness of the issues for judicial decision," for similar reasons, this case would "benefit from further factual development." *Duffner*, 930 F.3d at 977.  Much of Plaintiffs' rhetoric is based on misinterpretations of the Executive Order, which is narrower than Plaintiffs suggest.  For example, Plaintiffs assume incorrectly that "Section 5 of EO 13990 and the Working Group's Interim Values violate the statutes that confer authority on various federal agencies." Am. Compl. ¶ 204.  In reality, the Executive Order and the OIRA Guidance interpreting it confirm that any conflict between a federal statute and the Executive Order must be resolved in favor of the statute.  *See supra* at 23

---

[14] *See, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1203 ("NHTSA's decision not to monetize the benefit of carbon emissions reduction was arbitrary and capricious[.]"); *WildEarth Guardians v. Bernhardt*, 2021 WL 363955, at *10 (D. Mont. Feb. 3, 2021) (holding that the agency "failed to take a 'hard look' at the costs of greenhouse gas emissions"); *California v. Bernhardt*, 472 F. Supp. 3d at 611 (relying on "the consensus that [the 2016 Working Group's] estimates constitute the best available science about monetizing the impacts of greenhouse gas emissions" to hold that agency's failure to consider global "social cost of methane" was arbitrary and capricious); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1193 (D. Colo. 2014) (holding that the agency failed to justify "not using (or assigning minimal weight to) the social cost of carbon").

[15] *See, e.g.*, *Wyoming v. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1080 (D. Wyo. 2020) ("While the BLM can consider environmental impacts to the public lands . . . , there is nothing in any of the statutes empowering the agency to consider or work to address *global* climate change in the process.").

[16] *See, e.g.*, *Zero Zone*, 832 F.3d at 677 ("Congress intended that [the Department of Energy] have the authority . . . to consider the reduction in SCC."); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (rejecting argument that agency was obligated to consider social cost of carbon).

(citing E.O. 13990 §§ 5(b)(ii), 8; OIRA Guidance, at 2-3). And even in the unlikely event that an agency "tr[ies] to give effect to the Executive Order when to do so is inconsistent with the relevant . . . statute"—despite the text of the Executive Order, and OIRA guidance to the contrary— "an aggrieved party may seek redress through any of the procedures ordinarily available to it," including an APA lawsuit "challenging that specific decision." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (holding that "[t]he mere possibility that some agency might make a legally suspect decision . . . does not justify an injunction" against an executive order).

Plaintiffs similarly overlook that the Executive Order's direction to federal agencies to use the Interim Estimates applies to cost-benefit analyses of "regulations *and other relevant agency actions* until final values are published," but does not define the phrase "other relevant agency actions." E.O. 13990 § 5(b)(ii)(A) (emphasis added). And the Executive Order elsewhere directs the Working Group to provide "*recommendations* to the President, by no later than September 1, 2021, regarding areas of decision making, budgeting, and procurement" to which social-cost estimates "should be applied." *Id.* § 5(b)(ii)(C) (emphasis added). So all of Plaintiffs' assumptions about how the Executive Order will interact with the NEPA process, or with cooperative federalism programs, or in any context other than the issuance of federal regulations, are dependent on future actions and clarification by the Executive Branch. And if Plaintiffs continue to disagree with the Executive Branch's interpretation of the President's orders, any such disagreement will necessarily resolve itself—and may also be subject to challenge—when the courts are able to see how agencies *actually* implement the Executive Order.[17]

A few weeks ago, Judge Autrey dismissed another lawsuit filed by the State of Missouri against the United States, in part because of analogous ripeness problems. There, Missouri brought a lawsuit "challenging 'the threatened unconstitutional application' of section 9901 of the American Rescue

---

[17] Especially before those (non-binding) recommendations are delivered to the President, agencies retain substantial discretion in deciding whether, when, and how to use the Interim Estimates outside the context of rulemaking. The Secretary of the Interior, for example, has already issued guidance stating only that the Working Group's social-cost estimates "can be a useful measure" in some NEPA-related contexts, but not yet *mandating* their use by the agency in any context other than rulemaking. *See* Dep't of the Interior, Sec'y of the Interior Order No. 3399 (April 16, 2021), *available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf.

Plan Act of 2021," a federal statute that allocated "almost $2.8 billion" to Missouri for certain specified pandemic-related uses, but also restricted the State's ability to use those funds to "directly or indirectly offset a reduction in net tax revenue" resulting from changes in state law. *Missouri v. Yellen*, No. 4:21-cv-376 (HEA), ---- F. Supp. 3d ----, 2021 WL 1889867, at *1 (E.D. Mo. May 11, 2021). Missouri feared that the statute would be interpreted so broadly as to violate "Missouri's sovereign power to set its own tax policy," and thus "ask[ed] the Court to enjoin Defendants from enforcing any interpretation . . . that is broader than the narrow interpretation [Missouri] advance[d]." *Id.* at *3-4.

Judge Autrey denied Missouri's motion for a preliminary injunction, and simultaneously dismissed the entire lawsuit for lack of subject-matter jurisdiction, on grounds of standing and ripeness. The court held that Missouri's claims were not ripe, on the theory that "Missouri ask[ed] the Court to determine the scope of the [challenged provision] well in advance of any adverse effect and in a wholly, non-actionable hypothetical context." *Id.* at *5; *see also id.* ("Although Missouri asserts that this action presents the purely legal question of the correct interpretation of the Offset Restriction, it is readily apparent that this case would benefit from further factual development. . . . It is premature for the Court to interfere before Treasury can even promulgate regulations, much less have those regulation affect Missouri 'in a concrete way.'") (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807-08).

Here too, "Missouri's request 'involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)). To the extent that Plaintiffs fear some sort of future agency overreach that will violate the Constitution, the APA, or some other unspecified statute, this Court or some other court can consider those allegations, if and when they arise, in the context of some actual (rather than hypothetical) agency action, and "at a time when harm is more imminent and more certain." *Ohio Forestry Association*, 523 U.S. at 734.

