UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00287-AGF |
| | ) | |
| JOSEPH R. BIDEN, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

The State of Missouri and 12 other states[1] brought this suit against President
Joseph R. Biden, Jr. and several other executive branch departments and officials,
challenging the President's Executive Order 13990 ("EO 13990"), which, in relevant part,
establishes an Interagency Working Group on the Social Cost of Greenhouse Gases (the
"Working Group") and directs the Working Group to publish interim—and, by January of
2022, final—values for the "social costs" of greenhouse gas emissions.  The Executive
Order further provides that agencies "shall use [the Interim Estimates] when monetizing
the value of changes in greenhouse gas emissions resulting from regulations and other
relevant agency actions until final values are published."  86 Fed. Reg. 7037.

The matter is now before the Court on two motions: (1) Plaintiffs' motion (ECF
No. 17) for a "preliminary injunction prohibiting Defendants (excluding the President)
from using the social cost of greenhouse gases promulgated in the February 26, 2021

---

[1]     These are the States of Alaska, Arizona, Arkansas, Indiana, Kansas, Montana,
Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, and Utah.

Technical Support Document, [ECF No. 6-2], in any rule making or federal action where there is a statutory command to consider costs or costs are permitted by statute until this case is resolved on appeal"[2] (ECF No. 17 at 1); and (2) Defendants' motion (ECF No. 27) to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim.

The Court heard oral argument on both motions on August 25, 2021.  Upon review of the entire record and for the reasons set forth below, the Court concludes that Plaintiffs lack standing and that their claims are not ripe for adjudication.  Therefore, the Court will grant Defendants' motion to dismiss for lack of subject matter jurisdiction and will dismiss Plaintiffs' motion as moot.

## **BACKGROUND**

On January 20, 2021, President Biden issued EO 13990, titled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis."  86 Fed. Reg. 7037.  Section 5 of this Order, titled "Accounting for the Benefits of Reducing Climate Pollution," provides in full:

> (a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), "social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse

---

[2]      In their supporting brief, Plaintiffs narrow their request, asking only to "preliminarily enjoin all defendants, except for the President, from using the social cost of greenhouse gases promulgated in the February 26, 2021 Technical Support Document as binding values in any agency action."  ECF No. 18 at 59.

gas emissions. They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

(b) There is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"). The Chair of the Council of Economic Advisers, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group.

(i) Membership. The Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council.

(ii) Mission and Work. The Working Group shall, as appropriate and consistent with applicable law:

(A) publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(B) publish a final SCC, SCN, and SCM by no later than January 2022;

(C) provide recommendations to the President, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied;

3

(D) provide recommendations, by no later than June 1, 2022, regarding a process for reviewing, and, as appropriate, updating, the SCC, SCN, and SCM to ensure that these costs are based on the best available economics and science; and

(E) provide recommendations, to be published with the final SCC, SCN, and SCM under subparagraph (A) if feasible, and in any event by no later than June 1, 2022, to revise methodologies for calculating the SCC, SCN, and SCM, to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

(iii) Methodology. In carrying out its activities, the Working Group shall consider the recommendations of the National Academies of Science, Engineering, and Medicine as reported in Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SCC, SCN, and SCM reflect the interests of future generations in avoiding threats posed by climate change.

86 Fed. Reg. 7040-41.

**Interim Estimates**

On February 26, 2021, the Working Group issued a document entitled "Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990" ("Interim Estimates"). These Interim Estimates are purportedly identical to prior estimates developed by another interagency working group under President Barack Obama in 2016, except that they have been adjusted for inflation. *See* ECF No. 6-2, Working Group, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under E.O. 13990* (Feb. 2021), *also available at*

4

https://www.whitehouse.gov/wp-

content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethan

eNitrousOxide.pdf.

Plaintiffs argue that the Interim Estimates are faulty for a number of reasons,

including that the underlying factual inputs and modeling assumptions are

arbitrary and lack a reasonable basis.[3]  Plaintiffs rely on a sworn declaration of

Kevin D. Dayaratna, a statistician and data scientist at the Heritage Foundation's

Center for Data Analysis, in support of their assertions.  Because EO 13990

provides that federal agencies "shall" use the Interim Estimates "when monetizing

the value of changes in greenhouse gas emissions resulting from regulations and

other relevant agency actions until final values are published," 86 Fed. Reg. 7040,

Plaintiffs assert that the Interim Estimates "will inevitably be used to justify

increased regulation and restrictions in innumerable areas, affecting virtually every

aspect of daily life."  ECF No. 18 at 19.