**4.** All of these defects were already apparent from Plaintiffs' amended complaint, but they were highlighted by Plaintiffs' motion for a preliminary injunction. There, Plaintiffs point to a pending proceeding before the Federal Energy Regulatory Commission (FERC), in which FERC "request[ed] comments on whether 'the [Natural Gas Act (NGA)], NEPA, or other federal statute[s] authorize or mandate the use of Social Cost of Carbon (SCC) analysis by [FERC] in its consideration of certificate

34

applications.'" Pls.' Br. 26-27 (quoting Notice of Inquiry, *Certification of New Interstate Natural Gas Facilities*, 86 Fed. Reg. 11,268-72 (Feb. 24, 2021)). FERC also "ask[ed] for comment on how the SCC could be 'used to determine whether a proposed project is required by public convenience and necessity,' because that is the statutory language that Congress requires FERC to meet when certifying a new pipeline." *Id.* at 27. "Plaintiffs took advantage of this process and commented," *id.* at 26 n.7, arguing to the agency that Congress has *not* authorized FERC to consider the global costs of greenhouse gases when applying the "public convenience and necessity" standard in the Natural Gas Act. *See id.* at 2-6. Plaintiffs also criticized the Interim Estimates, leveling many of the same accusations that appear in their filings here. *See id.* at 7-12.

FERC is now considering these comments. But the final outcome is unknown and unknowable, until FERC acts. (That is why a notice of *proposed* rulemaking is never final agency action challengeable under the APA—it is "of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).) Ultimately, perhaps FERC will decide that the "public convenience and necessity" standard in the Natural Gas Act permits consideration of the social costs of greenhouse gases. Or perhaps FERC will be persuaded by Plaintiffs' critique that, as a matter of FERC's statutory authority, "[u]tilizing the SCC or SCM is not authorized under the NGA." Missouri Comment on the Use of Social Cost of Carbon, ECF No. 20-1, at 6. Or perhaps FERC will not take any immediate action at all—a real possibility, given that the previous comment period "closed on July 25, 2018," and FERC "has, to date, not taken any further action in this proceeding." 86 Fed. Reg. at 11,269.

These varying and uncertain possibilities confirm the incoherence of Plaintiffs' approach to this litigation. Unless and until FERC knows how it is going to regulate in this area—or, for that matter, whether FERC is going to regulate at all—it is both practically and legally impossible to litigate the question of whether FERC's future, possible consideration of the social costs of greenhouse gases would violate the Natural Gas Act, the APA, or the Constitution. That problem—which would foreclose any challenge to FERC's preliminary consideration of those questions, *see Bennett*, 520 U.S. at 178—is not cured by purporting to focus *this* lawsuit on the Executive Order.

To make matters worse, federal *district* courts lack jurisdiction over challenges (including constitutional claims) to FERC orders under the Natural Gas Act—those claims are channeled via petitions for review that must be filed directly in the court of appeals, after exhausting administrative remedies. *See* 15 U.S.C. § 717r(b); *N.J. Conservation Found. v. FERC*, 353 F. Supp. 3d 289, 299 (D.N.J. 2018) ("[T]he law is indeed 'well-settled' that the NGA's exclusivity provision has broad reach over challenges brought against FERC, including constitutional claims."). In fact, "all issues inhering in the controversy" of FERC action under the Natural Gas Act must be filed in the court of appeals. *City of Tacoma v. Taxpayers*, 357 U.S. 320, 336 (1958) (interpreting substantively identical provision in the Federal Power Act). Because Plaintiffs could *never* challenge FERC's interpretation of the Natural Gas Act in this (or any other) district court, relying on the possibility of future action by FERC as the basis for jurisdiction here (including for claims against FERC) is particularly inappropriate.

At a higher level of generality, this sort of problem is not limited to FERC. To be sure, most other federal agencies *can* be subject to APA litigation in federal district court. But in any future challenge to a future agency action taken by one or more of the nineteen agency Defendants in this lawsuit, Plaintiffs may have unique claims, and the government may have unique defenses—all of which are likely to vary from case to case, statute to statute, and agency to agency. As one obvious example, some statutes require an agency to consider costs and benefits.[18] Some statutes forbid it.[19] Some leave the matter to agency discretion.[20] Likewise, some statutes specify which factors an agency

---

[18] *See Michigan v. EPA*, 576 U.S. 743, 760 (2015) ("We hold that EPA interpreted § 7412(n)(1)(A) unreasonably when it deemed cost irrelevant to the decision to regulate power plants.").

[19] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) ("The text of § 109(b), interpreted in its statutory and historical context and with appreciation for its importance to the CAA as a whole, unambiguously bars cost considerations from the NAAQS-setting process.").

[20] *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009) ("[I]t was well within the bounds of reasonable interpretation for the EPA to conclude that cost-benefit analysis is not categorically forbidden."); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 509 (1981) ("[C]ost-benefit analysis by OSHA is not required by the statute[.]").

must consider, while others leave that to the agency.[21]   A court's determination of the legality of an agency's reliance on the Interim Estimates will necessarily be informed by the specific statutory directives that Congress has provided to guide the agency's actions.  The Court cannot meaningfully engage with Plaintiffs' arguments *en masse*, divorced from the context of particular agencies operating under specific statutory delegations of authority.

## II.   PLAINTIFFS LACK A CAUSE OF ACTION.

As explained above, the Court lacks subject-matter jurisdiction over any of Plaintiffs' claims.  But Plaintiffs' justiciability problems do not stop there.  Like any plaintiffs, to proceed in federal court, these must identify a cause of action.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).  Plaintiffs' brief largely ignores this requirement.  But as explained below, all of Plaintiffs' claims fail because of their inability to identify any "final agency action," 5 U.S.C. § 704—and, with respect to all Defendants other than the President and the Working Group, any action at all.  And whatever might be said about the President or the Working Group's actions, neither is an "agency" subject to APA litigation.  Nor is there any basis for this Court to imply an equitable cause of action with respect to Plaintiffs' separation-of-powers claim.  Accordingly, even if the Court otherwise had jurisdiction, all of Plaintiffs' claims should be dismissed for the lack of any cause of action.

### A.   Plaintiffs do not challenge any final agency action.[22]

The Administrative Procedure Act "provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'"  *Sackett v. EPA*, 566 U.S. 120, 125 (2012) (quoting 5 U.S.C. § 704).  "Two conditions must be satisfied for an agency action to be 'final':  First, the action must mark the 'consummation of the agency's decisionmaking process.'"  *Sisseton-Wahpeton Oyate of*

---

[21] *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("[I]n reviewing proposed rates for market-dominant products, the [Postal Regulatory] Commission must consider the statutory factors set out in 39 U.S.C. § 3622(c).") (citation omitted).