In support of this argument, Plaintiffs cite an academic review in 2017, which

identified "at least eighty-three separate regulatory or planning proceedings conducted by

six different federal agencies [that] have used the SCC or SCM in their analyses" through

---

[3]      For example, Plaintiffs describe in detail why the "discount rate" applied by the
Working Group in developing the Interim Estimates was faulty.  The discount rate is a
"percentage factor designed to calculate the net present value of the future anticipated
damages from a marginal increase in emissions of a particular gas."  ECF No. 18 at 17.
According to Plaintiffs, the discount rates applied by the Working Group were too low,
resulting in exaggerated "social costs" of the corresponding greenhouse gases. *See id.*

mid-2016.  Am. Compl., ECF No. 6 at ¶¶  160-61.  These included agency actions related to energy, transportation, and agriculture, among other areas, and regulations of everything from ozone standards to household appliances.  *Id.*

## Complaint

Plaintiffs filed suit on March 8, 2021.  In their amended complaint, filed on March 26, 2021, they assert four causes of action: (1) "Violation of the Separation of Powers," (2) "Violation of Agency Statutes,"[4] (3) "Procedural Violation of the Administrative Procedure Act (APA)," and (4) "Substantive Violation of the APA." Plaintiffs seek declaratory and injunctive relief.

## Post-Complaint Notice and Guidance from the Executive Office

On May 7, 2021, the Office of Management and Budget ("OMB") published a notice in the Federal Register, inviting public comments "on the [Interim Estimates] as well as on how best to incorporate the latest peer-reviewed science and economics literature in order to develop an updated set of SC-GHG estimates." OMB, *Notice of Availability and Request for Comment on ''Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under E.O. 13990"*, 86 Fed. Reg. 24669, 24669 (May 7, 2021).  Comments were due by June 21, 2021. *Id.*

On June 3, 2021, the Office of Information and Regulatory Affairs ("OIRA")

---

[4]     Specifically, Plaintiffs assert that "Section 5 of EO 13990 and the Working Group's Interim Estimates violate the statutes that confer authority on various federal agencies to conduct cost-benefit analyses in regulatory actions that involve emissions of carbon dioxide, methane, and/or nitrous oxide."  ECF No. 6 at ¶ 204.

issued a "Frequently Asked Questions" document related to the Interim Estimates. *See*
ECF No. 28-4, OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked
Questions (FAQs)*, (June 3, 2021), *also available at* https://www.whitehouse.gov/wp-
content/uploads/2021/06/Social-Cost-of-Greenhouse-Gas-Emissions.pdf.  The document
states that agencies should follow EO 13990's requirement to use the Interim Estimates
"as they follow other requirements for preparing E.O. 12866 benefit-cost analysis."[5]  *Id.*
at 1.  The document further states that "[d]irectives issued in executive orders and OIRA
guidance are always made subject to applicable law. . . . When an agency conducts
benefit-cost analysis pursuant to specific statutory authorities, those authorities must
control the agency's development and use of the analysis in taking an agency action the
issue."  *Id.* at 2.

## Motion to Dismiss

Defendants move to dismiss Plaintiffs' amended complaint for lack of subject
matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and,
alternatively, for failure to state a claim pursuant to Rule 12(b)(6).  Defendants assert that
Plaintiffs lack standing to pursue their claims because their allegations of injury all stem
from hypothetical future regulations that they speculate may be issued in reliance on the

---

[5]      EO 12866, issued by President Bill Clinton, directs agencies to follow certain
principles, including assessing costs and benefits of available regulatory alternatives and
selecting approaches that maximize net benefits, "unless a statute requires another
regulatory approach."  Exec. Order No. 12866, *Regulatory Planning and Review*, 58 Fed.
Reg. 51735 § 1(a) (Sept. 30, 1993).  It also establishes a regulatory-review process to be
coordinated by OMB and OIRA.  *Id.*

Interim Estimates.  Defendants further maintain that Plaintiffs' alleged injuries are not redressable by a favorable decision in this lawsuit because, even without EO 13990 or the Interim Estimates, agencies may consider the social costs of greenhouse gases and may arrive at the same—or, from Plaintiffs' perspective, worse—regulations either in light of those costs or in light of the myriad other factors considered by agencies in the rulemaking process.[6]

Regarding Plaintiffs' additional allegations of harm to their sovereign interests or to their ability to participate in the notice-and-comment rulemaking, Defendants contend that these, too, are neither concrete nor particularized enough to demonstrate Article III standing.

For similar reasons, Defendants argue that Plaintiffs' claims are not ripe.  Rather, according to Defendants, "[i]f an agency one day relies on the Interim Estimates to justify some action that actually causes Plaintiffs a concrete injury, they can challenge that specific agency action (including its use of the Interim Estimates) at that time."  ECF No. 28 at 43.