[22] There appears to be inconsistent authority within the Eighth Circuit as to whether the APA's final-agency-action requirement is jurisdictional.  *Compare, e.g., Batsche v. Price*, 875 F.3d 1176, 1177 (8th Cir. 2017) (jurisdictional); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813-16 (8th Cir. 2006) (jurisdictional), *with Iowa League of Cities v. EPA*, 711 F.3d 844, 863 n.12 (8th Cir. 2013) (not jurisdictional).  In any case, this nuance is academic here: under either Rule 12(b)(1) or Rule 12(b)(6), all of Plaintiffs' claims should be dismissed for the lack of any final agency action.

*Lake Traverse Rsrv. v. U.S. Corps of Engr's*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *Bennett*, 520 U.S. at 177-78). "Second, 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* (quoting *Bennett*, 520 U.S. at 178).

On the first *Bennett v. Spear* requirement, it is hard to say that the Interim Estimates represent the "consummation of the agency's decisionmaking process" in any meaningful sense, 520 U.S. at 177-78, given that they have no significance unless and until they are actually used in some future rulemaking. In a way, they mark only the (potential) *beginning* of dozens of separate regulatory processes, which may eventually culminate in the issuance of regulations that *are* final agency action.

But even setting that aside, Plaintiffs' failure to satisfy the second *Bennett* requirement is particularly clear—which may explain why Plaintiffs included no argument to the contrary in their brief. *See* Pls.' Br. 32-35 (arguing only that the Interim Estimates satisfy the first *Bennett v. Spear* requirement, without addressing the second). In short, the problem for Plaintiffs is that none of their "rights or obligations have been determined"; nor do Plaintiffs face any "legal consequences" from the Executive Order or the Interim Estimates. 520 U.S. at 178 (citation omitted).

Critically, the second *Bennett* prong examines finality "from the regulated parties' perspective," *not* "from the agency's perspective." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018); *see also, e.g.*, *Sackett*, 566 U.S. at 126 ("By reason of the order, *the Sacketts* have the legal obligation to 'restore' their property according to an Agency-approved Restoration Work Plan.") (emphasis added). And here, neither the Executive Order nor the Interim Estimates requires *Plaintiffs* to do anything. To be sure, *agencies* may, at least in some circumstances, be bound by the Executive Order, but that has no "direct and appreciable legal consequences" for anyone outside of the Executive Branch. *Bennett*, 520 U.S. at 178. By contrast, if and when some agency relies upon the Executive Order or the Interim Estimates to justify the issuance of a new, legally-binding regulation, which is applied in a manner that affects *Plaintiffs'* legal rights and obligations in a concrete way, they can sue. But here, all of Plaintiffs' APA claims fail for the lack of any final agency action.[23]

---

[23] Even with respect to Plaintiffs' constitutional claim, the only relevant cause of action and waiver of the government's sovereign immunity comes from the APA. *See* 5 U.S.C. §§ 702, 704. In

At a minimum, whatever can be said about the President or the Working Group, all of the other Defendants should plainly be dismissed for the lack of any "final agency action," 5 U.S.C. § 704—indeed, any "agency action" at all, *id.* § 551(13). Plaintiffs do not allege that any of those Defendants did *anything*—let alone anything that would qualify as a "circumscribed, discrete agency action[]" challengeable under the APA. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-63 (2004). For example, other than the caption and the "Parties" section, there are no references in the amended complaint to the Bureau of Land Management. Accordingly, at a minimum, all Defendants other than the President and the Working Group should be dismissed for lack of any final agency action.

## B.   The APA provides no cause of action to sue the President or the Working Group.

The APA creates a cause of action for persons "aggrieved by agency action." 5 U.S.C. § 702. But this cause of action is not boundless. Among other requirements, a plaintiff may sue under the APA only if he challenges an action that was taken by an "agency," which is a term of art under the APA. 5 U.S.C. § 701(b)(1). As Plaintiffs appear to appreciate, the Supreme Court has squarely held that "the President is not an agency," and so his actions are not subject to APA review. *Franklin*, 505 U.S. at 796; *see also* Pls.' Br. 29-32, 50 (excluding the President from Plaintiffs' request for preliminary relief, and arguing only that the Working Group is an "agency"). So to determine whether Plaintiffs have any APA cause of action that could apply here, the operative inquiry is whether the Working Group is an "agency" within the meaning of the APA.

---

addition, the APA explicitly provides for judicial review of claims that an agency action is "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B). So, as some courts have recognized, the APA's limitations on judicial review (including the final-agency-action requirement) apply equally to Plaintiffs' constitutional claim. *See Soundboard Ass'n*, 888 F.3d 1261, 1274 n.6 (D.C. Cir. 2018) ("We have found no decision of this Court, and no decision of any other circuit court, holding that the presence of constitutional claims eases the Supreme Court's two-part *Bennett* test for final agency action."); *cf. Almaklani v. Trump*, 444 F. Supp. 3d 425, 432-34 (E.D.N.Y. 2020) (collecting cases limiting constitutional claims to APA record-review principles, with rare exceptions). To Defendants' knowledge, the Eighth Circuit has not yet addressed this nuance. This Court similarly need not decide that question here, given that Plaintiffs' constitutional claims independently fail for several other reasons, as explained elsewhere in this brief.

It is not.  In *Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993), the D.C. Circuit explained why a similar Executive Branch entity, President Reagan's Task Force on Regulatory Relief, lacked agency status.[24]  The Task Force, whose members included the Vice President, various department heads, the Director of OMB, and several other White House officials, was directed to oversee the new regulatory review process established by Executive Order 12291.  *Id.* at 1289-90.  Virtually all aspects of that process—including, for example, the preparation of "uniform standards" for agency cost-benefit analysis, and the resolution of "any issues raised" in the process—were "subject to the direction of the Task Force."  E.O. 12291 §§ 2(e)(1), 6(a)(2).

Still, the D.C. Circuit concluded that the Task Force lacked "substantial independent authority," and so did not qualify as an agency.  *Meyer*, 981 F.2d at 1297-98.  For one, the Task Force's "lack of a separate staff" offered a "strong indicator" that the Task Force was not an independent actor distinct from the President.  *Id.* at 1296.  Further, that the President had staffed the Task Force with officials who reported directly to him suggested that the Task Force's members were acting as functional equivalents of assistants to the President, and would not exercise any delegated authority "unless they already knew the President's views."  *Id.* at 1294-95.  Most importantly, though, the Task Force was not authorized to give directions to the Executive Branch independently of the President.  *See, e.g., id.* at 1294 ("When the Task Force wished directions given to the executive branch, it found it necessary to advise the President to put such instructions in another Executive Order.").  Wary of adopting a rule that would create an agency anytime the President convened "a group of cabinet officers and perhaps White House staff in some sort of committee . . . to screen . . . regulatory issues," the D.C. Circuit concluded that the Task Force was not an agency.  *Id.* at 1296.