In any event, Defendants argue that Plaintiffs' claims are meritless.  As to Count One, Defendants maintain that there is no basis to imply an equitable cause of action arising from an alleged violation of separation of powers.  If there were, Defendants

---

[6]     Defendants argue that a separate redressability problem arises because Plaintiffs' request for relief would necessarily require the Court to enjoin the President's exercise of his official duties, which the Court cannot do.  Thus, at a minimum, Defendants ask that the Court dismiss President Biden as a Defendant.

contend that the claim would fail here because EO 13990 is well within the President's Article II authority and is consistent with the longstanding presidential practice of requiring cost-benefit analyses. Defendants note that that, since the Ninth Circuit's decision in *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (9th Cir. 2008),[7] federal agencies have specifically employed estimates of the social cost of greenhouse gases prepared by interagency working groups in connection with related cost-benefit analyses.[8]

Regarding Count Two, Defendants contend that no violation of agency statutes could occur because EO 13990 expressly defers to any conflicting federal statute.

As to Plaintiffs' claims under the APA (Counts Three and Four), Defendants maintain that Plaintiffs have not identified a final agency action from which judicial

---

[7]   In *Center for Biological Diversity*, the Ninth Circuit held that an agency's failure to monetize the benefits of greenhouse gas emissions reduction as part of its cost-benefit-analysis before issuing a rule setting fuel economy standards was arbitrary and capricious. 538 F.3d at 1200 (noting that "while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero").

[8]   In 2017, President Donald J. Trump issued EO 13783, which disbanded the Working Group and withdrew its prior analyses as "no longer representative of the administration's policy." Exec. Order 13783 § 5(b), Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16093 (Mar. 28, 2017). However, President Trump further ordered that "when monetizing the value of changes in greenhouse gas emissions resulting from regulations, including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in [the Office of Management and Budget] Circular A-4." *Id*. § 5(c). According to Defendants, federal agencies under President Trump continued to estimate the social cost of greenhouse gases in their cost-benefit analysis, albeit applying different models to calculate those costs, such as a higher discount rate.

review may be sought; that neither the President nor the Working Group is an agency subject to suit under the APA; and that even if the Interim Estimates were subject to notice-and-comment requirements under the APA, Plaintiffs' claim would still fail under the APA's harmless-error rule.

## Motion for Preliminary Injunction

Plaintiffs oppose Defendants' motion to dismiss and affirmatively move to "preliminarily enjoin all defendants, except for the President, from using the social cost of greenhouse gases promulgated in the [Interim Estimates] as binding values in any agency action." ECF No. 18 at 59. Plaintiffs assert that the Court "may decide to remand for the Interim [Estimates] to proceed through notice-and-comment or invalidate them as arbitrary and capricious." ECF No. 35 at 25. Plaintiffs also request a prompt ruling "[d]ue to the finality of any rules being promulgated now and the impending issuance of new social costs of greenhouse gases in January 2022." ECF No. 17 at 1.

In response to Defendants' assertions regarding standing and ripeness, Plaintiffs argue that there is nothing hypothetical about how agencies will use the Interim Estimates. According to Plaintiffs, EO 13990 mandates that federal agencies adopt the Interim Estimates in future rulemaking, regardless of Plaintiffs' objections thereto and without any public input. Plaintiffs contend that their injuries are not speculative because the Interim Estimates are designed to and "will inevitably be used to justify increased regulatory costs in foundational sectors of the American economy, including energy, agriculture, and manufacturing." ECF No. 35 at 9.

Plaintiffs maintain that if they wait to challenge the Interim Estimates until future regulations based on those numbers are issued—either in the notice-and-comment phase or through judicial review—their objections "will be disregarded" and "will receive no meaningful consideration."  ECF No. 35 at 9, 11.   Plaintiffs likewise maintain that their claims are ripe because the Interim Estimates are a "a self-executing regulation" that will result in immediate injuries to Plaintiffs in the form of "federal regulations using the Interim Values that will encroach on Plaintiff States' authority in areas subject to traditional state regulation."  ECF No. 35 at 27.

Next, Plaintiffs argue that all four factors relevant to the preliminary injunction analysis favor them.  Plaintiffs argue that they are likely to succeed on the merits of Count One (Violation of the Separation of Powers) and Count Three (Procedural Violation of the APA) of their amended complaint.[9]  Regarding Count One, Plaintiffs argue that "dictating binding values for the social cost of greenhouse gases for use in federal programs is a quintessentially legislative power that lies exclusively with Congress."  ECF No. 18 at 22.  Thus, Plaintiffs contend that Section 5 of EO 13990 is not a valid exercise of executive power but an exercise of legislative power that requires statutory authority.

---

[9]     Although Plaintiffs' motion for preliminary injunction does not address the merits of Counts Two and Four, Plaintiffs discuss these counts in their opposition to Defendants' motion to dismiss.  There, Plaintiffs assert that Count Two plausibly alleges that the Working Group is acting *ultra vires*, or without statutory authority, and that Count Four plausibly alleges that the Working Group is an agency and the issuance of the Interim Estimates a final agency action.

11

Regarding Count Three, Plaintiffs argue that the Working Group is an agency under the APA; that the binding nature of the Interim Estimates render them a final agency action and a substantive rule under the APA; and that the Working Group violated the APA's procedural requirements when it promulgated the Interim Estimates without providing notice to the public and an opportunity to comment.