Other courts have likewise held that an entity established by the President to assist him in his duties—even one that is seemingly powerful—is not an "agency" under the APA.  *See, e.g., Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542 (2d Cir. 2016) (National Security Council not an

---

[24] To be precise, *Meyer* considered the definition of "agency" under the Freedom of Information Act (FOIA).  But its analysis remains instructive here, because FOIA incorporates and expands upon the APA's definition, meaning that "all APA agencies are FOIA agencies, but not vice-versa."  *EPIC v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 107 (D.D.C. 2020).

agency); *CREW v. Off. of Admin.*, 566 F.3d 219 (D.C. Cir. 2009) (White House Office of Administration not an agency). Crucially, such entities lack "statutory grants of authority" and thus what power they have does not "flow from a source *independent* from the President." *Main St. Legal Servs.*, 811 F.3d at 558 (emphasis added); *see also Soucie v. David*, 448 F.2d 1067, 1074 (D.C. Cir. 1971) (finding an APA agency where *Congress* had "delegate[ed] some of its own broad power of inquiry" to the Office of Science and Technology, and so had bestowed on it "substantial independent authority"). Indeed, it is questionable "whether a President can ever be said to have delegated his own authority in a way that renders it truly independent of him" for APA purposes. *Main St. Legal Servs.*, 811 F.3d at 558.

Given these standards, the Working Group is not an agency under the APA. No statute establishes it, nor delegates it any legislative authority. Instead, what authority the Working Group has flows solely and directly from the President, via the Executive Order that created it. Further, like the Task Force in *Meyer*, the Working Group has no dedicated staff, and instead must rely entirely on its members to carry out its mission. Most importantly, the Working Group lacks any substantial authority that is independent from the President himself. *Cf. Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (finding no agency status where a unit of the Executive Office of the President does not "play[] a substantive role apart from that of the President"). Its sole function is to assist the President in his management of the Executive Branch, by implementing an Executive Order that he issued, and in setting SC-GHG estimates that reflect the President's policy priorities—which agencies can use in developing regulations when *already* permitted by some *separate* source of statutory authority. That is a project that (at least as a matter of legal authority) the President could have accomplished alone. It matters not that E.O. 13990 gives the Working Group an important practical role in parts of the regulatory process—the National Security Council and the White House Counsel's Office, for example, also have such powers (or more), but are not "agencies" for APA purposes. *Cf. Main Street Legal Servs.*, 811 F.3d at 562 ("[E]xecutive orders providing for the NSC to formulate or give policy direction . . . do not reach beyond the NSC's advisory coordinating function.").

For these reasons, neither the President nor the Working Group is an "agency" in the meaning of 5 U.S.C. § 701(b)(1). Therefore, at a minimum, all of the APA and statutory claims against the President and the Working Group should be dismissed for the lack of any APA cause of action.[25]

### C. Plaintiffs cannot rely on an implied equitable cause of action for their separation-of-powers claim.

That leaves (at most) Plaintiffs' separation-of-powers claim. In bringing this claim, Plaintiffs obscure whether they assert a cause of action under the APA, *see* 5 U.S.C. § 706(2)(B), or whether they seek to avail themselves of an implied equitable cause of action.[26] It matters not. Even assuming that Plaintiffs are not limited to the APA's cause of action for purposes of their constitutional claim, *but see Soundboard*, 888 F.3d at 1274 n.6, there is no basis to imply an equitable cause of action here.[27]

Because "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," a plaintiff may invoke a court's equitable powers only in "some circumstances" that present a "proper case." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Such a "proper case" has typically involved claims by "potential defendants in legal actions" who seek "to raise in equity a defense available at law," *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014), and where allegedly unconstitutional government

---

[25] Plaintiffs insist that the Executive Order's instruction to federal agencies to use the Interim Estimates makes the Working Group "a standalone entity that can bind other agencies," Pls.' Br. 30, but that argument ignores that the President, not the Working Group, issued the Executive Order, and that it is ultimately only his authority that has the power to bind his subordinates. And it matters not that E.O. 13990 did not set an "expiration date," *id.* at 32, for the Working Group: As President Trump demonstrated with E.O. 13783, the lack of an expiration date is no promise of longevity.

[26] Although the amended complaint also references the Declaratory Judgment Act, Am. Compl. ¶ 60 (citing 28 U.S.C. §§ 2201-2202), it is well-settled that that Act does not supply a freestanding cause of action. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011); *Stenger v. Bi-State Dev. Agency of Missouri/Illinois Metro. Dist.*, No. 14-cv-1655-AGF, 2015 WL 164044, at *3 (E.D. Mo. Jan. 13, 2015), *aff'd*, 808 F.3d 734 (8th Cir. 2015).

[27] To be clear, the Court could simply conclude that Plaintiffs' constitutional claim (like all the others) must be channeled through the APA's cause of action, such that the lack of an APA cause of action is, standing alone, also fatal to their constitutional claim. *Cf. supra* at 38-39 n.23 (citing authority for the proposition that the APA's final-agency-action and record-review requirements also apply to constitutional claims). But the Court need not decide that here, because even if it were ever permissible to sidestep the APA's cause of action by including a constitutional claim, here, Plaintiffs cannot justify the extraordinary step of implying an equitable cause of action.

action threatens a plaintiff's liberty or property, *see e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (suit for injunctive relief to forestall unconstitutional steel mill seizures).

But in circumstances like these—where Congress has already created a comprehensive and generous scheme for remedying constitutional violations by federal agencies (the APA), and where Plaintiffs face no impending injury, yet assert a scattershot claim against huge swaths of the federal government—courts should be reluctant to "imply a cause of action where Congress has not provided one." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001). That is sufficient to deny an equitable cause of action here, as courts "have, in suits against federal officers, refused to supplement [Congress's] scheme with one created by the judiciary." *Seminole Tribe v. Florida*, 517 U.S. 44, 73-74 (1996). Because the APA does not authorize this suit, *see supra* at Sections II.A., II.B., and because the Court should not imply an equitable cause of action here, all of Plaintiffs' claims should be dismissed.