Plaintiffs further assert that, absent a preliminary injunction, they will suffer irreparable injury in the form of: (i) deprivation of their ability to file comments objecting to the Interim Estimates, (ii) deprivation of their ability to participate meaningfully in future federal agency proceedings, because the Interim Estimates will be essentially shielded from further review; (iii) injury to their sovereign interests in administering "cooperative-federalism programs,"[10] because EO 13990 effectively mandates Plaintiffs to employ the Interim Estimates in administering such programs; (iv) injury to Plaintiffs' proprietary interests, because the cost of energy and other regulatory goods that Plaintiffs consume will "necessarily increase under the increased regulation mandated by [EO 13990] and the Interim Estimates" (ECF No. 18 at 51); and (v) the federalism-based injury inherent in any violation of the separation of powers.

Finally, Plaintiffs assert that a preliminary injunction that restores the status quo will impose no cognizable harm on Defendants and will serve the public interest by promoting democratic accountability.

---

[10]    As one example of a cooperative-federalism program, Plaintiffs cite the permitting of new stationary sources under the Clean Air Act.

12

In response, Defendants argue that the Court cannot reach Plaintiffs' motion because the Court lacks subject matter jurisdiction.  In any event, Defendants maintain that Plaintiffs would not be entitled to a preliminary injunction because their claims are meritless, they cannot show any imminent or irreparable harm, and an injunction would not serve the public interest.[11]

## **DISCUSSION**

## **Standing**

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "To establish Article III standing, plaintiffs must show (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision will likely redress the injury."  *Animal Legal Def. Fund v. Vaught*, No. 20-1538, 2021 WL 3482998, at *1 (8th Cir. Aug. 9, 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)).  These requirements assure that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal citations omitted).

---

[11]    In addition to the parties' briefs, the Court has received amicus curiae briefs in support of Plaintiffs' motion for preliminary injunction on behalf of the Texas Public Policy Foundation (ECF No. 26) and the Committee for a Constructive Tomorrow (ECF No. 33).

"The plaintiffs bear the burden of establishing these elements, and must support each element in the same way as any other matter on which they bear the burden of proof." *Vaught*, 2021 WL 3482998, at *1 (citing *Lujan*, 504 U.S. at 561). "On a motion to dismiss, therefore, the plaintiffs must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing." *Vaught*, 2021 WL 3482998, at *1. "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *In re Polaris Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 20-2518, 2021 WL 3612758, at *2 (8th Cir. Aug. 16, 2021) (citation omitted).

Injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 856, 136 S. Ct. 1540, 1548, *as revised* (May 24, 2016) (quoting *Lujan,* 504 U.S. at 560)). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist" in reality, rather than in the abstract." *Spokeo*, 136 S. Ct. at1548. "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.*

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original and citations omitted). "[A]llegations of *possible* future injury are not sufficient." *Id.* (emphasis in original).

14

"For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Agred Found. v. U.S. Army Corps of Eng'g*, 3 F.4th 1069, 1073 (8th Cir. 2021) (citation omitted). This "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm. That connection cannot be overly attenuated." *Id.*

"[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562. "To satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (citing *Dep't of Commerce* v. *New York*, 139 S. Ct. 2551, 2566 (2019)).

Redressability, the third element of standing, requires plaintiff to show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. In assessing redressability, the court must "consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021).

Plaintiffs have failed to establish any of these three elements.

Injury in Fact

Plaintiffs ask the Court to assume that at some point in the future, one or more agencies will "inevitably" issue one or more regulations that rely in some way upon the

Interim Estimates; that such agency will "inevitably" disregard any objections to the methodology by which the Interim Estimates were calculated; and that this yet-to-be-identified regulation will then harm Plaintiffs in a concrete and particularized way.  This "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending."  *See Clapper*, 568 U.S. at 410.

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) is instructive.  There, the Supreme Court held that environmental organizations lacked standing to challenge regulations that exempted a salvage sale of timber on the ground that they failed to demonstrate injury in fact.  In so reasoning, the Supreme Court explained that the regulations at issue "neither require[d] nor forb[ade] any action on the part of the [organizations]" but instead merely prescribed "standards and procedures" that governed "the conduct of Forest Service officials engaged in project planning." 555 U.S. at 493; *see also Clapper*, 568 U.S. at 401 (holding that the respondents' theory that there was "an objectively reasonable likelihood that their communications will be acquired under [challenged statute permitting electronic surveillance] at some point in the future [was] . . . too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending'").

Likewise here, EO 13990 neither requires nor forbids any action on the part of Plaintiffs but instead merely prescribes standards and procedures governing the conduct of federal agencies engaged in rulemaking and other agency actions when monetizing the

16

value of changes in greenhouse gas emissions.  In such cases, standing is "substantially more difficult to establish."  *Lujan*, 504 U.S. at 562.