## III.   PLAINTIFFS' CLAIMS ARE MERITLESS.

For all of the reasons above, each of Plaintiffs' claims should be dismissed on threshold grounds. But if the Court goes on to address the substance of Plaintiffs' claims, they are meritless.[28]

### A.   Plaintiffs' statutory claims are meritless.

Count II of the amended complaint asserts a claim for what Plaintiffs have labeled "violation of agency statutes." Am. Compl., at 39. Though the precise nature of this claim is hard to discern, Plaintiffs appear to assert that, by stating that agencies "shall use" the Interim Estimates when monetizing the costs and benefits of greenhouse gas emissions, the President has usurped certain (largely unidentified) agencies' statutory authority to conduct cost-benefit analyses, or has otherwise instructed those agencies to violate (largely unspecified) federal statutes.

---

[28] Because review of the *substance* of the Interim Estimates would ordinarily be on the basis of an administrative record, Defendants' motion to dismiss Plaintiffs' substantive APA arbitrary-and-capricious claim (Count IV) is limited to the matters of jurisdiction and justiciability set forth above (which would be dispositive of the entire case). Defendants of course believe that the rationality of the Interim Estimates is clear (particularly in light of the expertise applied to create them, and the deferential standard of review), but will reserve that argument for summary judgment should it prove to be necessary. For the reasons below, however, all of Plaintiffs' other claims (*i.e.*, Counts I, II, and III) can be dismissed now, for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6)—even if the Court rejects all of Defendants' threshold arguments of jurisdiction and justiciability.

The government of course does not dispute that Article I of the Constitution grants Congress the legislative power and that, pursuant to this authority, Congress may require, permit, or forbid federal agencies to prepare (and rely on) cost-benefit analyses when issuing rules. And it would be unlawful for the President to require agencies to ignore lawful statutory boundaries set by Congress.

Despite that common ground, one need only read the Executive Order to confirm that the key premise of Plaintiffs' statutory claim is mistaken. Whatever requirements E.O. 13990 imposes, or how broadly they might otherwise be read, the text of the Executive Order renders those requirements inoperative whenever they conflict with a federal statute: "Nothing in this order shall be construed to impair or otherwise affect the authority granted by law to an executive department or agency." E.O. 13990 § 8(a)(i). Moreover, although none of these provisions are cited (let alone explained) in Plaintiffs' filings, the Executive Order provides that it "shall be implemented in a manner consistent with applicable law," *id.* § 8(b), and the operative section at issue in this case also makes clear that the Working Group's actions (including creation of the Interim Estimates) may only be implemented "as appropriate and consistent with applicable law." *Id.* § 5(b)(ii). And recent OIRA guidance puts the matter beyond any doubt, confirming that, where applicable, "statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas emissions." OIRA Guidance, at 2. Thus, the President has not exercised, nor has he conferred, "any power to prevent an agency from carrying out its legal duty." *Meyer*, 981 F.2d at 1290. Instead, like many other executive orders before it, E.O. 13990 "recognizes that agencies face various statutory obligations, and it does not—and could not—purport to override those obligations." *California v. Trump*, 2020 WL 1643858, at *3. There has been no "violation of agency statutes" here, Am. Compl. at 39, and there never will be.

### B.   Plaintiffs' constitutional claims are meritless.

Plaintiffs also bring a separation-of-powers claim (Count I), arguing that E.O. 13990 impermissibly intrudes upon Congress's legislative powers by setting presidential policy and requiring agencies to use the Interim Estimates. Pls.' Br. 13-28. Plaintiffs argue that "no constitutional provision or statute authorize[d]" the President to issue E.O. 13990, rendering its directive to use the Interim Estimates unlawful. Pls.' Br. 14. And given Plaintiffs' narrow conception of the President's

policymaking role, they perceive the President's order to the Working Group to develop and publish the Interim Estimates as exceeding the President's constitutional authority, and as requiring judgment calls that must always be left to Congress. *Id.* at 18. Further, because Congress has, on occasion, "already told agencies what costs to consider" in rulemakings and has not expressly authorized consideration of the social costs of greenhouse gases, they argue that the President now lacks constitutional authority to direct agencies to do so. *Id.* at 27. All of these arguments fail.

For one, Plaintiffs' arguments are misdirected. The only legal authority at issue in this case that might actually affect Plaintiffs is that of federal agencies exercising the authority delegated to them by Congress. Consistent with longstanding principles of delegation, Congress must provide some "intelligible principle" to guide an agency's implementation of a statute. *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 476 (2001). Yet Congress may (and often does) delegate broad power to agencies, including requiring them to "make judgments of degree," *id.*, and to fill in statutory gaps "in reasonable fashion," *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). It is possible, then, that an agency may rely on the Interim Estimates to inform its judgment in exercising its congressionally delegated authority. But no agency can or will do so where a statute *prohibits* the use of the Interim Estimates, or where Congress has not otherwise authorized the agency to act. And nothing in the Executive Order requires (or permits) any other result. *See* E.O. 13990 § 8(a)(i). That is sufficient to dispense with Plaintiffs' constitutional claim, because any future agency action that actually affects Plaintiffs must be (and will be) justified by reference to specific congressional authorization, on an agency-by-agency, statute-by-statute, rule-by-rule basis.

In any event, even on their own terms, Plaintiffs' constitutional arguments miss the mark, because, in fact, Article II of the Constitution provides ample authority for the President to instruct agencies to use the Interim Estimates when otherwise permitted by law. Pursuant to his duty to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3, the President has "general administrative control of those executing the laws," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); *see also* Art II, § 1

("The executive Power shall be vested in a President").[29]   Courts have long understood this authority extends to oversight of agency rulemakings. *See Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981).

The D.C. Circuit's decision in *Allbaugh* is instructive.   There, President George W. Bush had issued E.O. 13202, which provided that, to the extent permitted by law, no federal agency that received federal assistance for a construction project could require bidders or contractors to enter into certain labor agreements. *See Allbaugh*, 295 F.3d at 29.   The district court held, relying on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), that the President could not impose such conditions without express authorization from Congress. *See Allbaugh*, 295 F.3d at 31.   Finding no such authorization for President Bush's order, the district court enjoined several agencies from complying with it. *See id.*

The D.C. Circuit reversed, holding that the district court had misconstrued the scope of the President's Article II authority.   The district court's reliance on *Youngstown* was inapt, the D.C. Circuit explained, because the question there was "whether the President had constitutional authority to seize the mills"—not "whether he could direct Executive Branch officials in their implementation of statutory authority." *Id.* at 33.   As to the latter question, the answer was yes: while the President is not a "lawmaker," "[h]is faithful execution of the laws enacted by the Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates." *Id.* at 32. Moreover, our constitutional structure requires that those subordinates be "duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law." *Id.*

It is clear, then, that pursuant to the Take Care Clause, the President may establish general principles for agencies to follow in rulemaking, such as cost-benefit principles, *see* E.O. 12866 § 1(b), as well as mechanisms to effectuate those principles, such as a centralized regulatory review process and accompanying quality controls.   Unsurprisingly then, specifically in the context of cost-benefit analysis, every President since Nixon has exercised some form of this authority. *See supra* at 3.