Plaintiffs argue that cases like *Summers* and *Clapper* do not apply "because instead of merely authorizing the injury, . . . the Executive Order mandates the Interim [Estimates]."[12]  ECF No. 35 at 21.  But Interim Estimates, alone, do not injure Plaintiffs. *Cf. City of Kennett, Mo. v. Env't Prot. Agency*, 887 F.3d 424, 431–32 (8th Cir. 2018) (holding that a city had standing to challenge a "total maximum daily load" standard for pollutants in a particular ditch where the standard directly injured the city in the form of compliance costs).  The injury that Plaintiffs fear is from hypothetical future regulation possibly derived from these Estimates.  That injury is not concrete and therefore insufficient for standing.  *See Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 13 (D.C. Cir. 2011) (rejecting theory of standing based on only the "*possibility* of [harmful] regulation" by federal agency) (emphasis in original).

---

[12]     Plaintiffs also argue that "*Summers* merely stands for the unremarkable proposition that a plaintiff lacks an injury to challenge procedural regulations after settling the substantive claim causing the injury."  ECF No. 35 at 16.  The environmental organizations in *Summers* challenged Forest Service regulations in general and as they applied to a particular project (the Burnt Ridge project).  *See Summers*, 555 U.S. at 490-91.  The Supreme Court noted that the organizations would have established standing with respect to the Burnt Ridge project, but by the time the case reached the Supreme Court, the parties had settled their dispute over that project.  *Id.* at 494.  Thus, the only challenge remaining was a challenge to "the regulation in the abstract . . . , apart from any concrete application that threaten[ed] imminent harm to [the organizations'] interests." *Id.*  That procedural challenge in the abstract is the one that Plaintiffs here raise.  And the Supreme Court was clear that plaintiffs lack standing to pursue such a challenge in the absence of concrete, imminent harm.  *Id.*  The Court observed that, to hold otherwise, "would fly in the face of Article III's injury-in-fact requirement."  *Id.*

Causation and Redressability

For similar reasons, Plaintiffs have failed to establish causation or redressability. In light of the inherently speculative nature of Plaintiffs' alleged harm, it is unknowable in advance whether that harm caused by possible future regulations would have any causal connection to EO 13990 or the Interim Estimates.  The causal chain, supported by a number of bare assumptions, is too weak for standing.

It is true, as Plaintiffs assert, that, "Article III requires no more than *de facto* causality," which may be satisfied by showing "the predictable effect of Government action on the decisions of third parties."  *Dep't of Commerce*, 139 S. Ct. at 2566.  But the actions of the third parties here are far from predictable.

In support of their argument otherwise, Plaintiffs rely heavily on *Bennett v. Spear*, 520 U.S. 154 (1997), in which the Supreme Court held that a group of ranchers and irrigation districts had standing to challenge a Fish and Wildlife Service biological opinion that had the effect of requiring minimum water levels in particular reservoirs. The government in that case conceded that, although the biological opinion purported to be "advisory," the relevant "statutory scheme presuppose[d] that the biological opinion [would] play a central role in the action agency's decisionmaking process," such that the opinion "alter[ed] the legal regime to which the agency [was] subject" and had a "*virtually determinative effect*" on the agency's resulting water level restrictions.  *Id.* at 169-70 (emphasis added).  In other words, the biological opinion prescribed a particular action (imposition of water level restrictions) which the agency was required to take or

18

face significant consequences, and that particular action posed imminent injury to petitioners in the form of reduced irrigation water.  *See id.* at 170-71.  The Supreme Court thus concluded the petitioners' injury was fairly traceable to the biological opinion.  *Id.* at 171.

Unlike the biological opinion in *Bennett*, neither EO 13990 nor the Interim Estimates mandate agencies issue the particular regulations that Plaintiffs fear will harm them.  As noted above, the mandate in EO 13990 on which Plaintiffs focus is limited to one of innumerable other factors in the cost-benefit analysis conducted by a wide range of agencies in an even wider range of regulatory contexts, and only to the extent consistent with applicable law.  It is implausible to suggest that the Interim Estimates alters the legal regime to which agencies are subject.

Indeed, when asked at oral argument to explain how exactly the Interim Estimates would apply in future agency actions, Plaintiffs could not.  Because they do not yet know.  Neither does this Court.  There is simply no way to predict how the Interim Estimates will affect an agency's analysis, if at all, without resorting to sheer speculation.

For similar reasons, Plaintiffs fail to demonstrate redressability.  Redressability may be shown "where a favorable decision avoids, or at least delays, a regulatory burden."  *City of Kennett*, 887 F.33d at 432 (citations omitted).  Plaintiffs' requested relief in this case would do neither.  Even if the Court were to declare the Interim Estimates non-binding, agencies would be free to—and may be required to, *see Center for Biological Diversity*, 538 F.3d at 1200—consider the social costs of greenhouse gas

19

emissions.  And agencies may arrive at the same or even more costly regulations at the same speed or even more quickly than Plaintiffs currently predict.