---

[29] The Opinions Clause would also suffice: it authorizes the President to "require [an] Opinion, in writing," from his officers on "any Subject" relating to "the duties of their . . . offices." U.S. Const. art. II, § 2, cl. 1.   Requiring agencies to report to the President (through OIRA and OMB) on the expected costs and benefits of their proposed rules falls squarely within this explicit grant of constitutional authority.

President Biden's instruction for agencies to use the Interim Estimates when monetizing the effects of greenhouse gas emissions falls comfortably within this constitutional tradition.

Nor should the Court be concerned that E.O. 13990 aggrandizes the President's power at the expense of Congress. Indeed, as demonstrated by years of litigation concerning the Appointments Clause and restrictions on the President's removal authority, a far more common separation-of-powers allegation is that the President has not exercised *enough* supervision and control over administrative agencies. *See, e.g.*, *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020) (in our constitutional scheme "individual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President"). Plaintiffs' apparent surprise that the President—who, unlike agency staff, is directly accountable to the People through elections—would take formal steps to operationalize his role as the head of the Executive Branch is difficult to square with our constitutional structure. Because it violates the Constitution for agency officials to be *insufficiently* supervised and directed by a politically accountable President, *see, e.g.*, *Free Enter. Fund*, 561 U.S. at 492, it is hard to see why Plaintiffs believe it "tears at the fabric of liberty," Am. Compl. ¶ 5, for the President to supervise and direct the work of his unelected subordinates.

To that end, were this Court to endorse Plaintiffs' theory, it would suggest that a wide swath of Presidential actions to supervise the Executive Branch were unconstitutional. *See, e.g.*, E.O. 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993) (requiring agency cost-benefit analysis); E.O. 11246 § 202, *Equal Employment Opportunity*, 30 Fed. Reg. 12319 (Sept. 24, 1965) (requiring government contracts to impose certain non-discrimination requirements on contractors).

Finally, though Plaintiffs argue (correctly) that developing the Interim Estimates involved difficult scientific, economic, and mathematic judgment calls, *see, e.g.*, Am. Compl. ¶ 108, they are wrong to imply that setting numeric values or exercising policy and analytic judgment is the dividing line between Executive and Legislative power. In fact, when it comes to delegated authority, "[i]t is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework." *Yakus*,

321 U.S. at 424. "The Constitution . . . does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations." *Id.*

In sum, there is nothing constitutionally problematic (or even unusual) about the Executive Order. That is presumably why, in litigation in Louisiana that also targets E.O. 13990, another group of state plaintiffs has not raised any separation-of-powers claim. *See* Compl., ECF No. 1, *Louisiana v. Biden*, No. 2:21-cv-1074 (W.D. La.). Plaintiffs' constitutional claim should be dismissed.

### C.   Plaintiffs' notice-and-comment claims are meritless.

Plaintiffs also argue that the Working Group violated the APA by failing to subject the Interim Estimates to formal notice-and-comment (Count III). That claim also fails—both because there was no notice-and-comment obligation here, and because, even if there were, any error was harmless.

**1.** At the outset, for all the reasons stated above, *see supra* at Section II.B., the Working Group is not an "agency" within the meaning of the APA, and so the notice-and-comment requirements of 5 U.S.C. § 553 are simply inapplicable. But, even setting that (and all of Defendants' other threshold arguments) to the side, Plaintiffs' notice-and-comment claim still fails on the merits.

Plaintiffs predicate their notice-and-comment claim on a belief that the Interim Estimates are a legislative rule, but the hallmark of a legislative rule is the imposition of "new rights or duties." *Nw. Nat'l Bank v. U.S. Dep't of the Treasury*, 917 F.2d 1111, 1117 (8th Cir. 1990). But the Interim Estimates have no binding effect outside of the Executive Branch. Accordingly, if the Working Group were subject to the APA at all, the Interim Estimates would at most be considered "general statements of policy," 5 U.S.C. § 553(b)(A), which do not establish binding legal norms, *see Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974), but merely memorialize for the agency and the public how an agency intends to exercise *future* agency discretion, *see Nat'l Mining Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1372 (11th Cir. 2009). That is all the Interim Estimates do: they "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted); *see also Gonnella v. SEC*, 954 F.3d 536, 546 (2d Cir. 2020) (general statements of policy "impact agency behavior rather than change the existing rights of others outside the agency") (internal quotation marks omitted).

48

In any case, the Interim Estimates *will* be subject to notice and comment—it will just come when (if ever) agencies rely on them to issue binding rules.  Indeed, contrary to Plaintiffs' claim that they have been deprived of "the opportunity to participate in notice-and-comment rulemaking—or to provide input of any kind—regarding the adoption of the Interim Values," Am. Compl. ¶ 191, Plaintiffs have already provided comments to FERC, *see supra* at Section I.B.4, and they will have the opportunity to do so yet again if and when other agencies propose rules that rely on the Interim Estimates.  *See* OIRA Guidance, at 2 ("[W]here required by the [APA], the agency must make its benefit-cost analysis (including any use of the interim estimates and methodological choices made with respect to the interim estimates, as well the agency's rationale for those choices) available for public notice and comment.").  Thus, before it actually matters, Plaintiffs may provide additional input.

**2.**  In any event, even assuming that the latest iteration of the Interim Estimates were required to go through notice-and-comment before publication in February 2021, Plaintiffs' claim still fails under the APA's harmless-error rule, because they cannot show prejudice—primarily, because all of the objections they now advance were long ago considered and rejected.  The APA explicitly instructs courts to take "due account . . . of the rule of prejudicial error."  5 U.S.C. § 706.  "The burden to demonstrate prejudicial error is on the party challenging agency action."  *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010).  Plaintiffs cannot meet that burden here.