In short, Plaintiffs are attempting to do what the Supreme Court cautioned against in *Lujan*, 497 U.S. 871.  "Instead of attacking the separate [rules or regulations] allegedly causing them harm, [Plaintiffs] chose to challenge a more generalized level of Government action."  504 U.S. at 568.   "This programmatic approach has obvious practical advantages, but also obvious difficulties insofar as proof of causation or redressability is concerned" and is "rarely if ever appropriate for federal-court adjudication."  *Id.*   Rather, a "case-by-case approach . . . [while] understandably frustrating" to Plaintiffs, "is the traditional, and remains the normal, mode of operation of the courts."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

Relaxed Requirements for Procedural Injuries or for State Plaintiffs

Plaintiffs argue that the standing requirements are somewhat relaxed in this case for two reasons: (1) because they have suffered a "procedural injury" in that they have been denied the ability to file comments on the Interim Estimates, and (2) because states in general are "entitled to special solicitude in the Court's standing analysis," *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). Both arguments are without merit.

The Supreme Court has made clear that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*— is insufficient to create Article III standing."  *Summers*, 555 U.S. at 496; *see also Spokeo*, 136 S. Ct. at 1549 ("[A plaintiff] could not, for example, allege a bare procedural

20

violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement

of Article III."). Put simply, an allegation of "'procedural' standing to challenge the . . .

failure to provide notice and an opportunity to submit comments pursuant to the APA" is

destined to fail where "no imminent injury in fact has been alleged." *Nat'l Ass'n of Home*

*Builders v. E.P.A.*, 667 F.3d 6, 15–16 (D.C. Cir. 2011); *see also Summers*, 555 U.S. at

497 ("Unlike redressability, . . . the requirement of injury in fact is a hard floor of Article

III jurisdiction that cannot be removed by statute."). As explained above, Plaintiffs have

not alleged imminent injury in fact. Therefore, they lack standing.

Neither are Article III's requirements excused merely because a state sues in its

sovereign capacity. In *Massachusetts v. EPA*, a group of states sued the EPA, alleging

that the agency's failure to regulate greenhouse gas emissions violated the Clean Air Act

and caused them injury in the form of harm to their states' environments. *Massachusetts*,

549 U.S. at 504. The Supreme Court held that because one of the plaintiff states,

Massachusetts, "own[ed] a substantial portion of the state's coastal property, . . . it ha[d]

alleged a particularized injury in its capacity as a landowner." *Id.* at 522. In so holding,

the Court rejected the EPA's argument that, because the harm from climate change is

"widely shared," it is the sort of "generalized harm" that is insufficient to establish

Article III jurisdiction. *Id.* at 516-23. Rather, the Court held that "States are not normal

litigants for the purposes of invoking federal jurisdiction," because of their unique "desire

to preserve [their] sovereign territory." *Id.* at 518-19. As such, the Court accorded

Massachusetts "special solicitude in [the] standing analysis." *Id.* at 520.

21

"Lower courts have lamented the 'lack of guidance on how they are to apply the special solicitude doctrine to standing questions.'"[13]  *California v. Trump*, No. CV 19-960 (RDM), 2020 WL 1643858, at *6 (D.D.C. Apr. 2, 2020) (quoting *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1238 (10th Cir. 2012)).  But whatever the exact meaning, it is at least clear that "[t]his special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury."  *Wyoming*, 674 F.3d at 1238 (emphasis in original).

Massachusetts established such a concrete and particularized injury to its coastal property.  *See Massachusetts*, 549 U.S. at 522.  Plaintiffs here have not.  Their injuries are merely speculative, which is insufficient for standing.  *See California*, 2020 WL 1643858, at *7 ("[T]he special-solitude and procedural-injury doctrines do not—and cannot—alter the irreducible constitutional minimum of standing reflected in the elements of injury in fact, causation, and redressability.").

---

[13]    The Fifth Circuit recently described the doctrine has having "two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests."  *State v. Biden*, No. 21-10806, 2021 WL 3674780, at *5 (5th Cir. Aug. 19, 2021).  Like the Supreme Court in *Massachusetts v. EPA*, the Fifth Circuit in *Biden* found that at least one state litigant (Texas) had shown actual and imminent injuries that directly flowed from—and could be redressed by enjoining—the agency's immigration-related action in that case. 2021 WL 3674780, at *4.  But to "remove any lingering doubt" as to redressability, the Fifth Circuit noted that the special solicitude doctrine made this prong of standing "easier to establish for certain state litigants than for other litigants."  2021 WL 3674780, at *6. Here, even giving Plaintiffs the benefit of doubt that the solicitude doctrine may afford, Plaintiffs cannot establish redressability or any of the other Article III requirements.