The Working Group's estimates and methodology have been subjected to more than a decade of peer review, public comment, and iterative improvement.  *See, e.g.*, EPA & NHTSA, *Proposed Rulemaking To Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 74 Fed. Reg. 49454, 49612 (Sept. 28, 2009).  Following those public-comment periods, and after the Working Group had adopted official SC-CO$_2$ estimates, those estimates and methodologies were again repeatedly subject to further notice-and-comment as part of many individual agency rulemakings—resulting in judicial opinions endorsing the Working Group's process and upholding agency use of their social-cost estimates.  *See, e.g.*, *Zero Zone*, 832 F.3d at 654.  And the Interim Estimates currently in effect are identical (save indexing for inflation) to the prior SC-GHG estimates that were subjected to specific and repeated forms of public comment from 2013-2016.  *See,*

*e.g.*, *Response to Comments*, at 4; EPA, *Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles*, 81 Fed. Reg. 73478 (Dec. 27, 2016).

Given that history, what matters is that over the past decade, all of the methodological critiques that Plaintiffs (and their declarant, *see* Dayaratana Declaration, ECF No. 19) now raise—most of them foundational in nature, going to the very enterprise of estimating future, social costs of emissions— have been aired and addressed by the Working Group (and multiple agencies) more than once. *See, e.g.*, *Response to Comments*, at 25 (addressing commenters' concerns with the averaging of SC-CO$_2$ estimates); *id.* at 20-25 (addressing comments about the selection of discount rates); *id.* at 30-32 (addressing comments about the consideration of domestic and global costs); EPA, *Fuel Efficiency Standards*, 81 Fed. Reg. at 73876-79.  And even if that were not enough, before agencies rely on the latest iteration of the Interim Estimates to promulgate final rules, Plaintiffs will have yet more opportunities to comment.  Accordingly, Plaintiffs cannot show any prejudice.[30]  *Cf. United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) ("[W]hen a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced.").  So even "[i]f this is an error, it is not one warranting reversal." *St. Louis Univ. v. Duncan*, 97 F. Supp. 3d 1106 (E.D. Mo. 2015).

> **D.** **Any remaining claims against the Defendants other than the President or the Working Group should be dismissed for failure to state a claim.**

Even if all other grounds for dismissal were rejected, the Court should still dismiss all claims against all Defendants other than the President and the Working Group under Rule 12(b)(6)—for the simple reason that Plaintiffs included no allegations of wrongdoing specific to those Defendants.

---

[30] *Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018), is not to the contrary.  There, because the FCC had never proposed doing what it ultimately did—the complete deregulation of transport services—the Eighth Circuit found that the rulemaking "did not allow for informed participation by interested parties in that portion of the rulemaking." *Id.* at 1005.  And this lack of notice was not rendered harmless by the early release of a draft final order that provided for complete deregulation just three weeks before adopting the final order, nor by the possibility that the relevant issues had already been addressed in the course of the rulemaking. *See id.* at 1005–06.  Here, by contrast, for more than a decade, the Working Group and agencies have repeatedly provided the public with notice of and an opportunity to comment on the SC-GHG estimates and their supporting methodology.

## IV.    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), which should only be granted when "the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted).   "[T]he Court must consider the following four factors: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the harm that granting the injunction will inflict on other parties; (3) the probability that movant will prevail on the merits; and (4) the public interest."   *Frank v. City of St. Louis*, 458 F. Supp. 3d 1090, 1092 (E.D. Mo. 2020) (citing *Dataphase Sys., Inc. v. C L Sys.*, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).   In practice, the second and fourth factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), into consideration of the public interest.

For all the reasons above, Plaintiffs' motion for a preliminary injunction can be denied because Plaintiffs are not likely to succeed on the merits.   The Court could also grant Defendants' motion to dismiss, and then deny Plaintiffs' motion for a preliminary injunction as moot.   *See Missouri v. Yellen*, 2021 WL 1889867.   But even if the Court does go on to consider the remaining preliminary-injunction factors, Plaintiffs have not carried their burden—and certainly, not "by a clear showing," *Mazurek*, 520 U.S. at 972—to show that they are entitled to this "extraordinary remedy," *Winter*, 555 U.S. at 24.

### A.     Plaintiffs cannot show imminent, irreparable harm.

**1.**   Plaintiffs cannot show any imminent harm that would be remedied by issuance of a preliminary injunction.   As they did in the context of standing, Plaintiffs again point to their involvement in cooperative-federalism programs, the possibility of future increases in energy costs, Defendants' alleged violations of the APA and the Constitution, and so on.   Pls.' Br. 37-48.   But as discussed above, none of those alleged harms are in fact (1) imminent, (2) traceable to the Executive Order and the Interim Estimates (rather than future agency regulations), or (3) redressable by a favorable decision.   *See generally supra* at Section I.A.

**2.** Setting aside the question of whether Plaintiffs have pointed to any *imminent* harm, to obtain a preliminary injunction, Plaintiffs must also show that such harm would be *irreparable*—that is, harm

that could not be recompensed at the end of the ligation, and thus justifies extraordinary, time-sensitive relief before final judgment. *See Dataphase*, 640 F.2d at 113. Other than a few conclusory statements, Plaintiffs do not even try. Most importantly, they do not identify any *particular* agency action that will result in irreparable harm. That is reason enough to deny their motion. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.").

In truth, as opposed to an effort to prevent irreparable harm, Plaintiffs' motion instead reads as a request to have this Court decide their case *faster*—based on harms that fail even to satisfy Article III requirements for injury in fact (let alone the extraordinary remedy of a preliminary injunction). For example, Plaintiffs rely on procedural harms from their alleged inability to comment. *See* Pls.' Br. 37-38. But even if procedural harm alone could be an Article III injury, *but see supra* at 29 (citing *Spokeo*, 136 S. Ct. at 1549; *Summers*, 555 U.S. at 496), that harm is not *irreparable*. The remedy— that is, conducting the required procedure—would be fully available at final judgment. In any case, there is not even a factual basis for Plaintiffs' concern: they *have* commented on the potential use of the Interim Estimates by FERC, *see* Pls.' Br. 38, just as they can in other future rulemakings.