**Ripeness**

Besides standing, Plaintiffs face another, closely related jurisdictional barrier. Their claims are not ripe.  "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08, (2003).  "The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention." *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (citation omitted).  The doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

"Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.*  "Both of these factors are weighed on a sliding scale, but each must be satisfied to at least a minimal degree." *City of Kennett*, 887 F.3d at 432.  "Absent a statutory provision providing for immediate judicial review, a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the . . . APA . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action

23

applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

Plaintiffs' claims are not ripe for judicial review because any impact of EO 13990 and the Interim Estimates cannot "be said to be felt immediately" by Plaintiffs (if at all) "in conducting their day-to-day affairs," and because "no irremediably adverse consequences flow[] from requiring a later challenge." *See id.* at 810 (citation omitted); *see also State v. Yellen*, No. 4:21CV376 HEA, 2021 WL 1889867, at *5 (E.D. Mo. May 11, 2021) (dismissing Missouri's challenge to the American Rescue Plan Act on both standing and ripeness grounds where "Missouri asked the Court to determine the scope of the ARPA's Offset Restriction well in advance of any adverse effect and in a wholly, non-actionable hypothetical context").

In *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 72 (1998), the Supreme Court held that a challenge to a Forest Service plan alleging excess logging was not ripe for judicial review because "[a]lthough the Plan set[] logging goals, select[ed] the areas of the forest that [were] suited to timber production, . . . and determine[d] which probable methods of timber harvest [were] appropriate, . . . it [did] not itself authorize the cutting of any trees." 523 U.S. at 729.  Before the logging could take place, the Forest Service  had to "(a) propose a specific area in which logging will take place and the harvesting methods to be used . . . ; (b) ensure that the project is consistent with the Plan . . . ; (c) provide those affected by proposed logging notice and an opportunity to be heard . . . ; (d) conduct an environmental analysis . . . ; and (e) subsequently make a

final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court . . . ." *Id.* at 729-30.

Likewise here, there is "considerable legal distance" between the adoption of the Interim Estimates and the moment—if one occurs—when a harmful regulation is issued. *See id.* at 730. Withholding the Court's consideration at present will not cause Plaintiffs significant hardship. The time or expense of having to pursue numerous challenges to each allegedly harmful regulation, rather than cutting the regulatory process off prematurely, is not the type of harm sufficient to justify immediate review. *See id.* at 734-35 (holding that the fact that it would "be easier, and certainly cheaper, to mount one legal challenge against the Plan now, than to pursue many challenges to each site-specific logging decision to which the Plan might eventually lead [is not] . . . sufficient by itself to justify review in a case that would otherwise be unripe").

The Court does not mean to disregard Plaintiffs' fears of future economic harm. But Plaintiffs will have ample opportunity to bring legal challenges to particular regulations if those regulations pose imminent, concrete, and particularized injury. For example, in *Zero Zone, Inc. v. United States Department of Energy*, the Seventh Circuit considered a challenge to a Department of Energy (DOE) regulation of the type Plaintiffs here fear—namely, a rule establishing new energy efficiency standards for commercial refrigeration equipment. That rule was developed after the agency conducted a cost-benefit analysis that considered, among other factors, "an estimate of the monetized

damages associated with an incremental increase in carbon emissions in a given year,

known as the Social Cost of Carbon ('SCC')."  832 F.3d 654, 677 (7th Cir. 2016).

The petitioners contended that the relevant statutory authority did not permit the

DOE to consider environmental factors and that the DOE's analysis of the SCC was itself

arbitrary and capricious.  *Id.* at 677.  Like the Plaintiffs here, the petitioners contended

that the calculation of the SCC was "irredeemably flawed" for a number of reasons and

that the DOE acted arbitrarily by accounting for indirect global benefits to the

environment while ignoring indirect costs such as the effects on displaced workers.  *Id.* at

678.  The Seventh Circuit considered the petitioners' arguments and held that the DOE

adequately responded to the petitioners' concerns during its notice-and-comment period

and that the DOE's analysis was not arbitrary or capricious.  *Id.*

In other words, the petitioners in *Zero Zone*, like many others with similar

concerns,[14] had a full and fair opportunity to address their objections to the SCC through

the normal review process under the APA—first, before the agency itself and later,

through judicial review.  So, too, would Plaintiffs here.[15]  Plaintiffs' speculation that their

---

[14]     Indeed, as Defendants note, several courts have considered challenges to specific
agency actions on the theory that an agency inappropriately accounted for the social costs
of greenhouse gases.  *See, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1203; *Wyoming
v. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1080 (D. Wyo. 2020).