Plaintiffs' scattered references to substantive harms fare no better. As discussed above, the Executive Order does not mandate *state* officials to take any action. *See supra* at Section I.A.4.c. And even if it did, Plaintiffs provide no authority for the idea that, for example, time spent by state officials drafting an environmental impact statement constitutes irreparable harm. *See* Pls.' Br. 40-42. And if Plaintiffs fear future rules that might, for example, affect prices of certain products, they can do what regulated parties routinely do if actually injured by agency action—challenge that particular action (with an accompanying motion for a preliminary injunction, if truly necessary). *Cf. Watkins*, 346 F.3d at 844 ("When there is an adequate remedy at law, a preliminary injunction is not appropriate.").

As an example, Plaintiffs argue that they "are major consumers of energy and many other regulated goods whose costs will necessarily increase under the increased regulation mandated by the Executive Order and Interim Values." Pls.' Br. 42. Setting aside the fact that *no regulations whatsoever* are "mandated by the Executive Order and Interim Values," *id.*, if and when some regulation is actually

issued that threatens to cause Plaintiffs some imminent, concrete, and particularized harm, Plaintiffs can challenge it then. But the fact that Plaintiffs must continue to rely on purely hypothetical, potential future regulations as the source of their allegedly "imminent" and "irreparable" harm underscores how inappropriate it would be to exercise jurisdiction here at all—let alone to grant the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.

### B.     The public interest would be disserved by a preliminary injunction.

The public interest weighs heavily against a preliminary injunction. As explained above, *supra* at Section III.B., the President's leadership is an essential source of democratic accountability within the Executive Branch. Indeed, it is presidential leadership that "enhances transparency, enabling the public to comprehend more accurately the sources and nature of bureaucratic power," and "establishes an electoral link between the public and the bureaucracy, increasing the latter's responsiveness to the former." Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2331-32 (2001). Thus, it will rarely be in the public interest for a court—especially in preliminary proceedings—to enjoin the Executive Branch from allowing the President to guide agency action according to his assessment of the public interest. *See Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008) (where "responsible public officials . . . have already considered [the public] interest," the court's authority to substitute its own policy judgment is "constrained").

Moreover, across four presidential administrations, agencies have considered the social costs of greenhouse gas emissions—sometimes, as required by court orders. *See Ctr. for Biological Diversity*, 538 F.3d at 1198. In that time, the methodologies behind what are now the Interim Estimates have only grown more sophisticated and mature, and the need for them has only increased. A court-ordered halt would pull the rug out from under the Working Group and federal agencies, raising questions about whether and how they could rely upon the most robust and up-to-date scientific methodology available. To set agencies adrift on this issue—while "the United States and the world face a climate crisis," E.O. 13990 § 6(d)—would disserve the public interest.

To that end, a preliminary injunction could do unjustified harm to the stature of the United States as an international leader on climate issues. As the President has declared, "[w]e have a narrow

moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of [the climate] crisis," meaning that "[d]omestic action must go hand in hand with United States international leadership, aimed at significantly enhancing global action."   E.O. 14008 prmbl., 86 Fed. Reg. 7619, 7619 (Jan. 27, 2021).   One component of American leadership on this issue has been the Working Group, which has served as a model for other governments seeking to contribute to the global effort to stabilize our climate.   GAO, *Social Cost of Carbon: Identifying a Federal Entity to Address the Nat'l Academies' Recommendations Could Strengthen Regulatory Analysis*, at 61-64 (June 2020) (describing Canada's use of the Working Group's estimates).   If the Court were to undermine the Interim Estimates now, just as the President works to spur further global action, *see* The White House, *Fact Sheet: President Biden's Leaders Summit on Climate* (Apr. 23, 2021), *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/23/fact-sheet-president-bidens-leaders-summit-on-climate,   it could do a grave disservice to the American public and the world.

### C.   Any relief should be limited to declaring the Interim Estimates non-binding.

"[A] preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs."   *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015).   And here, that means that, even if the Court fully adopted all of Plaintiffs' legal theories, the most that this Court should order is what Plaintiffs requested in the conclusion of their brief: "that the Court preliminarily enjoin all defendants, except for the President, from using the [Interim Estimates] as *binding* values in any agency action."   Pls.' Br. 50 (emphasis added).   That is, at most, the Court should declare the Interim Estimates to be non-binding on agencies.   Although Plaintiffs are not even entitled to that relief, it would be enough to resolve all of their legal objections, while preserving agency discretion to use the best available science as they see fit—precisely what Plaintiffs say they want.[31]

On the subject of Plaintiffs' requested relief, one additional point warrants mention.   In their motion for a preliminary injunction, Plaintiffs took the unusual step of requesting a ruling by a date

---

[31] At times, Plaintiffs have hinted at an interest in broader relief.   *See* Am. Compl., Prayer for Relief, ¶ i; Pls.' Mot. for Prelim. Injunction, ECF No. 17, at 1.   But Plaintiffs have never explained why any additional relief would be necessary or appropriate if the Court were to grant the relief they are requesting now—that is, an order that the Interim Estimates be considered non-binding.

certain. Although Defendants defer fully to the Court's preferences regarding the timing of a decision, Plaintiffs have failed to justify this extraordinary request. Indeed, it is not clear where Plaintiffs' proposed date (August 23) came from, or why Plaintiffs believe a ruling by that date is necessary. Moreover, Plaintiffs' request gives the Court only 33 days from the close of the parties' agreed-upon briefing schedule—even though Plaintiffs waited 47 days to file this lawsuit after the Executive Order was issued, and then delayed an additional 53 days before seeking a preliminary injunction. Plaintiffs have offered no explanation for these delays, much less a justification for why the Court should show greater urgency than Plaintiffs have. *See Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) ("[D]elay alone may justify the denial of a preliminary injunction when the delay is inexplainable in light of a plaintiff's knowledge of the conduct of the defendant.").

## CONCLUSION

For these reasons, all of Plaintiffs' claims should be dismissed, and Plaintiffs' motion for a preliminary injunction should be denied.

Dated: June 4, 2021                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Acting Assistant Attorney General

                                       SAYLER A. FLEMING
                                       United States Attorney

                                       ERIC WOMACK
                                       Assistant Branch Director
                                       Federal Programs Branch

                                       /s/   Stephen M. Pezzi
                                       STEPHEN M. PEZZI, #84311 (VA)
                                       CODY T. KNAPP, #5715438 (NY)
                                       Trial Attorneys
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street NW
                                       Washington, DC 20005
                                       Phone: (202) 305-8576
                                       Email: stephen.pezzi@usdoj.gov
                                       Email: cody.t.knapp@usdoj.gov

                                       *Attorneys for Defendants*