[15]     Plaintiffs suggest—cautiously, so as not to foreclose anticipated future lawsuits—
that the Supreme Court's decision in *Dep't of Homeland Sec. v. Regents of the Univ. of
Cal.*, 140 S. Ct. 1891, 1910 (2020) "cast doubt" on the notion that Plaintiffs could
challenge the Interim Estimates as part of a later complaint regarding agency action.  *See*
ECF No. 35 at 10.  *Regents* involved a challenge to the Department of Homeland
Security's (DHS) recission of the Deferred Action for Childhood Arrivals (DACA)

objections will be "disregarded" or "receive no meaningful consideration" (ECF No. 35, at 9, 11) is just that; it is not supported by well-pled facts.

In fact, the evidence suggests the opposite. In their motion for a preliminary injunction, Plaintiffs describe a recent proceeding before the Federal Energy Regulatory Commission (FERC), in which FERC "request[ed] comments on whether 'the [Natural Gas Act], [National Environmental Policy Act], or other federal statute[s] authorize[d] or mandate[d] the use of Social Cost of Carbon (SCC) analysis by [FERC] in its consideration of certificate applications.'" ECF No. 18 at 35 (quoting Notice of Inquiry, Certification of New Interstate Natural Gas Facilities, 86 Fed. Reg. 11,268-72 (Feb. 24, 2021)). FERC also "ask[ed] for comment on how the SCC could be 'used to determine whether a proposed project is required by public convenience and necessity,' because that is the statutory language that Congress requires FERC to meet when certifying a new pipeline." *Id*. at 26.

---

program. 140 S. Ct. at 1891. In rescinding DACA, DHS acted on the Attorney General's advice. *Id.* The Court noted that the Immigration and Nationality Act (INA) bound DHS to the Attorney General's legal conclusions and, therefore, raised the question of whether a suit challenging DHS's decision was the "proper vehicle" for attacking the Attorney General's underlying legal conclusions. *Id.* at 1910. But because the parties had not addressed that question in their briefs, the Court did not resolve it. *Id.* In other words, *Regents* did not involve an executive order at all, raised a question involving a unique provision of the INA not relevant here, and, in any event, did not answer the question. *Regents* is thus inapposite. Plaintiffs have not cited, and the Court has not found, any legal authority that would preclude Plaintiffs from challenging the Interim Estimates as part of a later challenge to agency action. To the contrary, such claims are regularly heard by federal courts. *E.g.*, *Zero Zone*, 832 F.3d at 677.

Plaintiffs state that they "took advantage of this process and commented."[16]  *Id.* at

35 n.7; *see also* ECF No. 35 at 16 n.1 (noting that their comments "explain[ed] that the

Interim Values are arbitrary, outdated, and the process lacks transparency").  Plaintiffs

have not suggested that FERC disregarded their comments.  But if that happens, and if

FERC then takes some action that harms Plaintiffs in a concrete and particularized way,

Plaintiffs may seek relief in the appropriate court, after exhausting any applicable

administrative remedies and complying with any applicable statutory authority.[17]   *See,*

*e.g.*, 15 U.S.C. § 717r(b) (setting forth the procedures for seeking review of FERC orders

under the Natural Gas Act);  *N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*,

353 F. Supp. 3d 289, 295 (D.N.J. 2018) ("[T]he courts of appeals have exclusive

jurisdiction to review all matters inhering in natural gas pipelines certificate proceedings

before FERC.").

In short, the Court agrees with Defendants' assessment:

> A court's determination of the legality of an agency's reliance on the Interim
> Estimates will necessarily be informed by the specific statutory directives
> that Congress has provided to guide the agency's actions.  The Court cannot
> meaningfully engage with Plaintiffs' arguments *en masse*, divorced from the
> context of particular agencies operating under specific statutory delegations
> of authority.

---

[16]    At oral argument, Plaintiffs also described a newly proposed EPA rule regarding
emissions standards for light duty vehicles that allegedly relies on the Interim Estimates.
Plaintiffs stated that they intended to participate in the notice-and-comment proceedings
with respect to this rule and, if appropriate, seek judicial relief in the proper forum.

[17]    As Defendants correctly note, the fact that governing statutes may vest jurisdiction
to challenge particular regulations or orders exclusively in certain courts, such as the
federal courts of appeal, makes premature review by this Court particularly inappropriate.

ECF No. 28 at 50.  That is to say, "further factual development would significantly advance [the court's] ability to deal with the legal issues presented and would aid . . . in their resolution."  *Ohio Forestry Ass'n*, 523 U.S. at 737.

For all of these reasons, the Court will grant Defendants' motion to dismiss for lack of subject matter jurisdiction.   Doing so properly responds to the separation-of-powers concerns raised by Plaintiffs by respecting the limits of judicial power.

**Remaining Motions and Arguments**

Because the Court lacks jurisdiction, it must dismiss this lawsuit without prejudice and without reaching the merits of Plaintiffs' claims or Plaintiffs' motion for preliminary injunction.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion to dismiss for lack of subject matter jurisdiction is **GRANTED**. ECF No. 27.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for a preliminary injunction is **DISMISSED as moot**.  ECF No. 17.

A separate Order of Dismissal will accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of August, 2021.

29